# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| YAH KAI WORLD WIDE ENTERPRISES, INC., *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 11-cv-2174 (KBJ) |
| GEOFFERY NAPPER, | ) ) | |
| Defendant. | ) ) ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This lawsuit arises from a dispute between members of the African Hebrew Israelite community (the "Community") and Geoffrey Napper ("Napper" or "Defendant"), one of the Community's former members, regarding the ownership and control of a business located in Capitol Heights, Maryland; the business in dispute is presently named Everlasting Life Restaurant & Lounge. "Everlasting Life" is a phrase that has special significance to the members of the Community, who claim to be descendants of biblical Israelites and who follow a strict vegan diet. Thus, when the Community undertook to open a food-service establishment to support their members' dietary needs, the name Everlasting Life—which was eventually trademarked by one of the group's leaders, Immanuel Ben Yehuda ("Prince Immanuel")—was selected to be the official moniker. The Community appointed Napper to manage its first Everlasting Life restaurant and grocery store, which was a cooperative in the District of Columbia, and Napper was also tapped to manage the expansive Everlasting Life Health Complex

that the Community later opened in Maryland.  When the Community subsequently

decided to replace Napper as manager of the Complex and to form a corporate entity

named Yah Kai World Wide Enterprises ("Yah Kai") to run that facility, Napper

seemed to accept that management decision and continued his involvement with certain,

limited aspects of the Complex's business operations—right up until the point at which

he forcibly evicted Prince Immanuel, Yah Kai, and other Community members from the

premises, took over the facility and all of its equipment, and began operating that

Everlasting Life establishment as his own.

Before this Court at present is the complaint that Prince Immanuel and Yah Kai

("Plaintiffs") have brought against Napper under the Lanham Act, 15 U.S.C. §§ 1051–

1129, and Maryland common law.  (*See* Compl., ECF No. 1.)[1]  Last year, this Court

conducted a three-day bench trial, during which five witnesses testified regarding the

facts underlying Plaintiffs' various trademark infringement and unfair business

practices claims and Napper's defenses.  The Court subsequently received and reviewed

proposed findings of fact and conclusions of law from the parties, and it has now

carefully examined the myriad legal tenets that the parties contend squarely apply to the

established facts of this case.  As explained in the Findings of Fact and Conclusions of

Law set forth below, this Court has determined that Plaintiffs have sustained their

burden of proof with respect to the complaint's two Lanham Act claims (trademark

---

[1] Community member William Young ("Young") was also a plaintiff in this case when the complaint
was filed, but his claims against Napper were dismissed with prejudice upon his death.  (*See* Order,
ECF No. 57, at 2 (affording Plaintiffs an opportunity to move the Court to substitute an appropriate
party for Young, and noting that failure to do so within the prescribed time and manner would result in
the dismissal of his claims).)  Young's deposition testimony was taken on March 6, 2014, prior to his
death (*see* Young Dep., March 6, 2014); this testimony was admitted at trial as evidence for the Court's
determination of liability with respect to all counts (*see* July 16, 2015 Trial Tr. at 9:7–10:9; see also
Young Dep., Def.'s Ex. 2).

infringement, and unfair competition/false designation of origin), and also two of the claims that Plaintiffs have brought under Maryland common law (unfair competition, and conversion). However, the elements of Plaintiffs' claim for usurpation of corporate opportunity have not been established as a matter of law, given the lack of any fiduciary duty between Napper and Plaintiffs during the relevant period. Accordingly, **JUDGMENT WILL BE ENTERED IN PLAINTIFFS' FAVOR** as to liability with respect to Counts I, II, III, and VI of the complaint, and **JUDGMENT WILL BE ENTERED IN DEFENDANT'S FAVOR** with respect to Count IV. A separate order consistent with the Court's findings and conclusions will follow.

## I.      PROCEDURAL BACKGROUND

Plaintiffs filed the instant lawsuit on December 8, 2011; the complaint has six counts, only five of which proceeded to trial. Counts I and II—which were brought under Sections 32 and 43(a) of the Lanham Act, respectively—claim that Napper's operation of the Everlasting Life Restaurant & Lounge infringes upon Prince Immanuel's registered trademark (*see id*. ¶¶ 32–39 (Count I)), and that Napper has engaged in federal unfair competition and false designation of origin (*see id*. ¶¶ 40–45 (Count II)). Counts III through VI allege various violations of Maryland common law; specifically, Plaintiffs maintain that Napper has engaged in unfair competition (*see id*. ¶¶ 46–49 (Count III)), has usurped Yah Kai's corporate opportunity (*see id*. ¶¶ 50–54 (Count IV)), has breached a fiduciary duty of loyalty he owed to Yah Kai and the Community (*see id*. ¶¶ 55–59 (Count V)), and has converted Yah Kai's tangible property (*see id*. ¶¶ 60–64 (Count VI)).

On November 12, 2013, this Court held a status conference with respect to this matter, during which it denied Napper's first motion for summary judgment on the grounds that the evidentiary record was significantly underdeveloped due to the parties' failure to engage in robust discovery. (*See* Order, ECF No. 33, at 1; *see also* Def.'s Mot. for Summ. J., ECF No. 24.) The Court directed the parties to undertake an extended period of discovery and also referred the matter to mediation. (*See* Order, ECF No. 33, at 1–2.) On July 17, 2014, after discovery was complete and mediation was unsuccessful, Napper filed a second motion for summary judgment. (*See* Def.'s 2d Mot. for Summ. J, ECF No. 43.) The Court denied this motion on the grounds that genuine issues of material fact existed regarding ownership of the restaurant at issue (*see* Minute Order of Feb. 11, 2015); the parties then proceeded to prepare for trial.

The Court held a final pre-trial conference on this matter on July 10, 2015. During that conference, the Court dismissed Plaintiffs' breach of fiduciary duty claim (*see* Compl. ¶¶ 55–59 (Count V)) as legally unfounded under Maryland law and duplicative of the usurpation of corporate opportunity claim. (*See* Order, ECF No. 57, at 2.) Furthermore, during this same pre-trial conference, the parties waived their right to a jury trial on the issue of liability with respect to the remaining counts of the complaint, but reserved their right to a jury trial on the issue of damages. (*See id*. at 1.) Accordingly, the Court bifurcated the previously scheduled jury trial and proceeded to hold a bench trial regarding Defendant's liability, expressly noting that, if needed, a separate jury trial would be held thereafter to determine any damages. (*See id*. at 1–2.)

The bench trial in this matter took place over three days between July 14, 2015, and July 16, 2015. Plaintiffs called five witnesses, including Prince Immanuel and Dr.

Cheryl Lee Butler ("Dr. Lee"), who is a member of the Community and a corporate designee of Yah Kai. The Court also heard the testimony of Carol Allen ("Allen"), the leasing administrator for Kingdom Management, and Darrel Edwards ("Edwards"), Yah Kai's accountant. Napper was called to the stand by Plaintiffs to testify as an adverse witness; however, Napper's counsel did not call any witnesses in Napper's case-in-chief.

After the bench trial concluded, the parties submitted proposed findings of fact in table format and in three iterations, in accordance with this Court's bench-trial practices. (*See* Order, ECF No. 61 (explaining Proposed Findings of Fact Table).) Plaintiffs went first, laying out their proposed findings of fact with citations to the record (*see* Proposed Findings of Fact, ECF No. 62 ("1st FOF Tbl.")), and in the second iteration of the table, Defendant noted any disputes regarding Plaintiffs' listed facts and added his own proposed findings (*see* Proposed Findings of Fact, ECF No. 63 ("2d FOF Tbl.")). Plaintiffs responded to Defendant's representations in the third iteration of the table. (*See* Proposed Findings of Fact, ECF No. 64 ("3d FOF Tbl.")).[2] In addition, both parties submitted proposed conclusions of law. (*See* Pls.' Proposed Concls. of Law ("Pls.' COL"), ECF No. 66; Def.'s Proposed Concls. of Law ("Def.'s COL"), ECF No. 68.)

---

[2] The third Findings of Fact Table represents the entire corpus of the findings that the parties have proposed to the Court, and this iteration of the table is the document that is cited in the instant Memorandum Opinion. Citations to specific material in that table will reference the row number or numbers in which the material is located, followed by the relevant column or columns, which are designated "A" "B" and "C". Thus, a pincite to "3d FOF Tbl. at 38–40 (A)" corresponds to the information at lines 38 through 40 under Column A.

## II.    LEGAL STANDARD

"In an action tried on the facts without a jury . . . the court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). "In setting forth the findings of fact, the court need not address every factual contention and argumentative detail raised by the parties, [n]or discuss all evidence presented at trial." *Moore v. Hartman*, 102 F. Supp. 3d 35, 65 (D.D.C. 2015) (internal quotation marks and citations omitted). Instead, "'the judge need only make brief, definite, pertinent findings and conclusions upon the contested matters[]'" in a manner that is "sufficient to allow the appellate court to conduct a meaningful review." *Wise v. United States*, No. 12-01636, 2015 WL 7274026, at *2 (D.D.C. Nov. 17, 2015) (quoting Fed. R. Civ. P. 52(a) advisory committee's note to 1946 amendment); *see also Lyles v. United States*, 759 F.2d 941, 943 (D.C. Cir. 1985) ("One of [Rule 52(a)'s] chief purposes is to aid the appellate court by affording it a clear understanding of the ground or basis of the decision of the trial court." (internal quotation marks and citation omitted)).

## III.    FINDINGS OF FACT

This Court's findings of fact with respect to the instant case are based on the evidence—*i.e.*, the testimony and exhibits—that the parties submitted during the bench trial, the Court's observations of the demeanor and credibility of the witnesses, the parties' stipulations, and the record as a whole.[3] Notably, because many of the basic facts regarding the formation and ownership of the Everlasting Life Health Complex are

---

[3] The Court received the following exhibits into evidence during the bench trial: Plaintiffs' Exhibits 1, 2, 3, 4, 5A, 5B, 6, 7, 8, 9, 10, 11, 12, 13, 14A, 14B, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 29, 31, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43; and Defendant's Exhibits 1, 2.

disputed, this Court has made its factual findings based largely on its evaluation of the believability of the testifying witnesses, whose general credibility the Court necessarily assessed in its role as the finder of the fact at trial. The Court finds, as a general matter, that Plaintiffs' four affirmative witnesses—Carol Allen, Darrel Edwards, Prince Immanuel, and Dr. Lee—presented relevant facts of which they had first-hand knowledge in a clear, frank, and candid manner, and that their testimony was entirely credible. By contrast, the Court found Napper to be disingenuous at times, and the Court did not believe some of his most salient representations, as described below.

### A. Overview Of The Testimony Presented At Trial

Allen, who is the leasing administrator for the lease management company Kingdom Management, testified about her interactions with Napper and Young regarding the anticipated expiration of the Complex's lease, the circumstances leading to renewal of the lease, the receipt of rent payments signed by Yah Kai, and certain facts related to overpayments for utilities with respect to the property. (*See* July 14, 2015 Trial Tr. at 168:6–197:12; July 15, 2015 Trial Tr. at 85:3–96:13.) Edwards, an accountant for both Yah Kai and Napper, testified about his accounting work for Yah Kai during the time that Yah Kai operated the Complex, including his observation that Yah Kai undertook all of the Complex's legal responsibilities and business expenditures from 2009 through 2011. (*See* July 14, 2015 Trial Tr. at 198:1–213:7; July 15, 2015 Trial Tr. at 11:15–30:20.)

Prince Immanuel and Dr. Lee, who are members of the Community and have a personal relationship with both Napper and with the Everlasting Life businesses, provided pertinent background and related specifics regarding the events underlying the instant trademark dispute. As a leader of the Community, Prince Immanuel testified

about the Community's history (its origins, structure, beliefs, culture, and founding); the Community's development and ownership of the Everlasting Life restaurant businesses; his own registration of the Everlasting Life service mark; Napper's involvement in the restaurant businesses on behalf of the Community; Napper's subsequent removal from management; and the events surrounding Napper's eviction of Yah Kai and the Community from the Capitol Heights facility. As the corporate designee of Yah Kai, Dr. Lee testified about the Community's history in establishing the Everlasting Life food-service businesses and its instructions to Napper with respect to starting the businesses. Dr. Lee also described the Community's decision to remove Napper as manager of Everlasting Life Health Complex, and its formation of Yah Kai as the legal entity that the Community entrusted with the responsibility of restructuring and operating that establishment.[4] Notably, the Court found that when Prince Immanuel and Dr. Lee testified about the same events (*e.g.*, Napper's removal as manager) they did so in a manner that was entirely consistent, and that they recounted the relevant events with a clear recollection of the matters described.

Napper's overall demeanor and testimony was quite to the contrary. The Court observed that Napper's testimony, which was presented as part of Plaintiffs' case-in-

---

[4] The evidence established that Dr. Lee has a financial interest in the outcome of this lawsuit (*see* 3d FOF Tbl. at 53–54 (A); July 15, 2015 Trial Tr. at 190:7–8 (Dr. Lee stating she is the corporate designee of Yah Kai, a Plaintiff in this case seeking monetary damages)); however, Dr. Lee elaborated on her close friendship with Napper and demonstrated a great deal of care for him during her testimony, which substantially reinforced her credibility and cloaked her testimony with an aura of impartiality (*see, e.g.,* July 15, 2015 Trial Tr. at 175:21–176:3 (Dr. Lee) ("I also wanted to say that I don't know where the dispute really started. But what I do know is that us sitting in that meeting and at that house that Mr. Napper was very important to me, and he was important to the members of that community. He not only was a leader in the community, nor was he just the manager of Everlasting Life Health Complex, he was our friend and he was our brother. So we wanted the best outcome for everybody."); July 16, 2015 Trial Tr. at 3:24–4:4 ("Q: Dr. Lee, during your answers to questions, it seems that you have a sisterly love for [Napper]. A: I do. Q: And this case for you is not about—it's not personal, is it? A: It's not.")).

chief, was riddled with contradictions and, at times, appeared manifestly inconsistent with undisputed facts in the record, which cast doubt upon his credibility and reliability as a witness.[5]  In addition, Napper displayed some signs of dissembling, such as the evasive nature of his answers with respect to the existence of a purportedly independent and unincorporated food business that he claimed to have created by himself in his home garage prior to the Community's formation of its restaurant businesses; according to Napper, this separate food-service business was also called "Everlasting Life" and was operating contemporaneously with, and in the same physical space as, the Community's Everlasting Life businesses, unbeknownst to any other members of the Community.[6]  To be sure, Napper did not falter in his insistence that he—alone—was

---

[5] For example, when asked during his deposition whether he had paid rent to run his juice counter inside the Complex between 2008 and 2011, Napper answered "I paid in kind" (*see* Napper Dep. 58:8, March 6, 2014, Pls.' Ex. 24), but when asked the same question at trial, Napper said, "[n]o, I didn't pay the rent in kind" (*see* July 14, 2015 Trial Tr. at 96:13).  Napper also appeared to be confused regarding which of the business entities at issue was legally authorized to operate the Complex at any given time. (*Compare* 3d FOF Tbl. at 57 (B) (Napper asserts that "Yah Kai obtained new occupancy and business permits from Prince George's County in 2008-2009" to run the Complex), *with* Napper Dep. 31:13–32:1 ("Q: . . . Your testimony is that [a legal entity the Community called the Everlasting Life Health Complex] actually had the business license to occupy . . . Everlasting Life Restaurant in 2009? A: As far as I know, yes. Q: 2010? Yes. Q: And 2011? A: As far as I know, yes.").)

[6] The following exchange between Napper and Plaintiffs' counsel is indicative of the far-fetched statements that Napper made throughout his testimony:

> Q: When you speak about a business in 1995, is it your testimony that you are not referring to Everlasting Life Community Co-Op? A: The business that I established in 1995 was the business that is now known as Everlasting Life. . .  Q: [Is it] the same business that you operate now under the auspices of Fair and Balanced, is that your testimony? A: The business that I established back in 1995 has not changed since 1995. It is the business that I established. . . . Q: Your testimony is that the garage business, the food business, non-restaurant, was never incorporated, never had a license to do business in the county, never registered, never filed an EIN number, existed between 1995 and 2015. Is that your testimony? A: My testimony is that my business, which is the food business that I established in 1995, has not been incorporated into any of the business entities that we've discussed today. . . . Q: Have you produced a single piece of paper or documentation to verify the existence of that business? . . . A: [W]ith all of the paperwork that was submitted, I'm not sure whether that, that entity is reflected in these, in this document or these submissions that we have.

(July 14, 2015 Trial Tr. at 140:18–144:7.)

the rightful owner of the Everlasting Life Health Complex. But much of Napper's logic appeared to turn on his mistaken belief that, as the Community member who helped to conceptualize the Community's food-service businesses and was tasked (at least initially) with the responsibility of bringing that vision to fruition, he *owned* that business; consequently, many of his explanations were simply not believable.[7]

In short, as reflected in the specific findings of fact that follow, this Court has generally resolved the parties' myriad disputes regarding material factual matters *in favor* of the testimony provided by Plaintiffs' affirmative witnesses—whose consistent and credible testimony was that the Community formed, funded, and owned the Everlasting Life business operation at issue in this case—and *against* Napper, who, the Court finds, improperly appropriated that trademarked, profitable ongoing business concern, and has continued to operate it without the Community's permission and in a manner that risks confusing the public about the nature, origins, and ownership of that business.

---

[7] In this regard, it appears that Napper's entire defense in this action hinges on the erroneous contention that he owned the Complex by virtue of his 'sweat equity' as the former manager, notwithstanding the fact that the manager reported to the Community's leadership, and the Community collectively made the financial investments that were required to maintain and operate the business. Napper's testimony regarding entitlement to the restaurant equipment that was located on the premises after he evicted Yah Kai and the other Community members provides one example of this flawed reasoning. Although Yah Kai had indisputably purchased certain equipment for the Complex, Napper testified that he "didn't feel the need to reimburse Yah Kai for [equipment] that was [in the Complex] before 2008 that was still there in 2011 even though it may have been different, new or otherwise." (July 14, 2015 Trial Tr. at 106:8–11.) Napper applied this same analysis when asked why he did not return the substantial utilities rebate that the landlord arranged as a reimbursement for overpayments that Yah Kai previously had made: Napper testified that "[a]s long as [he] owned the business and [was] the tenant at the . . . Capitol Heights location, [he had] paid utilities" vicariously and was thus entitled to the rebate. (July 15, 2015 Trial Tr. at 32:13–18.)

### B. The Everlasting Life Restaurant Businesses, And The Entities That Formed And Operated Them

Members of the African Hebrew Israelite community claim to be "descendants of the biblical Israelites from the African-American tradition" (July 15, 2015 Trial Tr. at 52:15–16 (Prince Immanuel)), and significantly for present purposes, African Hebrew Israelites strictly "follow a natural vegan plant-based diet" as a means of "enhancing and sustaining" their lives (*id.* 53:1–6; *see also* 3d FOF Tbl. at 7 (A, B)).  Napper "entered the [Community] in 1988 and was a leader within the group" (3d FOF Tbl. at 4 (A, B)), as were Young, Dr. Lee, and Prince Immanuel (*see id.* at 2–3, 6 (A, B)).  In 1993, the Community, which generally believes in collective ownership and eschews typical notions of individual property (*see id.* at 19 (A, B); *see also* July 15, 2015 Trial Tr. at 55:11–15, 106:3–13, 109:23–110:20 (Prince Immanuel)), collectively started and operated a vegetarian restaurant called Soul Vegetarian in Washington, D.C. (*see* July 15, 2015 Trial Tr. at 61:8–19 (Prince Immanuel)).  Two years later, in or around 1995, the Community opened a second food-based retail establishment: an organic vegetarian food market and restaurant in the same vicinity called the Everlasting Life Community Co-Op ("the Co-Op").  (*See id.* at 61:8–22.)  Napper helped to establish the Co-Op (*see* July 14, 2015 Trial Tr. at 48:15–18 (Napper)), and was selected by the Community to act as its official manager and to run its operations (*see* July 15, 2015 Trial Tr. at 65:3–4 (Prince Immanuel)).

In order to operate the business activities of the Co-Op legally and in accordance with broader societal norms, Community members undertook to incorporate a general cooperative association—a corporate structure that does *not* have individual ownership interests or issued shares—in the District of Columbia on August 22, 1996.  (*See* 3d

FOF Tbl. at 11–17 (A, B); *see also* July 15, 2015 Trial Tr. at 154:18–21 (Prince Immanuel); July 14, 2015 Trial Tr. at 50:9–12, 54:12–18, 115:12–18 (Napper).) The Community named this corporate entity after the Co-Op itself, calling it the "Everlasting Life Community Cooperative" (hereinafter "ELCC"). (*See* 3d FOF Tbl. at 11–17 (A, B); *see also* July 14, 2015 Trial Tr. at 122:4–7 (Napper).) Napper was one of the listed incorporators of ELCC, and according to the articles of incorporation, also served as a director for the first year of its corporate existence. (*See* ELCC Certificate of Incorporation, Pls.' Ex. 29.) Given the legal structure of the association, however, Napper could not have legally owned any share of ELCC in his individual capacity. (*See* July 14, 2015 Trial Tr. at 64:11–18 (Napper concedes as much).)

Sometime in the year 2000, the Community expanded its food-service operations to Capitol Heights, Maryland, where it opened the business that is at issue in this lawsuit. The Maryland facility was located in a sprawling building at 9185 Central Avenue (*see* Restaurant Lease between Hampton Mall and Everlasting Life Cooperative & 2004 Amendment to Lease, Pls.' Ex. 5, at 4–51), and the Community named this business the Everlasting Life Health Complex ("the Complex"). (*See* July 14, 2015 Trial Tr. at 66:15–18 (Napper).) The Complex offered an array of vegan soul food goods and services, including a restaurant, bakery, juice bar, and grocery store. (*See* July 15, 2015 Trial Tr. at 168:13–23 (Dr. Lee).) The Complex also contained administrative offices, a large banquet hall, and a health center offering massage therapy services. (*See id.* at 168:24–169:9.)

Importantly, the initial financial outlay for start-up expenses for the Complex came from investments and donations provided by Community members (*see* 3d FOF

Tbl. at 43 (A, B)); specifically, the members' collective financial input totaled "about $1.2 million" in the form of investments and charitable contributions, including donations "to help buy" building materials, such as paint brushes, lightbulbs, bricks and drywall (July 14, 2015 Trial Tr. at 166:6–14 (Napper)).  Similarly, prior to the grand opening of the Complex, Community members from various parts of the country and around the world traveled to Maryland to aid "at every phase" of the project development: "from the conceptualization, [to] the structure, the design, . . . [and] the build-out" of the Complex.  (July 15, 2015 Trial Tr. at 72:1–6 (Prince Immanuel).) Members "spent four or five hours each evening preparing th[e] space" (Young Dep. 15:5–16:1), including offering manual labor and skills such as carpentry and plumbing (*see* July 14, 2015 Trial Tr. at 165:22–166:5 (Napper)).  The Community appointed Napper to manage the Complex, just as it had done with the Co-Op.  (*See* July 15, 2015 Trial Tr. at 64:22–65:11 (Prince Immanuel).)

Moreover, just as with the Co-Op, Community members established a no-shares corporation so that the Complex could operate legally and in accordance with the laws of Maryland.  The Complex's operating entity was incorporated in 2001 in the state of Maryland, and this corporate entity was given the same official name as the restaurant itself: the Everlasting Life Health Complex (hereinafter "ELHC").  (*See* 3d FOF Tbl. at 24 (A, B); July 15, 2015 Trial Tr. at 165:23–166:15 (Dr. Lee).)  Napper served as ELHC's registered resident agent.  (*See* July 15, 2015 Trial Tr. at 165:23–166:15 (Dr. Lee).)  However, the original lease for the Capitol Heights building—where ELHC would be operating the Complex—was entered into by ELCC as the contractual tenant, and Napper signed the original lease and all subsequent modifications and extensions in

his capacity as an officer of ELCC.[8]  Napper also eventually negotiated a substantial

settlement agreement between ELCC and the management company that oversaw the

Capitol Heights building concerning the overpayment of utilities, as described below.

Unfortunately for the Community, authorities in Maryland and the District of

Columbia revoked the corporate statuses of ELHC and ELCC (in the years 2008 and

2012, respectively) because these entities failed to comply with the statutory

requirements for remaining in good standing.  (*See* 3d FOF Tbl. at 35 (A, B); *see also*

July 15, 2015 Trial Tr. at 150:20–151:7 ("The Court will take judicial notice of the

facts of the forfeiture [on October 3, 2008] of the entity known as Everlasting Life

Health Complex, Inc."); *id.* at 155:7–10 (Plaintiffs' counsel) ("Everlasting Life

Community Cooperative corporate status was revoked or was not in good standing

effective 2012").)[9]  However, somehow, the Complex and the Co-Op continued to

operate despite these difficulties, and with respect to the Complex, the Community

decided to form yet another legal corporate entity—Yah Kai Worldwide Enterprises,

---

[8] ELCC was apparently selected as the lessee because, unlike the newly-incorporated ELHC, it had a well-established business record and credit, both of which were needed to facilitate the approval of a commercial lease.  (*See* July 15, 2015 Trial Tr. at 70:10–15 (Prince Immanuel) ("Q: And why was [ELCC] used for purposes of that lease? A: It was the enterprise which had established itself and was known in the commercial community, so we were able to leverage that reputation into establishing this new enterprise."); July 14, 2015 Trial Tr. at 137:11–18 (Napper) (responding to the same question, Napper testifies that "[ELCC] was the entity that was going to be recognized on paper . . . with the business history that was going to be satisfactory for the property owner at the time").)

[9] Under Maryland law, a corporate status will be forfeited for failure to pay taxes, unemployment insurance, or failure to file annual reports.  *See* Md. Code, Corps. & Ass'ns § 3-503(a)–(c) (1997); *see also id.* § 3-503(d) (explaining that, if corporate status is forfeited, any legal rights and powers the entity enjoyed automatically become "inoperative, null, and void"); *id.* § 3-515 (explaining further that corporate directors become "the trustees of its assets for purposes of liquidation" and to wind up its affairs).  Similarly, under D.C. law, a corporate entity will be administratively dissolved for failure to pay fees and penalties, to deliver a biennial report, or to have a D.C. registered agent.  *See* D.C. Code § 29-106.01.  Thus, upon ELCC's dissolution, its registered agent (Napper) retained some legal authority, but was foreclosed from "carry[ing] on any activities or affairs except as necessary to wind up [ELCC's] activities and affairs and liquidate its assets[.]"  *Id.* § 29-106.02.

Inc.—in 2009, to take on the responsibility of "restructur[ing] and reformulat[ing] Everlasting Life Health Complex to become a viable business again." (July 15, 2015 Trial Tr. at 173:23–25 (Dr. Lee).)

Three Community members—Dr. Lee, Young, and Reginald Clay—registered Yah Kai as a non-profit corporation under the laws of the District of Columbia. (*See id.* 173:9–22; 3d FOF Tbl. at 52–53 (A, B).) The Community then authorized Yah Kai to "t[ake] over Everlasting Life Health Complex, rearrange[] it, and pa[y] all bills and taxes." (*See* 3d FOF Tbl. at 52 (A, B).) It is undisputed that Yah Kai managed and operated all the legal and business activities of the Everlasting Life Health Complex from 2009 until Napper forced it to relinquish the Capitol Heights facility in November of 2011, as described *infra* in Part III.D. (*See* July 15, 2015 Trial Tr. at 155:16–22 (Prince Immanuel); *see also id.* at 176:21–178:16 (Dr. Lee).) Specifically, in its role as manager of the Complex between 2009 and 2011, Yah Kai:

(1) acquired all of the necessary licenses and permits for the Complex's operations (*see* 3d FOF Tbl. at 57 (A, B); Maryland Permit to Yah Kai to Operate Facility, Pls.' Ex. 3);

(2) assumed and repaid ELHC's debts with respect to tax arrears and outstanding payments owed to suppliers and Community members (*see* July 15, 2015 Trial Tr. at 177:19–179:5 (Dr. Lee));

(3) paid rent for use of the building at 9185 Central Avenue, where the Complex was housed (*see* 3d FOF Tbl. at 67(A); Yah Kai's 2009-2011 Rent Checks, Pls.' Exs. 34–36);

(4) paid the Complex's bills, including utilities and food supplies (*see* July 15, 2015 Trial Tr. at 178:15–16, 188:1–10 (Dr. Lee); July 14, 2015 Trial Tr. at 209:18–210:5 (Edwards); *see also* 3d FOF Tbl. at 52, 60 (A, B); Everlasting Life Health Complex Financial Records for 2011-2015, Pls.' Ex. 31 (used for Yah Kai's tax returns));

(5) paid taxes related to the Complex's business (*see* 3d FOF Tbl. at 56, 60–61, 64–65, 68–69 (A, B); Yah Kai's Tax Returns, Pls.' Ex. 9);

(6) paid the salaries of the Complex's employees (*see* 3d FOF Tbl. at 62–63, 66, 69 (A, B); Income Records for Yah Kai Employees, Pls.' Ex. 10); and

(7) publicly sold goods and services under the name Everlasting Life Health Complex (*see* 3d FOF Tbl. at 55 (A, B); Yah Kai's Certificate of Business Registration, Pls.' Ex. 8; Yah Kai's DCRA Basic Business License Application, Pls.' Ex. 7).

### C. Napper's Relationship To The Community

The events that give rise to the claims at issue in this case center on the personal and professional relationships between Napper and members of the Community, which date back to the mid-1980s. Napper held a leadership position within the Community's organizational structure, a structure that is best characterized as a hierarchical apportionment of authority that has representative members on an international, national, and local level. (*See* July 15, 2015 Trial Tr. at 55:9–15, 152:6–23 (Prince Immanuel).) Briefly, the "anointed spiritual leader of the African-American Hebrew community"—Ben Ami—sits at the helm of the leadership hierarchy. (*Id.* at 54:16–17.) Directly under him are the "member[s] of the Holy Council, the [Community's] spiritual guiding body[,]" who receive the title of "Prince" (*id.* at 52:9–12); Plaintiff Prince Immanuel is one such leader. Under the Princes are the "Ministers," who

"oversee the day-to-day actions in the particular areas of focus, be it agricultural, education, sports and recreation" (*id.* at 152:12–14), and on the lowest rung of the ladder of leadership are the "Crowns," such as Napper and Dr. Lee, "who are also involved in the day-to-day oversight and coordination of the activities of the members of the community, the brothers and sisters" (*id.* at 152:14–18). Notably, the leaders play a crucial role in the establishment and operation of the Community's businesses, each of which is individually managed by a selected leader for the benefit of the Community. (*See id.* at 65:4–11.)

Prince Immanuel met Napper in 1986 or 1987, when they were both "holding classes [and] meetings, [and were] very much involved in the [C]ommunity." (*Id.* at 56:14–20 (Prince Immanuel).) By 1992, when Dr. Lee first joined the Community, Napper was already a leader among its members (*id.* at 162:1–10 (Dr. Lee)), and in the years to follow, Napper would come to be identified as a "champion[] [for] the cause of the Hebrew Israelite Community" (*id.* at 164:21–24). Napper was a highly "personable" and "effective" leader, who would often "motivate the members" to engage in Community activities. (*Id.* at 164:16–20.) Napper was also "important to the members of that [C]ommunity . . . not only [in his capacity as] a leader" and "the manager of the Everlasting Life Health Complex," but also as their "friend and . . . brother." (*Id.* at 175:24–176:3.)

In the mid-1990s, Prince Immanuel was appointed the local leader for the African Hebrew Israelites in the District of Columbia, and as such, he was "responsible for teaching, coordinating, [and] directing" the members and their activities. (*Id.* at 63:3–5 (Prince Immanuel).) It was under Prince Immanuel's supervision that the

Community members in the District of Columbia decided to establish the Everlasting Life Community Co-Op in 1995 (*see id.* at 61:20–63:18). At the time, Napper and Prince Immanuel had an amicable and "fruitful relationship," interacted regularly, and were both closely involved in the inception of the Co-Op. (*Id.* at 58:8–9, 57:17–21, 61:17–22.) The Community and its local leaders chose Napper to manage the Co-Op and he became a prominent contributor to its success; he undertook essential responsibilities such as securing the location's lease, which he did under his own name. (*See id.* at 65:3–4 (Prince Immanuel); July 14, 2015 Trial Tr. at 118:4–10 (Napper).)

Once the Co-Op proved to be a profitable venture, the Community began to explore the possibility of expanding to a new location, and Napper played a pivotal role in the development of the new business as well. For example, it was Napper who "located a space in [Capitol Heights, Maryland] and suggested that [the Community] come together and develop that space into a restaurant and other associated facilities." (July 15, 2015 Trial Tr. at 65:18–21 (Prince Immanuel).) The leaders of the Community in the Washington Metropolitan area agreed, and after consulting with Ben Ami and other leaders around the world, decided to pursue that business opportunity. (*See id.* at 65:21–66:2.) Napper then proceeded to become intricately involved in the structuring, financing, and development of the project; for example, he was directly involved in the deliberations with Prince Immanuel to name the business the "Everlasting Life Health Complex" (*see id.* at 66:5–18), and he secured the lease for the property where the Complex would operate—this time, he did so as an officer of ELCC and as one of the guarantors, and not in his individual capacity (*see* Original Lease between Hampton Mall as Landlord and Everlasting Life Co-Op, Pls.' Ex. 5A). Napper

was also selected to be the manager of the Complex's day-to-day operations. (*See* July 15, 2015 Trial Tr. at 170:1–6 (Dr. Lee).) Alongside other members of the Community, Napper contributed his "time, . . . energy and money" to the betterment of this collectively-owned business (*id.* at 175:8–10), and even if he disagreed with the Community leaders at times regarding strategic business operations, his "love" for his "brother[s] and [his] sister[s]" motivated his continued "adherence and obedience to the [C]ommunity" (July 14, 2015 Trial Tr. at 78:5–20 (Napper)).

Lamentably, the relatively harmonious relationship that developed between Napper and the Community during the creation of the Complex began deteriorating about four years after the Complex opened its doors to the public. By 2004, the Complex business "was in serious arrearage," so the Community decided to reduce the size of the premises and modify the Complex's management structure. (July 15, 2015 Trial Tr. at 72:13 (Prince Immanuel).)[10] The 2004 restructuring also included a decision by the Community's leaders to remove Napper as the manager of the Complex and the Co-Op (*id.* at 73:3–8), and to replace him, initially, with Young—"a former military man" with meticulous skills who they believed would successfully turn the business around (*id.* at 73:16–19). To address Napper's concerns about his displacement and his significant debts—most which he had acquired in order to establish the businesses—the Community agreed to pay Napper a monthly stipend of

---

[10] It was the decision to reduce the size of the Complex's physical footprint (which the landlord accomplished by erecting a wall and leasing of part of the space to another entity) that marked the beginning of the utilities overpayment problems described *infra* in Part III.D. In short, although the Community had relinquished control over part of the space that had been leased for the Complex, the landlord and power company neglected to account for this change when it billed the Community for the Complex's use of utilities. (*See* July 15, 2015 Trial Tr. at 180:23–181:17 (Dr. Lee); *see also id.* at 86:22–87:8, 95:22–96:2 (Allen).)

$9,000 for the next two to three years, for a total of approximately "$200,000 to $236,000." (*See id.* at 74:21–75:14.)

Under Young's management, the businesses thrived and the Complex's operations regained profitability. (*See id.* at 74:14–15 (Prince Immanuel).) But three years later, in 2007, Young had to "step back" from management "due to health challenges" (*id.* at 76:4–7), and after another Community member failed to take his place successfully, Napper was reinstituted as manager of the Complex (*see id.* at 76:8–77:6). Napper remained in that position for about a year, until October of 2008, when the Community's leaders reconvened once more to address problems with the Complex's operations. Like before, the Complex had begun to fail under Napper's management, but this time the leadership was determined to restructure all of the Community's business operations in the D.C. Metropolitan area. (*See id.* at 78:5–79:20.) In a meeting that took place at Young's house in early October of 2008, with Napper in attendance, the Community leaders concluded that a new "economic committee" would have to be established to revamp and reorient the Community's businesses. (*Id.* at 81:16–19.) The leaders selected Young, Dr. Lee, and Reginald Clay to comprise that committee (*see id.* at 79:8–14 (Prince Immanuel); *see also id.* at 173:9–25 (Dr. Lee) (explaining that these three members later formed Yah Kai)), and in that same meeting, Napper was permanently relieved of his position as manager of the Complex by a "consensus of the leadership" (*id.* at 81:13–15 (Prince Immanuel)). As a peace offering to Napper, and also to assist him in recouping his considerable investment in the Complex, Napper was given a full individual ownership interest in the Co-Op, which was at that time a profitable business. (*Id.* at 82:9–18.)

Notably, although Napper had been an incorporator and/or corporate officer of ELCC and ELHC, *see supra* Part III.B, he was not involved in the subsequent creation or organization of Yah Kai, nor was he involved in the management of the Complex after October of 2008 (*see* 3d FOF Tbl. at 129 (A, B); July 15, 2015 Trial Tr. at 81:8–21 (Prince Immanuel) ("Mr. Napper was offered a position on [the Complex's restructuring scheme] along with Dr. Lee, Mr. Young and Mr. Clay. He refused.")).  Thus, when Yah Kai was managing the Complex between 2009 and 2011, *see supra* Part III.B, Napper's only remaining involvement with that business was his sponsorship of a health counter within the facility from which he sold juices and other products, and which he operated without paying rent or utilities for the use of that counter area.  (*See* July 15, 2015 Trial Tr. at 99:16–25 (Prince Immanuel).)

### D. Napper's Eviction Of Yah Kai And Other Community Members

As mentioned above, Napper had signed the original lease for the Complex on December 6, 2000, on behalf of ELCC as the contractual tenant.  (*See* Original Lease between Hampton Mall as Landlord and Everlasting Life Co-Op, Pls.' Ex. 5A.)  Napper also acted as a guarantor for ELCC's obligations along with Cheryl Marshall, another corporate officer of ELCC.  (*See id.*)  The lease for the Complex subsequently underwent two modifications—on June 2, 2002 and October 1, 2004—to address ELCC's past-due rent payments and the Community's "desire to reconfigure and reduce the size of the" premises leased.  (Second Amendment to the Lease, Pls.' Ex. 5B.)  Notably, with respect to the second amendment, Young replaced Cheryl Marshall as the second guarantor for ELCC (*see id.*), and both he and Napper signed a promissory note undertaking the obligation to satisfy ELCC's debt, which amounted to a sum of $172,836.45 in arrears (*see id.*).

In June of 2011, approximately two and a half years after Yah Kai took over as the manager of the Complex, Young reached out to Kingdom Management (the management company that the landlord used with respect to the Capitol Heights building) on behalf of Yah Kai in anticipation of the November 2011 expiration of the original lease to inquire about getting a new lease for the space that the Complex was using. The Community's leadership reasoned that the Community could continue successfully operating the Everlasting Life Health Complex at the Capitol Heights location with Yah Kai as the leaseholder. (*See* July 14, 2015 Trial Tr. at 178:13–180:8 (Allen).) However, because ELCC was the contractual tenant under the lease and Napper was listed as ELCC's registered agent, Kingdom Management considered Napper to be the current leaseholder, and it gave him "the first right of refusal" and priority with respect to extension of the existing lease, rather than immediately accepting Yah Kai's new lease proposal. (*Id.* at 189:20–190:6.) Napper expressed interest in extending the lease and Kingdom Management then engaged in lease-related negotiations directly with Napper, who at that point proclaimed himself CEO of ELCC. (*See* 3d FOF Tbl. at 92 (A, B); *see also* July 14, 2015 Trial Tr. at 65:19–22 (Napper) ("Q: So effectively you self-designated yourself as the CEO of Everlasting Life Community Cooperative; correct? A: In this document, yes.").) And as a result of these negotiations—which included discussions of the newly-discovered fact that the landlord and utilities company had been overbilling for utilities payments related to the Capitol Heights location since 2004—Napper, as ELCC's designated representative, received a reduced-rent extension of the original lease for one year, until September 30, 2012. (*See* 2011 Lease Extension and Modification, Pls.' Ex. 6; 3d FOF Tbl. at 88 (A); *see*

*also* July 15, 2015 Trial Tr. at 8:19–9:25 (Napper's counsel arguing that he does "not disput[e] that Yah Kai paid the utility bills").)[11]  Consequently, on July 13, 2011, Kingdom Management notified Yah Kai that it would not enter into a new lease for the facility because the existing lease had been extended.  (*See* Kingdom Management Letter to Yah Kai, Pls.' Ex. 39.)

One week later, on July 20, 2011, Napper delivered to Yah Kai, Young, and the Community a 'Notice to Vacate' that pertained to the Complex building.  (*See* 1st Notice to Vacate, Pls.' Ex. 14A; 3d FOF Tbl. at 75 (A, B).)  The notice stated that Yah Kai's "rights of occupancy and possession" were terminated, and that all occupants had three days to take their personal effects and exit the premises at 9185 Central Avenue, Capitol Heights, Maryland.  (1st Notice to Vacate, Pls.' Ex. 14A.)  The notice explicitly warned that no one would "be allowed to remove any of the equipment in the building or inventory" and that "no equipment large or small [would] be allowed out of the building."  (*Id.*)  This surprising notification sparked a series of discussions between Napper and the Community regarding Yah Kai's "continuing use of the space" and the possibility of "additional compensation for . . . Napper[.]"  (July 15, 2015 Trial Tr. at 99:8–15 (Prince Immanuel).)  But by October 15, 2011, attempts to resolve the dispute

---

[11] As noted, Pepco had been systematically over-billing for utilities in the Capitol Heights retail space ever since 2004, when the Complex downsized its space, due to a technical glitch in the generation of the utility bills. (*See* July 15, 2015 Trial Tr. at 87:6–8 (Allen).)  Pepco negotiated solely with Kingdom Management on behalf of the landlord regarding the over-charges (*see* July 15, 2015 Trial Tr. at 95:1–4 (Allen)), and Kingdom Management, in turn, only contracted with Napper regarding the Pepco reimbursement (*see id.* 85:23–86:9).  These negotiations occurred as part of the discussions that Napper was having with Kingdom Management regarding the renewal of the Capitol Heights lease. (*See* July 14, 2015 Trial Tr. at 195:15–20 (Allen).) In October of 2011, Kingdom Management executed a formal settlement agreement with Napper under which the tenant (ELCC) would be paid the rebated amount in the form of an offset against future rent and other payments pertaining to the extended lease that Napper himself was negotiating.  (*See* July 15, 2015 Trial Tr. at 91:3–92:1 (Allen).)

"amiably" had failed (*id.* at 100:8), and Napper sent a second Notice to Vacate; this one was addressed to Young and Yah Kai, and it expressly included "all representatives, subordinates, associates and affiliates of Yah Kai[.]" (2d Notice to Vacate, Pls.' Ex. 14B; *see also* 3d FOF Tbl. at 111 (A, B).) The notice demanded that these parties vacate the premises on or before November 15, 2011, and, again, it noted that they were not allowed to remove any equipment. (*See* 2d Notice to Vacate, Pls.' Ex. 14B; 3d FOF Tbl. at 111 (A, B).)

On the fateful night of November 15, 2011, members of the Community and representatives of Yah Kai arrived at the Capitol Heights facility with moving trucks to remove their personal items and their own equipment and inventory from the premises. (*See* July 15, 2015 Trial Tr. at 103:4–6 (Prince Immanuel).) Napper called the police, and when the officers arrived, they informed Yah Kai's representatives that no equipment would be allowed to leave the building because Napper was the official the tenant of the space, and that any dispute with Napper would have to be resolved in court. (*See id.* at 102:21–103:6 (Prince Immanuel); *see also id.* 184:3–18 (Dr. Lee).) Napper also requested that the police physically remove Yah Kai's representatives, along with Prince Immanuel and the other Community members who had come to assist. (*See* July 14, 2015 Trial Tr. at 102:8–12 (Napper).) The Community members and Yah Kai representatives complied with the officers' order to vacate the premises, leaving behind Complex-related business records and a plethora of other items that Yah Kai had created, purchased, or built during its management of the Complex, including furniture, food products, and restaurant equipment. (*See* 3d FOF Tbl. at 79–82 (A); July 15, 2015 Trial Tr. at 103:7–104:9 (Prince Immanuel); *id.* 185:25–186:9, 187:17–188:16 (Dr.

Lee); Young Dep. 49:18–52:2, 98:12–99:6; *see, e.g.,* July 14, 2015 Trial Tr. at 91:7–14 (Napper) (acknowledging that Yah Kai was not allowed to remove food supplies that it had bought).)

### E. Napper's Unauthorized Use Of The Everlasting Life Mark

Since his eviction of Yah Kai and other members of the Community from the facility formerly known as the Everlasting Life Health Complex in November of 2011, Napper has continued to operate a food-service business in that same location in Capitol Heights, Maryland, under the name "Everlasting Life Restaurant and Lounge." (*See* 3d FOF Tbl. at 96, 103, 106, 113–14 (A, B).) Napper is the sole owner and member of a limited liability company called "Fair and Balanced," which he incorporated in the state of Maryland in November of 2011, and Fair and Balanced manages and operates the Everlasting Life Restaurant & Lounge. Fair and Balanced promotes Napper's food-service business using the Everlasting Life name (*see* Everlasting Life Restaurant & Lounge Store-front, Def.'s Ex. 1; Promotional Events by Fair & Balanced for Everlasting Life, Pls.' Ex. 22; *see also* 3d FOF Tbl. at 127(A, B)), even though Prince Immanuel has notified Napper that, by operating a vegan food establishment under the name Everlasting Life in the same location as the prior Everlasting Life Health Complex, he is infringing on Prince Immanuel's registered trademark (*see* 3d FOF Tbl. at 132 (A, B); *see also* Def.'s Answer to Int., Pls.' Ex. 23, ¶ 13; Trademark Infringement Notice from Prince Immanuel, Pls.' Ex. 15).

With respect to the trademark-infringement allegations, it is undisputed that, back in April of 2004 while the Complex was still under the Community's control, Prince Immanuel filed a registration for the Everlasting Life service mark with the United States Patent & Trademark Office ("USPTO"). (*See* USPTO Service Mark

Registration, Pls.' Ex. 1, ECF No. 29-1, at 2.)  The registration became effective on

November 22, 2005 (*see id.*), once the statutorily required publication and examination

requirements were satisfied, *see* §12, 15 U.S.C. § 1062 ("Upon the filing of an

application for registration . . . the Director shall refer the application to the examiner

in charge of the registration of marks [and] . . . shall cause the mark to be published in

the Official Gazette of the Patent and Trademark Office.").  Pictured below, Prince

Immanuel's registered trademark consists of: (i) the words "Everlasting Life" in large

"black" font; (ii) the words "Community Owned Cooperative" in "green" font; (iii) the

words "Health Complex & Organic Market" in "black" font; and (iv) a depiction of

various fruits and vegetables.  (USPTO Service Mark Registration, Pls.' Ex. 2, at 2.)



Moreover, the registration document disclaims any "exclusive right to use [the words]

Community Owned Cooperative Health Complex & Organic Market," but no similar

disclaimer was made regarding use of the words "Everlasting Life."  (*Id*.)  The USPTO

categorized the service mark's use as "retail grocery store for natural foods." (*Id*.)

According to Prince Immanuel, the Community decided that the mark should be

registered in order to protect the Community's reputation with respect to service and

food standards, given that the name "Everlasting Life" has long been associated with

the business operations of the African Hebrew Israelite community.  (*See* July 15, 2015

Trial Tr. at 133:13–21, 135:24–136:8 (Prince Immanuel).)  Ben Ami, the founder of the

Community, wrote a publication named "Everlasting Life" in 1994 (*see* 3d FOF Tbl. at

5 (A, B)), and that term, which is intended to refer specifically to the concept of

"restoring the natural life cycles that an individual has and possesses in order to

prolong their life" (July 15, 2015 Trial Tr. at 108:3–6 (Prince Immanuel)), is a

fundamental tenet for Community members.  Even more important, the name

Everlasting Life has become directly associated with the Community's commercial

enterprises and is inextricably intertwined with the Community's particular service

standards in the realm of food establishments.  (*See id.* at 67:9–12, 131:11–21, 133:3–

134:7, 145:23–146:8 (Prince Immanuel).)  No other food establishment, beyond the one

presently under dispute, trades under the name Everlasting Life in the D.C.

metropolitan area.  (*See* 3d FOF Tbl. at 26 (A, B).)

Because Prince Immanuel was the Community member who registered the

Everlasting Life service mark, "no one else could authorize [its] use[.]"  (*Id.* at 32

(A, B).)  Prince Immanuel permitted the Community, including its legal enterprises, to

use the registered mark (*see* July 15, 2015 Trial Tr. at 134:12–15 (Prince Immanuel)),

but he did not authorize Napper's use of the name Everlasting Life in an individual

capacity or through Fair and Balanced (*see* 3d FOF Tbl. at 102(C)).  Furthermore, when

Prince Immanuel tendered the infringement notice to Napper in November of 2011, he

stated specifically that he was "revoking" any license that Napper had had to use the

mark, while he was still a member of the Community.  (*See* Trademark Infringement

Notice from Prince Immanuel, Pls.' Ex. 15.)  Thus, any use of the mark by Napper after

he left the Community—which was in "2008, 2009" by his own account (July 14, 2015

Trial Tr. at 46:2)—was unauthorized. (*See* Compl. ¶ 35 ("At no time since his 2008 removal as manager of the Complex did Prince Immanuel authorize Defendant Napper to use said [registered mark].").).

## IV. CONCLUSIONS OF LAW

Counts I, II, and III of the complaint allege three separate trademark-related claims against Napper: (1) federal trademark infringement pursuant to Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1) (Compl. ¶¶ 32–39); (2) unfair competition and false designation of origin under Section 43(a) if the Lanham Act, 15 U.S.C. § 1125(a) (*id*. ¶¶ 40–45); and (3) unfair competition in violation of Maryland common law (*id.* ¶¶ 46–49). In Counts IV through VI, Plaintiffs bring three additional claims under Maryland common law; specifically, they contend that Napper usurped their corporate opportunity (*id.* ¶¶ 50–54 (Count IV)); breached a fiduciary duty of loyalty (*id*. ¶¶ 55–59 (Count V)); and converted their physical property (*id.* ¶¶ 60–64 (Count VI). Notably, because a violation of a breach of fiduciary duty of loyalty is not a stand-alone legal claim under Maryland law, this Court dismissed Count V before trial. (*See* Order, ECF No. 57, at 2). Thus, the subject of the bench trial was Napper's liability for the claims alleged in Counts I, II, III, IV, and VI of Plaintiff's complaint.

As explained in detail below, this Court concludes that Plaintiffs have proven by a preponderance of the evidence that they are the valid owners of the distinctive trade name and mark "Everlasting Life" that Plaintiffs used in connection with a food service business in this local geographic area, and that Napper's unauthorized use of this name with respect to the Capitol Heights facility after he evicted Plaintiffs from the premises in 2011 is likely to confuse consumers into believing that Napper's services and

products are affiliated with, or sponsored by, Plaintiffs and the African Hebrew Israelite community. This means that Napper has violated both the Lanham Act and Maryland's common law of unfair competition, as alleged in Counts I, II, and III. The Court also finds that Plaintiffs have established by a preponderance of the evidence that Napper intentionally exerted ownership and control over Yah Kai's tangible property when he evicted Yah Kai's representatives and other Community members without permitting them to remove that property; therefore, the elements of conversion under Maryland common law (Count VI) are also satisfied. However, with respect to Plaintiffs' claim that Napper impermissibly usurped their corporate opportunity in violation of Maryland common law (Count IV), this Court concludes that, although Napper acted egregiously (and perhaps even fraudulently) in renewing the lease in his own name as the "CEO" of ELCC without the Community's permission, he never owed a duty of loyalty to either Plaintiff in this case as a matter of law, and thus, Plaintiffs' claim that he usurped their corporate opportunity must be dismissed.

### A. By Using The Trade Name Everlasting Life, Napper Has Committed Trademark Infringement Under The Lanham Act And Has Engaged In Unfair Competition In Violation Of Maryland Common Law

The Lanham Act provides a cause of action for "the deceptive and misleading use of marks" and "to protect persons engaged in . . . commerce against unfair competition." §45, 15 U.S.C. § 1127. The Act's protection covers "any word, name, symbol, or device, or any combination thereof . . . used by a person . . . to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." *Id*. Furthermore, it is a mark's "source-distinguishing ability[,]" *EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos Inc.*, 228 F.3d 56, 62 (2d Cir. 2000) (citation

omitted), that lies at the heart of Congress's interest in protecting authentic traders from infringers. By permitting lawsuits to be brought against those who would seek to pass off their own goods and services as that of another, the Act's clear purpose is "to ensure that a product's maker reaps the rewards of the reputation it has built and to enable consumers to recognize and repurchase goods with which they have previously been satisfied." *EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos Inc.*, 228 F.3d 56, 62 (2d Cir. 2000) (citing *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 164 (1995)).

A claim of unfair competition under Maryland common law has the same impetus, and thus, trademark infringement under the Lanham Act and unfair competition under Maryland common law generally turn on the same question: whether or not the defendant's use of a mark that is substantially similar to the plaintiff's is likely to confuse the average consumer regarding the source or affiliation of the product. *See Breaking the Chain Found., Inc. v. Capitol Educ. Support, Inc.,* 589 F. Supp. 2d 25, 29 (D.D.C. 2008); *Putt-Putt, LLC v. 416 Constant Friendship, LLC*, 936 F. Supp. 2d 648, 659 (D. Md. 2013) ("Under the common law of Maryland, the applicable test for unfair competition is the same likelihood of confusion test applied under the Lanham Act." (citing *Scotch Whisky Ass'n v. Majestic Distilling Co.*, 958 F.2d 594, 597 (4th Cir. 1992))). Hence, "the scope of [legal protection and] exclusivity of a trademark is coextensive with the" degree of confusion likely to result in the consumer's mind. 3 J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition ("McCarthy on Trademarks") § 2:10 (4th ed. 2016). Moreover, while trademark infringement claims typically involve rival businesses actively competing in

the same marketplace, *see, e.g., Sears, Roebuck & Co. v. Sears Fin. Network*, 576 F. Supp. 857, 863 (D.D.C. 1983), the consumer confusion that is the hallmark of trademark infringement and unfair competition "can result even if [the] plaintiff's product is no longer being made" or his services are no longer being offered, McCarthy on Trademarks § 23:8; *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1391, 188 L. Ed. 2d 392 (2014) ("[A] competitor who is forced out of business by a defendant's [infringing conduct] generally will be able to sue for its losses[.]"). Indeed, to have a potentially viable claim for trademark infringement, a plaintiff need only show that "consumers in the relevant product market are likely to believe that defendant's products or services come from the same source or are affiliated with plaintiff." *Appleseed Found. Inc. v. Appleseed Inst., Inc.*, 981 F. Supp. 672, 674–75 (D.D.C. 1997) (citing *Foxtrap Inc. v. Foxtrap, Inc.*, 671 F.2d 636, 639 (D.C. Cir. 1982)).

This Court has evaluated the standard trademark-infringement and unfair competition factors in the context of the dispute between Yah Kai, Prince Immanuel, and Napper that was presented at trial. As explained below, the evidence establishes that Napper has engaged in the unauthorized use of a valid, registered service mark for the distinctive name "Everlasting Life" (which Plaintiff Prince Immanuel owns) in a manner that is likely to confuse and deceive consumers into believing that Plaintiffs sponsor, or are affiliated with, Napper's food-service establishment. Thus, Plaintiffs are entitled to recover for trademark infringement under Sections 32 and 43(a) of the Lanham Act and also for unfair competition under Maryland common law.

1. <u>Napper's Unauthorized Use Of The Mark And Name Everlasting Life Violates Sections 32 And 43(a) Of The Lanham Act</u>

Section 32 of the Lanham Act, which is codified as section 1114 of Title 15 of the United States Code, prohibits the use of "any reproduction, counterfeit, copy, or colorable imitation of a registered mark" for goods or services "without the consent of the registrant" in a manner "likely to cause confusion, . . . [or] mistake, or to deceive" the average consumer. *See* §32, 15 U.S.C. § 1114; *see also Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 763 (1992) (explaining that a claim under Section 32 is designed to "secur[e] to a mark's owner the goodwill of his business" and to prevent the public perception that he is affiliated with the infringer's business).[12] One who registers a trademark in the principal register of the USPTO is entitled to sue an alleged infringer under Section 32. *See id.* Pursuant to section 7(b) of the Act, registration also entitles the registrant to several presumptions: that the mark is valid; that he is the owner of the mark; and that he has the exclusive right use to that mark. *See* § 7(b), 15 U.S.C. § 1057(b). Moreover, "after five years of continuous use" of a registered mark, *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 209 (2000) (citation omitted),

---

[12] In addition to trademarks, which apply to goods, the Lanham Act provides for the registration of *service* marks, *see* § 3, 15 U.S.C. § 1053, which it defines as "any word, name, symbol, or device, or any combination thereof" that a person uses or intends to use "to identify and distinguish the services of one person, including a unique service, from the services of others and to indicate the source of the services, even if that source is unknown[,]" § 45, 15 U.S.C. § 1127. For all present purposes, the Lanham Act treats service marks and trademarks equally. *See* § 3, 15 U.S.C. § 1053 ("Subject to the provisions relating to the registration of trademarks, so far as they are applicable, service marks shall be registrable, in the same manner and with the same effect as are trademarks, and when registered they shall be entitled to the protection provided in this chapter in the case of trademarks."); *see also Dranoff–Perlstein Assocs. v. Sklar*, 967 F.2d 852, 855 (3d Cir. 1992) (applying trademark case law to a service mark infringement claim because, "[a]lthough technically distinct, the terms are often used interchangeably, with no significant legal consequences"). This Memorandum Opinion references both marks, indistinguishably, as well.

proof of registration is conclusive evidence of ownership, validity, and the right to exclusive use, *see* § 33(b) 15 U.S.C. § 1115(b).

The established elements of a claim for trademark or service mark infringement in violation of Section 32 are (1) ownership of a valid mark, (2) the mark's inherent distinctiveness or acquisition of a secondary meaning—in other words, "an association in the minds of the buying public between the name . . . and the product itself or the source[,]" *Sears, Roebuck & Co. v. Sears Fin. Network*, 576 F. Supp. 857, 861 (D.D.C. 1983)—and (3) the likelihood of confusion, mistake, or deception in the public created by the defendant's use of the mark, *id*. Although registration is one means of proving the ownership element, a mark need not be registered with the USPTO in order to receive protection under federal law, nor must the plaintiff who seeks to bring the infringement action be the owner of the mark in question. This is because Section 43(a) of the Lanham Act establishes a cause of action for infringement of an *un*registered mark, and the Section 43(a) option, which requires proof of elements that mirror a claim for infringement under Section 32, is available to "any person who believes that he or she is or is likely to be damaged by [a defendant's] act." *See* § 43(a), 15 U.S.C. § 1125(a) (permitting any servicer or producer to sue another for the use of "any word, term, name, symbol, or device, or any combination thereof . . . which . . . is likely to cause confusion . . . as to the origin, sponsorship, or approval of his or her goods").[13]

_____

[13] The scope of protection afforded by Section 32 and Section 43(a) is nearly identical; the primary, and perhaps even the sole, distinction between Sections 32 and 43(a) is that "the former section requires registration of the mark at issue, while the latter does not." *Breaking the Chain Found., Inc. v. Capitol Educ. Support, Inc.,* 589 F. Supp. 2d 25, 29 (D.D.C. 2008). Thus, the registrant of a registered mark can bring actions under either or both Sections 32 and 43(a), *see, e.g.*, *Am. Ass'n for Advancement of Sci. v. Hearst Corp.*, 498 F. Supp. 244, 261 (D.D.C. 1980); however, the appropriate cause of action for unregistered marks and non-registrant users of registered marks (including licensees) is Section 43(a), *see Partido Revolucionario Dominicano (PRD) Seccional Metropolitana de Washington–DC, Maryland y Virginia v. Partido Revolucionario Dominicano, Seccional de Maryland y Virginia*, 312 F. Supp. 2d

It is clear beyond cavil that, as the individual registrant of the Everlasting Life service mark, Prince Immanuel is the only plaintiff with the right to recover for trademark infringement under Section 32. *See Globalaw*, 452 F. Supp. 2d at 25 ("[B]y its very text, a Section 32(1) claim—unlike a Section 43 claim—contemplates that a 'registration' has occurred and that a 'registrant' is seeking certain remedies."). But Yah Kai is eligible to recover along with Prince Immanuel under Section 43(a), and because these Plaintiffs have established the elements of a federal infringement claim under Sections 32 and 43(a) of the Lanham Act as discussed below, this Court finds that they are entitled to judgment in their favor on Counts I and II of the complaint.

    a. *Plaintiffs Prince Immanuel And Yah Kai Own A Valid Mark*

With respect to the issue of ownership of the mark and name, Plaintiffs maintain that they are the owners and first users of the term "Everlasting Life" in connection with their restaurant and food-service business, as evidenced by the Community's opening of the Everlasting Life Co-Op in 1995, and Plaintiff Prince Immanuel's subsequent registration of the "Everlasting Life" service mark on the federal register in 2005. (*See* 3d FOF Tbl. at 26, 28 (A).) This Court agrees. First of all, there is no dispute that, based on the evidence presented at trial, Prince Immanuel registered the Everlasting Life service mark on November 22, 2005. (*See* USPTO Service Mark Registration, Pls.' Ex. 1, at 2.) Proof of this registration qualifies as prima facie evidence of Prince Immanuel's ownership of the mark and his exclusive right to use the

---

1, at *11 (D.D.C. 2004) ("Courts have concluded that [Section 43(a)] provides a cause of action to the licensee of a trademark or tradename against a competitor for improper use of the licensed mark."); *see also Quabaug Rubber Co. v. Fabiano Shoe Co., Inc.*, 567 F.2d 154 (1st Cir. 1977) (permitting a licensee to sue under Section 43(a) to enforce trademark rights); *Stanfield v. Osborne Indus.*, 52 F.3d 867, 873 (10th Cir. 1995) ("[T]he plaintiff need not be the owner of a registered trademark in order to have standing to sue" under Section 43(a)).

mark in commerce, and it also means that the mark is presumptively valid. Thus, in and of itself, the registration goes a long way toward demonstrating that Plaintiff Prince Immanuel is the rightful owner of a valid "Everlasting Life" service mark. *See, e.g., Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925, 928 (9th Cir. 2005) ("In essence, the registration discharges the plaintiff's original common law burden of proving validity [and ownership] in an infringement action." (internal quotation marks and citation omitted)).

Although Yah Kai does not enjoy the presumptions afforded by Prince Immanuel's registration, it derives its ownership interest in the mark from Prince Immanuel's license of the mark to it, both individually and as a representative of the Community. *See Partido Revolucionario Dominicano (PRD) Seccional Metropolitana de Washington–DC, Maryland y Virginia v. Partido Revolucionario Dominicano, Seccional de Maryland y Virginia*, 312 F. Supp. 2d 1, at *12 (D.D.C. 2004) (hereinafter "PRD") (holding that plaintiff established ownership under Section 43(a) solely based on a non-exclusive license granted to it by registrant, whereas defendant failed to show ownership because he was not authorized to use the mark). In addition, based on the evidence presented at trial, the Court is persuaded that the Community and Prince Immanuel were the first users of the mark and name in commerce starting in 1995—a fact Napper does not contest—and, therefore, Plaintiffs hold superior rights at common law that establish their exclusive ownership of the mark and entrust them with the legal power to prevent junior users (such as Napper) from infringing upon said mark. *See* McCarthy on Trademarks § 16:1.50 ("[I]t is not registration, but only actual [first] use of a designation as a mark that creates rights and priority over others."); *see also United*

*Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 100 (1918) (explaining that "[t]he general rule is that, as between conflicting claimants to the right to use the same mark, priority of appropriation determines the question").  Plaintiff Prince Immanuel testified that he was a Community member and leader in 1995, and that he worked with others to direct the opening of the Community's first Everlasting Life restaurant.  (*See* July 15, 2015 Trial Tr. at 61:20–63:18.)  And although Yah Kai did not exist as a separate legal entity back then, it can still be deemed a priority user based on the uncontroverted fact that the Community established Yah Kai (which is comprised solely of Community members) for the very purpose of acting as the Community's successor-in-interest with respect to using the Everlasting Life mark in conjunction with the operation of the Everlasting Life Health Complex business, and Yah Kai's exclusive use of the mark beginning in 2009 undoubtedly predates Napper's formation of the Everlasting Life Restaurant & Lounge (through Fair and Balanced) in 2011.[14]

Notably, the Lanham Act provides that an alleged infringer, such as Napper, may seek to challenge the ownership and validity of a registered mark pursuant to the statutory and equitable defenses and defects laid out in section 33.  *See* § 33, 15 U.S.C. § 1115; *see also Iowa Farmers Union v. Farmers' Educ. & Co-Op. Union*, 247 F.2d 809, 818 (8th Cir. 1957) (explaining that the defendant bears the burden of proof with

---

[14] When analyzing priority of use in order to determine ownership rights in a mark or name at common law, a user can rely on his or her predecessor-in-interest's first use to establish seniority (and superiority) of rights over a junior user. *See, e.g., SCM Corp. v. Langis Foods Ltd.*, 539 F.2d 196, 198 (D.C. Cir. 1976) (plaintiff was the successor to the original plaintiff, who in turn was the successor-in-interest to the first user of the mark in the United States, and was allowed to rely on his predecessor's first use); *JDR Indus. v. McDowell*, 121 F. Supp. 3d 872, 883 (D. Neb. 2015) (priority of use was established "through an unbroken chain of use in commerce by [plaintiff] and its predecessors-in-interest['s first use]").  Here, the Court finds that Yah Kai is the successor-in-interest to the Community with respect to the management of the Complex.

respect to asserted statutory defenses to a Lanham Act infringement claim); *Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. De C.V.*, 79 F. Supp. 3d 60, 73 (D.D.C. 2015) (stating that thedefendant bears burden of proving acquiescence, laches, and equitable estoppel).  This Court construes Napper's trial testimony and written submissions as an attempt to launch such a challenge: he claims, among other things, that he used the Everlasting Life mark prior to Prince Immanuel's registration of it; that equitable principles of acquiescence, estoppel, and laches bar a claim of infringement; and that Prince Immanuel has abandoned the mark.  (*See* Def.'s COL at 8–12; 2d Am. Answer, ECF No. 21, at 6.)  *See also* §§ 33(b)(2), (b)(5), (b)(9), 15 U.S.C. §§ 1115(b)(2), (b)(5), (b)(9).  This Court acknowledges Napper's valiant effort to rebut the presumption that the law affords to Prince Immanuel's registration certificate, but it finds that Napper has fallen far short of satisfying his burden of proof with respect to establishing any of these affirmative defenses, for several reasons.

First of all, in order to satisfy the elements of a prior use defense, Napper must show, at a minimum: "(1) that [he] adopted the mark without knowledge of plaintiff's . . . use; (2) that [his] use predates plaintiff's registration; [and] (3) that its use in the disputed area has been continuous since that time[.]"  *Foxtrap, Inc.*, 671 F.2d at 640. Napper insists that he has been using the phrase "Everlasting Life" in commerce since 1995 with respect to an unincorporated food business that he says he owns in his personal capacity (*see* 3d FOF Tbl. at 125 (A), 134 (B); *see also* July 14, 2015 Trial Tr. at 140:17–148:22 (Napper)), but this Court deems that assertion of fact simply not credible, and regardless, the Court finds that Napper's story fails to satisfy the elements of a prior use defense, because the record evidence clearly demonstrates that Napper

*knew* that Community members, including himself and Prince Immanuel, were using the mark in the operation of the Co-Op and Complex at or around the same time as he claims to have adopted it. Napper testified as much: he expressly stated that, when he allegedly adopted the name Everlasting Life for his separate individual business, he was managing the Everlasting Community Co-Op in the same space and at the same time. (*See* July 14, 2015 Trial Tr. at 140:17–148:22 (Napper) (claiming he ran a business from 1995 until 2000, which operated in the rear of the Co-Op and within the Complex as operated by the Community).) Thus, Napper has failed to demonstrate that he was unaware of the Community's use of the name, as the prior use defense requires. What is more, the record also reveals that Napper's alleged personal use of the mark has not been continuous, insofar as he was removed from management of the Complex (the purported homes base of his personal business) in February of 2008, and he sold the D.C. Co-Op in 2008 or 2009. (*See id.* at 74:25–76:9, 128:5–11 (Napper); *see also supra* Part III.C (explaining that Napper was not involved in the Co-Op and Complex from 2004 to 2007, and from 2008 to 2011).)

This Court is also not persuaded that the equitable principles that Napper seeks to rely upon to defend against the infringement claims are available to him in the context of this case. To establish acquiescence, for example, Napper must show that "the plaintiff actively represented [he] would not assert a right or claim[,]" *Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1207 (11th Cir. 2008) (citation and quotation omitted), and similarly, to establish laches, a defendant needs to demonstrate that "plaintiff had knowledge of defendant's use of its marks" and "inexcusably delayed in taking action with respect thereto," McCarthy on Trademarks

§ 31:1 (citation and quotation marks omitted). *See generally Angel Flight of Ga.*, 522 F.3d at 1207 ("The difference between acquiescence and laches is that laches denotes passive consent and acquiescence denotes active consent." (internal quotation marks omitted) (quoting *Coach House Rest., Inc. v. Coach & Six Restaurants, Inc.*, 934 F.2d 1551, 1558 (11th Cir. 1991))). But Napper's evidence at trial—which consisted exclusively of his own testimony—did not establish that Prince Immanuel ever consented to Napper's *individual* use of the mark in connection with his *own* businesses, *either* actively *or* passively; and indeed, Plaintiffs' proved that the opposite was true: Prince Immanuel immediately sent Napper a cease-and-desist letter on the eve of the eviction when he realized that Napper intended to take over the Complex and operate it as his own (*see* Trademark Infringement Notice from Prince Immanuel, Pls.' Ex. 15), and Prince Immanuel also credibly testified that he was unaware that Napper was operating an independent business and was using the Everlasting Life mark in connection with his personal (garage-founded) business (*see* July 15, 2015 Trial Tr. at 57:1–14 (Prince Immanuel)). This Court's conclusion that Prince Immanuel did not acquiesce to Napper's personal use of the mark and did not even know that Napper was using it in connection with his own individual business interests (assuming that he was) is entirely consistent with the record facts regarding the Community's fervent belief in collective ownership (*see, e.g.,* July 15, 2015 Trial Tr. at 55:25–56:12, 106:3–11 (Prince Immanuel); *id.* at 162:11–24 (Dr. Lee)), and it also credits Napper's own admission that he never told any member of the Community about his alleged independent business (*see* 3d FOF Tbl. at 97 (A, B) ("Napper never disclosed to members of the [Community] that he was operating a business in his garage.")).

It is also clear that any express or implied license that could possibly have been granted to Napper when he used the mark to manage the Community's business enterprises has been revoked. (*See* Trademark Infringement Notice from Prince Immanuel, Pls.' Ex. 15 ("[S]ince we are no longer in partnership I am hereby revoking your license to use the Everlasting Life trademark effective immediately in any locale or medium.").) And given that the "gravamen" of estoppel is an "intentionally misleading representation[]" regarding plaintiff's abstention from suit upon which the defendant relies to his detriment, *Petrella v. Metro-Goldwyn-Mayer, Inc*., 134 S. Ct. 1962, 1977 (2014), there is no legal or evidentiary basis for Napper's suggestion that Prince Immanuel has abandoned the mark by licensing it to the Community without any exercise of oversight or control, or that, by virtue of his actions, Prince Immanuel should somehow be estopped from asserting his right to exclusive use of the mark now (*see* Def.'s COL at 9–13). To the contrary, Prince Immanuel testified that, in his role as the local Community leader, he maintained continuous oversight over the Everlasting Life Health Complex's operations and management from its inception until Plaintiffs' eviction in 2011 (*see* July 15, 2015 Trial Tr. at 129:8–130:1), and that he authorized various Community members to use the mark precisely and solely because of their assigned roles with respect to the businesses and their adherence to the Community's service and food preparation standards (*see id.* 146:3–8). Nor did Yah Kai abandon its use of the mark at any point during its management of the Complex; rather, as the Community's representative, Yah Kai received Prince Immanuel's blessing to use the mark when that legal entity was formed in 2009 (*see* July 15, 2015 Trial Tr. at 134:13–15 (Prince Immanuel); Young Dep. 57:2–58:13), and Plaintiffs brought this

40

infringement suit against Napper immediately after he evicted them and other members of the Community from the premises and began operating the restaurant and using the mark independently. (*See generally* Compl.)

Thus, this Court finds that Napper's contention that Plaintiffs represented or asserted (either impliedly or expressly) that they would not pursue a legal action against him for his unauthorized use of the mark is baseless. And not only has Napper failed to meet his burden of proving any of the statutory defenses raised, but the presumptions of ownership, exclusive use, and validity that Prince Immanuel's proof of registration of the term "Everlasting Life" raises are sufficient to establish that the Plaintiffs owned a valid trademark and had an exclusive right to use that mark in commerce with respect to the services provided by the Complex.

> b. *The Term Everlasting Life Is Inherently Distinctive In This Context*

Plaintiffs also established by a preponderance of the evidence presented at trial that the phrase "Everlasting Life" is entitled to trademark protection because it is inherently distinctive when used in relation to a retail food-service establishment. *See Blinded Veterans Ass'n v. Blinded American Veterans Foundation*, 872 F.2d 1035, 1039 (D.C. Cir. 1989) ("The existence and extent of trademark protection for a particular term depends on that term's inherent distinctiveness.").

As a general matter, all words or phrases used as marks with respect to goods and services can be characterized as fitting into one of four categories of distinctiveness (arbitrary or fanciful; suggestive; descriptive, or generic) and, accordingly, are deemed entitled to stronger or weaker trademark protection. *See id.* Arbitrary marks are words or phrases that in no way describe or have any "intrinsic connection" to the particular

product/service it is meant to identify, and thus, are inherently distinctive. *Id.* at 1040; *see, e.g.*, *Appleseed Found.*, 981 F. Supp. at 675 (finding the mark "Appleseed" arbitrary when used in connection with a non-profit's legal "public advocacy" services). Similarly, while suggestive marks do imply some characteristic or quality of the product/service to which they are attached, if the consumer must use imagination or any type of multi-stage reasoning to understand the mark's significance, then that mark, too, is considered sufficiently distinctive to be afforded protection from infringing use. *See Blinded Veterans*, 872 F.2d at 1040 (citation omitted). Descriptive marks are deserving of less protection under the Lanham Act because they directly identify or describe some aspect, characteristic, or quality of the product/service to which they are affixed, in a straightforward way that requires no exercise of imagination to be understood. *See id.* at 1039–40 (explaining that, "[b]ecause descriptive terms are thus not inherently distinctive, they acquire trademark protection only upon proof of secondary meaning— *i.e.*, upon proof that the public recognizes only one source of the product or service" (citing *Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 118 (1938)). And the marks that receive the least protection under the Lanham Act (none) are those that are deemed "generic" insofar as they directly "refer[] to the genus of which the particular product is a species." *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985); *see, e.g.*, *Blinded Veterans*, 872 F.2d at 1041 (mark "Blinded Veterans" was generic when used to "refers to former members of the armed forces who have lost their vision"); *Nat'l Conf. of Bar Exam'rs v. Multistate Legal Studies*, 692 F.2d 478, 488 (7th Cir. 1982), *cert. denied*, 464 U.S. 814 (1983) (mark "Multistate Bar Examination" was generic when used to refer to "a test prepared for determining the competency of

applicants to the bars of the several states"). "Because a generic term denotes the thing itself, it cannot be appropriated by one party from the public domain[, and] it therefore is not afforded trademark protection even if it becomes associated with only one source." *Blinded Veterans*, 872 F.2d at 1039.[15]

It is well established that the registration of a mark is prima facie evidence of its distinctiveness, *see Am. Ass'n for Advancement of Sci. v. Hearst Corp.*, 498 F. Supp. 244, 256 (D.D.C. 1980); thus, by virtue of Prince Immanuel's registration, the mark "Everlasting Life" is presumptively distinctive. This means that Napper bears the burden of rebutting this presumption by a preponderance of the evidence; to carry this burden, he must show that, despite its registration, the mark was (or has become) generic, and therefore, is not entitled to protection. *See Colt Def. LLC v. Bushmaster Firearms, Inc.*, 486 F.3d 701, 705 (1st Cir. 2007); *Yellow Cab*, 419 F.3d at 928.

In this regard, Napper argues that the phrase "Everlasting Life" is a generic term that is commonly "used by religious organizations and other spiritual groups" (Def.'s COL at 13), and thus it is not entitled to trademark protection (*see id.* at 13–15).

---

[15] In this Circuit, "the test for genericness is whether the public perceives the term primarily as the designation of the article[.]" *Blinded Veterans*, 872 F.2d at 1041. "For example, 'washing machine' is a generic term; 'MAYTAG' is a [protectable] trademark for a particular brand of washing machine." *Heroes, Inc. v. Boomer Esiason Hero's Found., Inc.*, No. CIV. A. 96-1260, 1997 WL 335807, at *2 (D.D.C. June 6, 1997), *as amended*, No. CIV.A. 96-1260, 1997 WL 350097 (D.D.C. June 16, 1997). When commonly-used words are selected to designate the source of a product or service, courts have found the "Who are you—What are you?" test particularly instructive to distinguish generic from non-generic terms. Under this analysis, "[a] mark answers the buyer's questions '*Who* are you? *Where* do you come from?' '*Who vouches* for you?'" McCarthy on Trademarks § 12:1 (emphasis added). By contrast, "the [generic] name of the product answers the question '*What* are you?'" *id.* (emphasis added). So, for example, "APPLE is a generic name for the edible fruit of the apple tree, but is a trademark for computers[,]" and "BICYCLE is a generic name for the two-wheeled vehicle, but has been a trademark since 1885 for playing cards[.]" *Id.*; *see also id.* (providing several other examples, including that "CATERPILLAR is a generic name for the larva of a butterfly, but is a trademark for earth moving equipment" and "SANDALS is a generic name for warm-weather footwear, but is a service mark for a chain of Caribbean resort hotels").

Napper's argument misses the mark, however, because even if "everlasting life" is common phrase in religious circles, the generic nature of a term for the purpose of the trademark-infringement analysis must be evaluated *in the context* of the service or goods to which the term is being applied. *See* McCarthy on Trademarks § 12:1 ("[T]o properly be called an unprotectable 'generic name' in trademark law, the designation must be the name *of the same product or service* which it is alleged to identify the source of. Certainly, a term can be a generic name of one thing but be a valid trademark for some *other* product." (emphasis added)); *see, e.g.*, *Eurotech, Inc. v. Cosmos European Travels Aktiengesellschaft*, 213 F. Supp. 2d 612, 620 n.16 (E.D. Va. 2002) (rejecting as fallacious the argument that because the word "Cosmos" is commonly-used to identify the universe, it cannot be a used as a non-generic mark for travel agency services). Napper does not (and apparently cannot) contend that the term "Everlasting Life" is commonly used *in the restaurant or food-services industry*, or that the public typically perceives that phrase as primarily designating restaurant services. And, indeed, it is precisely because this Court finds that the phrase "Everlasting Life" is not ordinarily associated with the provision of food (and is, at most, suggestive of vegan, healthy meals) that the Court concludes that Napper has failed to rebut the presumption that the mark is inherently distinctive with respect to the products and services of a vegan restaurant or grocery store and is therefore is entitled to trademark protection. *See Eurotech, Inc.*, 213 F. Supp. 2d at 620 n.16 (noting that "simply because a word is commonly-used does not render it generic. Rather, many commonly-used terms receive Lanham Act protection within a particular industry: 'Delta' faucets, 'Polo' clothing, and 'Apple' computers"); *accord Appleseed Found.*, 981 F. Supp. at

675 n.3 ("[T]hird party uses [outside plaintiff's market]" do not "weaken[] the distinctiveness of plaintiff's mark within [its] field" of use).

       c.   *There Is A Strong Likelihood That Consumers Will Believe That Plaintiffs Sponsor, Or Are Affiliated With, Napper's Goods And Services*

The most salient consideration with respect to the trademark infringement claims at issue here is whether Napper's continued use of the "Everlasting Life" mark risks confusing the public. *See Two Pesos, Inc.*, 505 U.S. at 780 (Stevens, J., concurring) ("[T]he test for liability is likelihood of confusion: '[U]nder the Lanham Act [§ 43(a)], the ultimate test is whether the public is likely to be deceived or confused by the similarity of the marks.'" (second and third alterations in original) (citation omitted)). Notably, as mentioned, there need not be direct competition between Plaintiffs and Napper in order for "source confusion" to arise; rather, this unfortunate circumstance occurs whenever "consumers in the relevant product market are likely to believe that defendant's products or services come from the same source or are affiliated with plaintiff." *Appleseed Found.*, 981 F. Supp. at 674–75 (citation omitted); *see AMP Inc. v. Foy*, 540 F.2d 1181, 1184 (4th Cir. 1976) ("[T]he protection received by a registrant's trademark is not limited to cases of unfair competition, and exists between parties not in competition with each other."). The Lanham Act's aim is to prevent the public "from being confused as to the sponsorship of goods or services purchased[,]" which protects the mark's owner from being "harmed by such popular confusion because inferior service by the infringer might be attributed to the registrant." *AMP*, 540 F.2d at 1184; *accord Burger King Corp. v. Mason*, 710 F.2d 1480, 1493 (11th Cir. 1983) (same). And that kind of harmful confusion is precisely what Prince Immanuel and Yah Kai say is happening here.

Specifically, Plaintiffs contend that Napper is selling his products and services using a copy of Plaintiffs' distinctive mark (*see* Pls.' COL at 10–11); is operating in the "exact same facility with the exact same signage" (*id.* at 12); and is availing himself of Plaintiffs' prior business, including its "employees, its good will, its menus, its customer lists and its equipment" (*id.* at 11), all while intentionally concealing his ousting of the Community to freeride on Plaintiffs' reputation (*see id.* at 11–12).  (*See also* July 15, 2015 Trial Tr. at 131:11–133:21 (Prince Immanuel testifying that his mark was intended to protect Plaintiffs' business reputation and, among other things, ensure that its use by third-parties is conditional upon strict adherence to the well-known "standards and practices" associated with their products and services).) Based on the evidence presented at trial and the various factors that D.C. Circuit precedent establishes for evaluating the existence and degree of consumer confusion, this Court wholeheartedly agrees.

There are seven factors that the D.C. Circuit has found relevant to an evaluation of consumer confusion for Lanham Act purposes: "(1) the strength of the plaintiff's mark; (2) the degree of similarity between the two marks; (3) the proximity of the products; (4) evidence of actual confusion; (5) the defendant's purpose or reciprocal good faith in adopting its own mark; (6) the quality of defendant's product; and (7) the sophistication of the buyers."  *Globalaw*, 452 F. Supp. 2d at 48 (citations omitted). "[N]one of [these] is individually determinative and not all . . .  must be given equal weight or be present in every case[.]"  *Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo SA. De C.V.*, 69 F. Supp. 3d 175, 198 (D.D.C. 2014).  Here, the Court finds that mark strength, the degree of similarity between the protected mark and the

allegedly infringing mark, and the products' proximity are particularly relevant factors, and each compels the conclusion that Napper's continued use of the "Everlasting Life" mark creates a significant risk of consumer confusion, for the following reasons.

First and foremost, the "Everlasting Life" mark is a strong brand that the public has long identified with the food products that the African Hebrew Israelite community has introduced into the marketplace. (*See supra* Part IV.A.1.b; *see also* July 15, 2015 Trial Tr. at 131:11–21, 133:1–8 (Prince Immanuel) (explaining that Everlasting Life "has become known to be attached to" the Community and its "commercial enterprise[s]" in the healthy-food realm).) "[T]he relative strength of a mark is determined by weighing two aspects of strength: (1) Conceptual Strength: the placement of the mark on the spectrum of marks; and (2) Commercial Strength: the marketplace recognition value of the mark." McCarthy on Trademarks § 23:40:50. The mark Everlasting Life is conceptually strong because it is inherently distinctive in the context of a vegan food-serve establishment, as the Court has already concluded. *See supra* Part IV.A.1.b. This mark is also commercially strong, because the Court believes the uncontroverted testimony of Plaintiffs' witnesses regarding the public's recognition of the Community and its healthy food standards in relation to the term and mark Everlasting Life. (*See* July 15, 2015 Trial Tr. at 131:11–21, 133:1–8 (Prince Immanuel).)

In addition, the similarity between the Community's mark and Napper's trade name is unmistakable. The phrase "Everlasting Life" is the key distinguishing feature of Napper's restaurant name ("Everlasting Life Restaurant and Lounge"), which means that the name that Napper has selected is virtually identical to Yah Kai's trade name

"Everlasting Life" and Prince Immanuel's service mark, "Everlasting Life Health Complex."  *See AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 795 (6th Cir. 2004) ("The similarity of the senior and junior marks is a factor of considerable weight." (internal quotation marks and citation omitted)).  To be sure, the logo that Napper apparently includes on his advertising materials does not include the words "Community Owned Cooperative" or the phrase "Health Complex & Organic Market," as appears on the composite mark that Prince Immanuel registered, and the fruits and vegetables that are part of Prince Immanuel's mark have been omitted.  (*See* Def.'s COL at 8; *see also* July 14, 2015 Trial Tr. at 39:1–6 (Napper's counsel arguing "my client has never used that service mark. . . . He's using the term 'Everlasting Life,' different fonts, no fruits, nuts and berries")).  But Napper is wrong to insist that these differences thwart a finding of consumer confusion for the purpose of the infringement analysis, because it is well established that "[e]xact similitude is not required between defendant['s] mark and the [plaintiff]'s registered marks for there to be infringement."  *U.S. Olympic Comm. v. Int'l Fed'n of Body Builders*, No. 81–969, 1982 WL 917454, at *13 (D.D.C. Dec. 1, 1982).  This is because, "[i]f the 'dominant' portion of both marks is the same, then confusion may be likely, notwithstanding peripheral differences." McCarthy on Trademarks § 23:44.  And in any event, "the comparison between marks is made in light of what happens with consumers in the marketplace, not by viewing the marks side-by-side in a vacuum."  *Paleteria La Michoacana*, 69 F. Supp. 3d at 198.

When this Court considers the realities of the consumer experience, it has no doubt that all but the most discerning consumer would easily mistake Napper's mark and restaurant for (a perhaps updated version of) Plaintiffs' Everlasting Life Health

Complex. And this is especially so given that Napper's vegan food business is operating *in the same physical space* as the former Complex, and thus, is in the closest possible proximity to Plaintiffs' prior products and services. *See Brennan's, Inc. v. Brennan's Rest., L.L.C.*, 360 F.3d 125, 134 (2d Cir. 2004) ("In the restaurant industry, especially where individual restaurants rather than chains are competing, physical separation [or lack thereof] seems particularly significant to the inquiry into consumer confusion."). Furthermore, it appears that Napper actually has sought to *capitalize* on the customer confusion that this similarity and proximity undoubtedly creates: when the Community and Yah Kai were operating the Complex, the name "Everlasting Life" was prominently displayed on a sign on the outside of the Capitol Heights building; Napper retained that same sign—unaltered—when he took over the business in 2011, and has utilized it in advertising the Restaurant & Lounge. (*See* July 15, 2015 Trial Tr. at 141:25–143:5 (Prince Immanuel); *see also* Everlasting Life Restaurant & Lounge Store-front, Def.'s Ex. 1; Promotional Events by Fair & Balanced for Everlasting Life, Pls.' Ex. 22.)

Undaunted, Napper's counsel has struggled valiantly to convince this Court that there is nothing untoward about Napper's continuation of a restaurant business that, in Napper's view, he himself created. (*See, e.g.*, Def.'s COL at 15 ("[Napper] is providing the same goods and services he has always provided to the public. . . . The public is purchasing the same goods, from the same business, and the same proprietor, as it always has."); July 16, 2016 Trial Tr. at 33:23–34:1 (Napper's counsel) ("There's no evidence of deception or any attempt to mislead the public in this case. My client has been doing the same thing for the past 20 years."); *id.* at 35:13–14 ("My client is simply

continuing to operate his business.").) But far from exonerating Napper with respect to his audacious use of the same protected name that Plaintiffs previously had used to sell similar products, defense counsel's arguments only served to underscore the point. For example, counsel repeatedly emphasized that, rather than establishing a new, competing enterprise, Napper is currently operating "the *same* business . . . [that has] been in the *same* place using the *same* name that was being used prior to the trademark registration" (July 14, 2015 Trial Tr. at 39:17–22 (emphasis added)), which, counsel asserted, means that "[t]he food originates from the same place it always ha[s]" (*id*. at 42:15–17). (*See also* Def.'s COL at 19 ("[T]he customers are getting the same products from the same business[.]").) Counsel apparently took this tack in an attempt to dispel any notion that there are food-quality differences now that Napper is at the helm, but this declared sameness also amounts to an admission (and conclusive evidence) of the fact that Napper's continued use of the name "Everlasting Life" creates an untenable risk of confusing the public into believing that the African Hebrew Israelite community still sponsors, or is affiliated with, the goods and services being offered. Put another way, no matter how astute vegan consumers might be when it comes to evaluating marketed food products, fans of the Community's former Complex have no reason to believe that the *source* of the food that Napper is currently selling at the Capitol Heights facility has changed—even though it has—and the fact that the menu and other offerings have largely remained the same, makes it *more* likely that consumers will be confused about who is vouching for the goods and services offered at that facility, not *less*. *See* McCarthy on Trademarks § 23:20:50 ("[A]s the degree of similarity of the goods of the parties increases, 'the degree of similarity [of the marks] necessar[y] to

support a conclusion of likely confusion declines.'" (first and second alterations in original) (quoting *Fossil Inc. v. Fossil Grp.*, 49 U.S.P.Q.2d 1451 (T.T.A.B. 1998))).

The bottom line is this: the fact that Napper is now using a virtually identical name as the distinctive, protected service mark that Plaintiffs own and previously used in order to market virtually identical products and services from the exact same location where Plaintiffs once operated is a clear indication that the average consumer is likely to be confused into believing that Napper's Everlasting Life Restaurant and Lounge is affiliated with, or sponsored by, the Community and Plaintiffs. And because of the Court's near certainty that consumers will (mistakenly) think that Napper's food-service business is one of the enterprises that is owned and operated by the African Hebrew Israelites, this Court finds that Napper has committed trademark infringement in violation of the Lanham Act, as Plaintiffs' maintain in Counts I and II of their complaint.

2. Napper's Conduct Also Amounts To Unfair Competition Under Maryland Common Law

The Court's analysis of Plaintiffs' Lanham Act claims compels the conclusion that Napper has also violated the unfair competition principles of Maryland common law. "The essential element of unfair competition is deception," *GAI Audio of New York, Inc. v. Columbia Broad. Sys., Inc.*, 340 A.2d 736, 748 (Md. Ct. Spec. App. 1975), and the cause of action extends to "all cases of unfair competition in the field of business" under the principle that "no one, especially a trader, is justified in damaging or jeopardizing another's business by fraud, deceit, trickery or unfair methods of any sort[,]" *Baltimore Bedding Corp. v. Moses,* 34 A.2d 338, 342 (Md. 1943). Consistent

with this view, Maryland courts have broadly construed the type of conduct that can trigger liability for the tort of unfair competition, noting that

> [w]hat constitutes unfair competition in a given case is governed by its own particular facts and circumstances. Each case is a law unto itself, subject, only, to the general principle that all dealings must be done on the basis of common honesty and fairness, without taint of fraud or deception. Wherever, in any case, these elements of fair trade are found to be lacking equity will grant protection against the offending party.

*Id.*

Significantly for present purposes, Maryland courts have long held that "persisting in the use of the corporate name [of another] without modification of any kind, when, before it started operations, it had been given reason to believe through timely protest that its continued use of the name would probably create confusion amounting to unfair competition" is an unequivocal indication of wrongful and deceitful intent, and thus, warrants liability for unfair competition. *Id.* at 345. It is also clear beyond cavil that a claim for unfair competition under Maryland common law ultimately rests upon the same finding of "likelihood of confusion" that is required under the Lanham Act, as previously discussed. *See Putt-Putt, LLC v. 416 Constant Friendship, LLC*, 936 F. Supp. 2d 648, 659 (D. Md. 2013) ("Under the common law of Maryland, the applicable test for unfair competition is the same likelihood of confusion test applied under the Lanham Act." (citing *Scotch Whisky Ass'n v. Majestic Distilling Co.*, 958 F.2d 594, 597 (4th Cir. 1992))).

This Court has no doubt that the facts and circumstances of Napper's business practices as laid out in this Court's findings of fact amount to unfair competition in violation of Maryland common law, and this conclusion is rooted, in particular, in the Court's determination that Plaintiffs have shown a likelihood of confusion arising from

Napper's unauthorized use of the protected mark and name "Everlasting Life" after he evicted them from the premises that once housed the Complex. *See supra* Part IV.A.1. Thus, judgment will be entered in Plaintiffs' favor with respect to Count III of the complaint.

### B. Napper Converted Plaintiff Yah Kai's Property When He Evicted Them From The Capitol Heights Location

In addition to making the trademark infringement-related allegations discussed above, Plaintiffs have also accused Napper of having converted their property when he evicted them and other members of the Community from the Capitol Heights facility. (*See* Compl. ¶¶ 60–64 (Count VI)). For the reasons explained below, and based on the evidence presented at trial, this Court easily finds that (at least with respect to Yah Kai) Plaintiffs' conversion contention has been sustained.

### 1. Napper Intentionally Exerted Control Over Tangible Items Yah Kai Owned, And He Did So Without Yah Kai's Consent

Under Maryland law, the tort of conversion consists "of two elements[:] a physical act combined with a certain state of mind." *Darcars Motors of Silver Spring, Inc. v. Borzym*, 841 A.2d 828, 835 (Md. 2004). Regarding the physical act, "any distinct act of ownership or dominion exerted by one person over the personal property of another in denial of his right or inconsistent with it" will qualify, and such act "can occur either by initially acquiring the property or by retaining it longer than the rightful possessor permits." *Id*. at 835. As for the required mental state, the intent to exercise dominion or control over the property is both necessary and sufficient. *See id.* at 836. Moreover, notably, "[t]he defendant may have the requisite intent even though he or she acted in good faith and lacked any consciousness of wrongdoing, as long as there was an intent to exert control over the property." *Id.*

During the bench trial, Napper was adamant that, because he "originally purchased" equipment for the Complex when he managed it prior to 2009 (July 14, 2015 Trial Tr. at 90:12–19 (Napper)), his refusal to let Plaintiffs take anything with them when he took over the Complex in November of 2011, and/or his failure to reimburse Yah Kai for the equipment they had purchased for the facility, did not amount to conversion.  (*See, e.g., id*. at 105:9–106:11 (when asked if he had compensated Yah Kai for the equipment that he made them leave in the building during the eviction, Napper said "I didn't feel the need to reimburse Yah Kai for anything that was there before 2008 that was still there in 2011 even though it may have been different, new or otherwise")).  Napper has repeatedly asserted that he was the rightful owner of *all* of the equipment, inventory, and food supplies that were in the Complex in November of 2011, despite the fact that Yah Kai had made significant property purchases during its management tenure.  (*See* Napper Dep. 80:2–7 ("Q: And it says, 'You are not to remove any equipment from the building.' A: That's correct. Q: And why did you put this— A: Because when they took the business from me, the business came with equipment."); *see also* Everlasting Life Health Complex Financial Records for 2009–2015, Pls.' Ex. 31 (showing that Yah Kai made multiple purchases for food, office supplies, furniture and equipment between November 4, 2009 and August 2, 2011).)  Stated generously, Napper apparently believes that he was entitled to take over the entire premises in 2011, along with all equipment, inventory, and food products therein, without compensating Yah Kai, the Community, or the members who had purchased items between 2009 and 2011, because the same kind of uncompensated ousting had happened to him when he was removed from his position as manager of the

54

Complex against his will in 2008.  (*See* July 14, 2015 Trial Tr. at 104:20–106:16

(Napper).)  However, this Court finds that, once again, Napper's vision of his rights and

entitlements is inconsistent with the law and is not supported by the facts that were

established during trial.

For example, this Court cannot begin to assess Napper's contention that he was

the rightful owner of restaurant equipment and supplies that he purchased when he was

managing the Complex without any *proof* that he actually purchased any inventory or

equipment, and, equally important, that he did so in his individual capacity, thereby

reasonably entitling him to claim ownership.  (*See* 3d FOF Tbl. at 110 (A, B) ("At no

time did Napper produce any documentation of ownership or purchase of the

equipment[.]").)  Napper's own testimony regarding who owned what inside the Capitol

Heights facility is admittedly not based on his having taken an inventory at the time of

the eviction in order to determine what was there (*see* 3d FOF Tbl. at 76 (A, B), so it is

simply not a credible basis upon which to conclude that all of the restaurant equipment

and other property inside the Capitol Heights facility in the fall of 2011 belonged to

Napper.  Indeed, even if Napper's statements in this regard were deemed believable, he

admits only that he physically procured items for the Complex prior to 2009; his

statements do not demonstrate that he purchased those items with his *own* money, or

that he *personally* owned the equipment that he may have ordered, and, in fact, his

admissions strongly suggest the opposite.  (*See* 3d FOF Tbl. at 82 (B) (admitting that

"[t]he equipment was purchased *from the business revenue*" (emphasis added)); *see also*

*id*. at 85 (B) (Napper states that he "owned the equipment that was utilized and *paid for*

*by the business*" (emphasis supplied)).)

Similarly, Napper's suggestion that his allegedly unwarranted demotion as manager of the Complex entitled him to exercise vigilante justice by taking control of the facility in 2011—soup to nuts—finds no support in law, and also fails to comport with the facts that were presented during trial. Prince Immanuel and Dr. Lee both testified that Napper was compensated handsomely for his removal as manager—to the tune of $ 200,000 after the 2004 demotion, plus a proprietary interest in the Co-Op after the 2008 removal, which he partly sold for $ 70,000 (*see* 3d FOF Tbl. at 119–122 (A, B))—and there is nothing in the record that establishes that these payments were insufficient to reimburse Napper for the personal investments in inventory and equipment that he purportedly had made. Furthermore, and perhaps even more important, Napper offers no cases that stand for the proposition that one who feels slighted with respect to a prior transaction can (legally) appropriate the offending party's property at a later time without his consent, and this Court is aware of none. To the contrary, under clear and well-established law, so long as Napper intended to exert ownership or control over Yah Kai's property without that entity's consent, he is liable for conversion, regardless of whether he honestly believed that his actions were justified based on the Community's prior treatment of him and thus "acted in good faith and lacked any consciousness of wrongdoing[.]" *Darcars*, 379 Md. at 262; *see also First Union Nat. Bank v. New York Life Ins. & Annuity Corp.*, 152 F. Supp. 2d 850, 855 (D. Md. 2001) (explaining that "[a] mistake of law or fact is no defense[]" to a claim of conversion (internal quotation mark and citation omitted)).

This all means that, even in Napper's imagined *quid-pro-quo* universe, Maryland common law clearly establishes the conduct that qualifies as unlawful conversion, and

this Court has no doubt that such conduct occurred when Napper evicted Yah Kai, Prince Immanuel, and the other members of the Community. Specifically, as evidenced by the statements Napper made in the eviction notice and testified to at trial, Napper expressly and intentionally exercised dominion and control over all of the equipment, inventory, and food supplies that were inside the Capitol Heights facility as of November 15, 2011. (*See* 1st Notice to Vacate, Pls.' Ex. 14A; 2d Notice to Vacate, Pls.' Ex. 14B; *see also* July 15, 2015 Trial Tr. at 102:4–103:3 (Prince Immanuel).) And the items inside that facility included tangible property that Napper could not have had any claim to because Yah Kai had purchased them for the Complex during the years it managed that business on behalf of the Community. (*See, e.g.*, Everlasting Life Health Complex Financial Records for 2011-2015, Pls.' Ex. 31.) Such intentional exertion of dominion and control over another's tangible property is all that Maryland law requires for liability for conversion. *See, e.g.*, *Darcars*, 379 Md. at 257–60 (car dealership converted plaintiff's "$2,500 cash down-payment, . . . laptop and CDs that had been taken during the [lawful] repossession" of plaintiff's car and never returned); *K & K Mgmt., Inc. v. Lee*, 557 A.2d 965, 982 (Md. 1989) (defendant directly converted plaintiff's equipment and furniture by not allowing their removal upon defendant's repossession of the premises on which they were located, notwithstanding defendant's mistaken belief that he shared ownership over the property). Therefore, Napper is liable for conversion, and Yah Kai is entitled to judgment in its favor on Count VI.[16]

---

[16] Plaintiffs have fashioned their pleadings and evidence to bring a claim of conversion solely based upon property owned by Yah Kai. (*See e.g.*, Compl. ¶ 31 ("[Napper] has converted the equipment in the property *which belongs to the Yah Kai* and the Community[.]" (emphasis added)); Pls.' COL at 18 ("Napper had absolutely no rights whatsoever to *Yah Kai's* equipment, customer lists, menus, employees, use of its name and business operation." (emphasis added).) Because conversion necessitates a threshold finding of ownership to warrant redress, the Court finds that Yah Kai alone has

2.  <u>Yah Kai's Damages For Conversion Include Not Only The Value Of The Restaurant Equipment, Food, And Other Tangible Items It Purchased For The Complex, But Also The Pepco Rebate Amount</u>

As noted above, the parties here have consented to proceed to a jury trial on damages, so it will be up to the jury to sort out the value of the items Napper converted based on Yah Kai's proof of purchases that it made, but it is worth pausing here to inform the parties of the law that governs the scope of Yah Kai's recovery.  Under Maryland law, when conversion occurs, a plaintiff is entitled to recover "the full value of the chattel" measured by its "market value . . . at the time and place of conversion plus interest to the date of judgment."  *Staub v. Staub*, 376 A.2d 1129, 1132–33 (Md. Ct. Spec. App. 1977).  Although it used to be that only tangible property was recoverable with respect to a claim of conversion, Maryland law now also permits recovery for intangible property interests in specific circumstances, such as when a defendant converts a paper or digital document that embodies the plaintiff's right to certain intangible property.  *See Neuman v. Travelers Indem. Co.*, 319 A.2d 522, 525 (Md. 1974) (tangible property is property that has "physical substance" and all other property is intangible (citation omitted)).  Under such circumstances, the defendant is liable not only for the value of the document defendant converted, but also the intangible rights that document represents.  *See Lawson v. Commonwealth Land Title Ins. Co.*, 518 A.2d 174, 176 (Md. Ct. Spec. App. 1986) ("[I]njured owner could recover not just the nominal value of the document itself that was wrongfully withheld but also the value of the right evidenced or represented by the document."); *see also Thompson*

---

sustained its burden, and it cannot conclude that Prince Immanuel has established any entitlement to damages for conversion.

*v. UBS Fin. Servs., Inc*., 115 A.3d 125, 133 (Md. 2015) (explaining that Maryland courts have found such recovery appropriate when a defendant converts "a stock certificate, a promissory note, or a document that embodies the right to a life insurance policy" (internal citations omitted)).

Consequently, with respect to the instant case, Napper will be required to reimburse Yah Kai for the tangible items he converted in November of 2011—*e.g.*, the restaurant equipment and food that Plaintiffs were forced to leave behind when Napper evicted them—and also any intangible property rights that Plaintiffs can prove Napper took, including those embodied in the records that were in the facility at the time of the November eviction. (*See* Compl. ¶ 61 (alleging that "Napper has converted Plaintiff's customer base and confidential business information and records"; *see also* Napper Dep. 139:3–9 ("Q: Did you return the documents that were [in the Complex's file cabinets] to Yah Kai [after the November 15th eviction]? A: No, I didn't. Q: Did you ever look in those files to examine – do an inventory of what was in those files? A: Sure, we did.").) Certain "confidential business information" (Compl ¶ 61) that Yah Kai compiled while operating the Complex and existed in Yah Kai's business records from 2008 to 2011 qualifies as a recoverable intangible property interest of Yah Kai. *See Carpenter v. United States*, 484 U.S. 19, 26 (1987) ("Confidential business information has long been recognized as property[.]").[17]

---

[17] To the extent that Yah Kai claims the ability to recover their interest in "customer information" included in the physical customer lists left in the Complex (Compl. ¶ 61), the Court notes that, under Maryland law, a "compilation of customer information does not, as a matter of course, carry with it the right to exclude all others from also possessing the same information," and, therefore, cannot be the subject of a conversion claim, even when embodied in tangible documentation, *Alliance for Telecommunications Indus. Sols., Inc. v. Hall*, No. CCB-05-440, 2007 WL 3224589, at *14 (D. Md. Sept. 27, 2007); *see also Thompson*, 115 A.3d at 134 ("It is at present the prevailing view that there can be no conversion of . . . such intangible [property] rights as the goodwill of a business or the names of customers."). However, if Yah Kai can establish that other types of confidential business information

Also recoverable under the circumstances presented here is the intangible utilities rebate amount that was revealed for the first time during trial, because this rebate was "a debt" that Yah Kai was "entitled to collect[,]" as reflected in the PEPCO invoices that Yah Kai stored in the file cabinets that Napper converted at the time of the eviction. *Texas v. New Jersey, et al.*, 379 U.S. 674, 677 (1965) (stating that "a debt which a person is entitled to collect is intangible property), *supplemented sub nom. Texas v. New Jersey*, 380 U.S. 518 (1965); *Medi-Cen Corp. v. Birschbach*, 720 A.2d 966, 972 (Md. Ct. Spec. App. 1998) (holding that a balance due from debtor can be subject to conversion through physical documents, such as a general accounting ledger, that evidenced those debts). The evidence at trial established that it was Yah Kai—not Napper—that had overpaid for the utilities that the Complex used between 2009 until 2011. (*See* 3d FOF Tbl. at 88 (A), 78 (A, B); July 15, 2015 Trial Tr. at 181:16 (Dr. Lee) ("Yah Kai continued to pay that electric bill [from 2009 to 2011]"); *see also id.* at 34:14–23 (Napper) (admitting he was not paying utilities but that he knew that someone else in the Community, likely Yah Kai, was instead making the payments).) Yet, when the management company sought to provide the $ 125,000 rebate from PEPCO, it was Napper who negotiated the rebate credit for his own personal benefit. *See supra* Part III.D and note 11. Moreover, according to Carol Allen, Napper demonstrated his purported entitlement to the rebate *by tendering documentation* regarding the prior overpayments in the form of utility invoices for the years of 2008 through 2011. (*See* July 15, 2015 Trial Tr. 87:15–88:20.) Based on the record evidence, this Court finds

---

was in the records it left behind, it may seek to recover those intangible property interests during future proceedings on damages.

that those invoices belonged to Yah Kai and were stored in the business files that Napper exerted dominion and control over when he evicted Yah Kai and the Community. Furthermore, because those invoices were the only documents requested (and presented) to substantiate (and support) a right to the rebate payment in the amount of $ 125,000 (*see id.* at 87:15–88:20 (Allen)), the tangible invoices that Napper converted—and then presented to Allen—encompassed Yah Kai's intangible property interest in the PEPCO rebate as a matter of law. *See First Union Nat. Bank*, 152 F. Supp. 2d at 855 (D. Md. 2001) (explaining that, in order to recover for conversion, a plaintiff has to show that he is "entitled to possession of any document evidencing the [intangible property interest] or that any such document[] [is] necessary to the protection and enforcement of the intangible rights").[18]

In short, Plaintiffs have established that documents exist that establish and encompass their right to a $ 125,000 rebate (the PEPCO invoices), and also that Napper converted and used those documents to secure the rebate for himself. Consequently, Napper must pay damages under a theory of conversion for the intangible property rights of Yah Kai that were embodied in the records that Napper converted, as well as

---

[18] Notably, in this set of circumstances, the fact that the rebate payment never took the form of actual currency—*i.e.*, that Kingdom Management did not tender cash or a check to Napper, but instead credited his future rent payments—does not thwart Yah Kai's conversion claim; if anything, one might argue that the form of the rebate here makes Yah Kai's claim for damages even stronger. That is because, "[a]s a general rule, money, i.e., currency, is not subject to a claim of conversion" under Maryland law, *Darcars*, 379 Md. at 258 n.3; *see also Tillery v. Borden*, No. CBD-07-1092, 2010 WL 3517015, at *8 (D. Md. Sept. 3, 2010) (defendant cannot exert ownership or control over money that was applied to satisfy obligations and debts), but the rebate at issue here was, and has always remained, an intangible property interest in the future satisfaction of a debt, and as such, Maryland law permits its recovery. *Cf., Diane Sales, Inc. v. Am. Express Centurion Bank*, No. GLR-14-1063, 2014 WL 11429026, at *2–3 (D. Md. July 14, 2014) ("[Because] monies deposited in a bank account are not the personal property of the account holder, but rather they "consist[ ] of nothing more or less than a [bank's] promise to pay," plaintiff had intangible property rights in those funds which must be embodied in a tangible document to be converted. (second alteration in original) (internal quotation marks and citation omitted)).

any other tangible and intangible property interests of Yah Kai that were taken when Napper evicted them from the Complex.

### C. Napper Did Not Owe A Fiduciary Duty To Plaintiffs, And Therefore, Did Not Usurp Their Corporate Opportunity

Finally, after careful consideration of the evidence and law, this Court has reached the conclusion that Napper cannot be held liable for usurpation of corporate opportunity under Maryland law, as Count VI contends. As "an offshoot of the general duty of loyalty owed by corporate officers, directors and upper-level management employees[,]" *Maryland Metals, Inc. v. Metzner*, 382 A.2d 564, 572 (Md. 1978) (footnote omitted), the doctrine of usurpation of corporate opportunity is quite narrow: it precludes "corporate personnel"—*i.e.*, individuals who have a fiduciary duty of loyalty to the corporation—"from diverting unto themselves opportunities which in fairness ought to belong to the corporation." *Id*. at 572 n.5. The core principle of a duty of loyalty is the existence of a *fiduciary* relationship between the parties; where such a relationship exists, the party has a legal duty to act for the benefit of the other party in matters within the scope of their relationship. *See Lasater v. Guttmann*, 5 A.3d 79, 93 (Md. 2010) (citation omitted); *see also Sterling v. Ourisman Chevrolet of Bowie Inc.*, 943 F. Supp. 2d 577, 599 (D. Md. 2013) ("Examples of fiduciary relationships include trustee and beneficiary, guardian and ward, agent and principal, attorney and client, partners in a partnership, corporate directors and their corporation." (internal quotation marks and citation omitted)). Notably, a fiduciary relationship is not synonymous with a "confidential" relationship—the former gives rise to a *legal* duty and is based on the nature of the relationship as a matter of law, while, to have the latter, a party need only have "gained the confidence of the other and purport[s] to act

or advise with the other's interest in mind." *Lasater*, 5 A.3d at 93 (internal quotation marks and citation omitted).

Try as it might, this Court can find no evidence that Napper had a fiduciary relationship—as that term is defined by law—to Yah Kai, Prince Immanuel, or, for that matter, the Community. Indeed, in the fall of 2011, when Napper surreptitiously renewed the lease for the Capitol Heights location and evicted Yah Kai (which, as far as this Court can tell, are the acts that comprise the alleged usurpation) Napper was no longer the manager of the Complex. (*See* July 15, 2015 Trial Tr. at 81:8–19 (Prince Immanuel) (explaining that Napper was permanently removed from the Complex's management by the Community leaders at the October 2008 meeting).) Perhaps even more important, the record clearly reflects that he was essentially estranged from the Community leadership at the time. (*See* July 14, 2015 Trial Tr. at 45:21–46:2 (Napper) (attesting that he no longer associated with the Community's leadership after 2008 or 2009).) It is possible that, even so, Napper might have had a fiduciary relationship with ELCC when he renewed the lease in 2011, because he was purporting to serve as that entity's agent with respect to the execution of contracts and other legal documents. But ELCC is not joined as a plaintiff in this lawsuit, and to the extent that Napper's conduct in renewing the lease in his own name clearly constituted a taking of a corporate opportunity from named-Plaintiff Yah Kai (which was seeking to take over the lease at that same time), the record establishes that Napper was never an agent of Yah Kai and thus did not owe Yah Kai a legal duty to refrain from undertaking the challenged renewal. (*See* July 15, 2015 Trial Tr. at 81:20–21 (Prince Immanuel) ("Mr. Napper was

offered a position on [the Complex's restructuring scheme and in the creation of Yah Kai] along with Dr. Lee, Mr. Young and Mr. Clay. He refused.").)

This Court truly understands the thrust of Plaintiffs' contention that Napper betrayed them, and their feelings of betrayal are certainly borne out by the unfortunate facts and circumstances presented during the trial. Dr. Lee put it best when she characterized the Complex as a business that the Community had lovingly created and that the Community owned "as a collective body[.]" (*Id.* at 205:2–5 (Dr. Lee).) Everyone had invested in the project and had worked together to ensure its success, but "[s]omewhere along the line there was a dispute" (*id.* at 205:6), and "in the blink of an eye[,]" without any warning or explanation, Napper "had negotiated a lease on his own" (*id.* at 205:25, 206:7–8), and "Yah Kai [didn't] have access to the facility, [didn't] have access to the business Everlasting Life Health Complex any longer" (*id.* at 205:12–15). This Court has no doubt that the swift and painful eviction that Napper coldly executed crushed the dreams and financial stability of a giving group of people whom he had previously "loved" and had shared his life with as "brother[s] and . . . sister[s.]" (July 14, 2015 Trial Tr. at 85:18–19 (Napper).) But a *moral* obligation to do the right thing when a business opportunity arises is not the same a *legal* one. And Plaintiffs have failed to demonstrate that Napper owed them a fiduciary duty of loyalty, as Maryland law requires. Consequently, with respect to Count IV of the complaint, this Court must enter judgment for Defendant.

## V.     CONCLUSION

For the reasons explained above, and based on the evidence presented at trial, this Court concludes that Plaintiffs have satisfied their burden of proof with respect to several legal claims.  As a result, this Court finds that Defendant is liable for federal trademark infringement and unfair competition under the Lanham Act (Counts I and II), Maryland common law unfair competition (Count III), and Maryland common law conversion (Count VI), but that Defendant is not liable for Maryland common law usurpation of a corporate opportunity under Count IV.  As set forth in the accompanying order, the parties will now be directed to submit a joint proposed schedule for further proceedings in this matter, including dates for a jury trial with respect to damages for Counts I, II, III, and VI of the complaint.

DATE:  July 3, 2016              *Ketanji Brown Jackson*
                                KETANJI BROWN JACKSON
                                United States District Judge