# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| YAH KAI WORLD WIDE ENTERPRISES, INC., *et al*., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 11-cv-2174 (KBJ) |
| GEOFFREY NAPPER, | ) ) | |
| Defendant. | ) ) ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW
## REGARDING DAMAGES

At the conclusion of a three-day bench trial held in July of 2015, this Court determined that Defendant Geoffrey Napper is liable for trademark infringement, unfair competition, and conversion in connection with Napper's appropriation and control of the food-service business in Capitol Heights, Maryland that is presently named "Everlasting Life Restaurant & Lounge." *See Yah Kai World Wide Enters., Inc. v. Napper*, 195 F. Supp. 3d 287, 326–27 (D.D.C. 2016) [hereinafter *Yah Kai I*]. Because the liability and damages questions in this case were bifurcated for trial, the Court then proceeded to hold an additional one-day bench trial to evaluate the monetary damages and other remedies available to Plaintiffs Prince Immanuel Ben Yehuda and Yah Kai World Wide Enterprises, Inc. Following the damages trial, the parties submitted proposed findings of fact and conclusions of law that addressed the facts that had been established relating to damages and the remedies to which Plaintiffs were entitled as a result of Napper's violations. (*See* Pls.' Proposed Conclusions of Law on Damages

("Pls.' Dam. COL"), ECF No. 111; Def.'s Proposed Conclusions of Law on Damages ("Def.'s Dam. COL"), ECF No. 112; Pls.' Corrected Proposed Findings of Fact on Damages, ECF No. 113-1 ("3d Dam. FOF Tbl.").)  This Court's own findings of fact and conclusions of law appear below.

In short, after reviewing the evidence presented at both trials, the parties' submissions, and the legal theories that the parties contend apply to the established facts of this case, this Court finds that Plaintiffs have demonstrated that they are entitled to monetary damages for Napper's violation of the Lanham Act, 15 U.S.C. §§ 1051–1129, in the form of (1) the profits that Napper's infringing conduct generated, (2) actual damages, and (3) attorney fees and costs—all of which overlap with the damages Napper owes for unfair competition under Maryland common law.  Plaintiffs are also entitled to compensatory damages related to Napper's tortious conversion of both their tangible assets and certain intangible rights, along with prejudgment interest related to the conversion damages, but Plaintiffs have not sustained their burden with respect to any claims for injunctive relief, nor have they shown that an award of punitive damages under Maryland common law is appropriate here.

Accordingly, **JUDGMENT WILL BE ENTERED IN PLAINTIFFS' FAVOR** against Napper for monetary damages in the amount of $2,598,849 (consisting of: $1,856,144 for Napper's profits and $545,407 for Plaintiffs' actual damages for trademark infringement/unfair competition, plus $142,864 in compensatory damages for conversion and $54,434 in prejudgment interest on those conversion damages).  In addition, Plaintiffs will recover a yet-to-be determined amount of attorney fees and

costs arising from the litigation of Plaintiffs' trademark infringement claims.  A separate order consistent with the Court's findings and conclusions will follow.

## I.     BACKGROUND

### A.     The Court's Liability Findings

This Court's Findings of Fact and Conclusions of Law regarding Napper's liability for certain breaches of the Lanham Act and Maryland common law are laid out in a lengthy Memorandum Opinion that the Court issued on July 3, 2016.  (*See* Findings of Fact & Conclusions of Law, ECF No. 69.)  The background facts are recited at length in that opinion, and need not be reproduced here.

It suffices to recall now that Plaintiffs are members of the African Hebrew Israelite Community ("the Community"), which follows a strict vegan diet, *see Yah Kai I*, 195 F. Supp. 3d at 292, and that the Community founded and maintained a food-service business called the "Everlasting Life Health Complex" ("the Complex") through the service and monetary contributions of its members, including Plaintiffs, *see id.* at 298–99.  Napper—a former member of the Community—played a key role in starting the Complex and served as its first manager, but Community leaders eventually replaced Napper with Yah Kai World Wide Enterprises, Inc., an incorporated entity that the Community created.  *See id.* at 301–03.  In response to the Community's decision to remove him from the manager's post, Napper utilized his legal status as the Community's agent on the Complex's lease to evict members of the Community and Yah Kai and to assert total control over the business.  *See id.* at 303–05.  Plaintiffs filed the instant legal action because Napper appropriated their business for himself, and has continued to operate essentially the same food-service establishment using the

trademarked name "Everlasting Life" in the same location as that business operated prior to the takeover. *See id.* at 305. Plaintiffs claimed that Napper's operation of what he now calls the "Everlasting Life Restaurant & Lounge" ("the Restaurant") infringed upon Prince Immanuel and Yah Kai's trademark rights in violation of the Lanham Act, and constituted unfair competition under both the Lanham Act and Maryland's common law. *See id.* at 293–94, 305. Plaintiffs also asserted that Napper's theft of the Complex, and the goods and records contained therein, constituted conversion of Yah Kai's tangible and intangible property in violation of Maryland's common law. *See id.* at 293–94.

After a bench trial regarding Napper's liability, this Court found that Napper was liable for his actions in forcibly evicting Plaintiffs from the premises, seizing their equipment and goods, and re-opening the business at the same location with the same moniker. *See id.* at 305–07. To be specific, this Court held that Napper had committed trademark infringement under Section 32 of the Lanham Act and the tort of unfair competition under both Section 43(a) of the Lanham Act and Maryland common law, and the Court also found that Napper had converted tangible and intangible property owned by Yah Kai in violation of Maryland common law. *See id.* at 308–26.[1]

### B.     The Present Proceedings

After this Court issued its liability findings, the parties proceeded to engage in additional discovery related to the question of damages, with the initial intention of presenting the damages issues to a jury. (*See* Scheduling Order, ECF No. 73.) However, Plaintiffs subsequently opted to litigate damages in the context of a second

---

[1] The Court rejected Plaintiffs' contention that Napper had usurped a corporate opportunity in violation of Maryland common law. *See Yah Kai I*, 195 F. Supp. 3d at 325–26.

bench trial. (*See* Notice, ECF No. 85.) That trial began on February 13, 2017, and concluded later that same day. During the trial, Plaintiffs offered the testimony of three witnesses: Prince Immanuel, Napper, and Darrel Edwards (*see* Feb. 13, 2017 Trial Tr. ("Damages Trial Tr.") at 23:20–155:22); Edwards had served as Yah Kai's accountant and is currently the accountant for Napper and Fair and Balanced, LLC, which is the umbrella corporation that Napper formed to manage his restaurant businesses, *see Yah Kai I*, 195 F. Supp. 3d at 295–96. Napper elected not to call any witnesses or to provide any independent evidence regarding damages, and the parties proceeded immediately to closing arguments at the conclusion of Plaintiffs' case-in-chief. (*See id.* at 159:1–169:6.) The parties also agreed to keep the record open after trial so that Edwards could supply documents that detailed the Restaurant's expenses and gross sales for the years 2011 through 2016. (*See id.* at 147:2–149:16; 153:3–154:23.) For the most part, these documents were filed with the Court on February 22, 2017. (*See* Def.'s Doc. Produc. Reqs. Pursuant to Feb. 13, 2017 Ct. Order, ECF No. 105.)

The parties then engaged in the detailed process that this Court requires for submitting proposed findings of fact in the wake of a bench trial. (*See* Order Regarding Proposed Findings of Fact and Conclusions of Law, ECF No. 103, at 1–2 (requiring the proposed findings to be offered in different iterations and in table format); *see also* Pls.' Proposed Findings of Fact Regarding Damages, ECF No. 107-1 ("1st Dam. FOF Tbl."); Def.'s Proposed Findings of Fact on Damages, 109-1 ("2nd Dam. FOF Tbl."); 3d Dam. FOF Tbl.)[2] After the proposed findings of fact table was compiled and submitted, the parties filed proposed conclusions of law. (*See* Pls.' Dam. COL; Def.'s Dam. COL.)

---

[2] The entire corpus of the findings that the parties have proposed to the Court appear in two tables that were completed in several iterations. (*See* Proposed Findings of Fact, ECF No. 64 ("3d Liability FOF

## II.    LEGAL STANDARD

"In an action tried on the facts without a jury . . . the court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). "In setting forth the findings of fact, the court need not address every factual contention and argumentative detail raised by the parties, [n]or discuss all evidence presented at trial." *Moore v. Hartman*, 102 F. Supp. 3d 35, 65 (D.D.C. 2015) (internal quotation marks and citations omitted). Instead, "'the judge need only make brief, definite, pertinent findings and conclusions upon the contested matters'" in a manner that is "sufficient to allow the appellate court to conduct a meaningful review." *Wise v. United States*, 145 F. Supp. 3d 53, 57 (D.D.C. 2015) (quoting Fed. R. Civ. P. 52(a) advisory committee's note to 1946 amendment); *see also Lyles v. United States*, 759 F.2d 941, 943 (D.C. Cir. 1985) ("One of [Rule 52(a)'s] chief purposes is to aid the appellate court by affording it a clear understanding of the ground or basis of the decision of the trial court." (internal quotation marks and citation omitted)).

## III.    FINDINGS OF FACT PERTAINING TO THE MONETARY DAMAGES OWED TO PLAINTIFFS AND OTHER REQUESTED REMEDIES

This Court's findings of fact with respect to Plaintiffs' request for damages and injunctive relief are based on the testimony and exhibits that the parties submitted during the second bench trial, the Court's observation of the witnesses' demeanor, the Court's conclusions regarding the witnesses' credibility, the parties' stipulations, and the record as a whole, which includes the evidence offered in the liability bench trial.

---

Tbl"); 3d Dam. FOF Tbl.)  In the instant Memorandum Opinion, citations to specific material in the tables will reference the row number or numbers in which the material is located, followed by the relevant column or columns, which are designated "A," "B," and "C."  Thus, a pincite to "3d Dam. FOF Tbl. at 38-40 (A)" corresponds to lines 38 through 40 under Column A.

**A. Overview Of The Evidence Presented During The Damages Trial**

As explained above, Plaintiffs called Prince Immanuel, Napper, and Edwards to the stand during the bench trial on damages, and Defendant Napper opted not to put on any case-in-chief. Prince Immanuel was the first to testify. (*See* Damages Trial Tr. at 24:1–34:6 (Prince Immanuel).) Among other things, his testimony addressed his ownership of the Everlasting Life trademark, the recent expiration of his trademark registration, and the agreements he had with other individuals regarding their use of that trademark. In addition, Prince Immanuel testified about Napper's use of the Everlasting Life trademark to promote the Restaurant after Napper evicted Yah Kai from the Complex, including Napper's use of the trademark with respect to internet advertising. For the most part, Prince Immanuel appeared to testify candidly, although he avoided providing direct answers to questions regarding the current registration status of the Everlasting Life trademark. (*See, e.g., id.* at 30:5–11 ("Q. Have you been made aware [] by either your counsel or any other sources that you are no longer the holder of that trademark? A. That's rumored. Q. Rumored? A. We heard that, but again, as I've said, we're following up on that to clarify the situation.").)

Next, Plaintiffs called Napper as an adverse witness. (*See id.* at 34:14–130:21 (Napper).) While testifying, Napper spoke extensively about his management of the Restaurant and its current parent corporation, Fair and Balanced LLC. Napper's testimony also touched upon the contents of Napper's personal tax returns; the contents of Fair and Balanced's tax returns; Napper's purported ownership of the equipment and inventory present within the Complex on November 15, 2011; the gross sales for the various restaurants Fair and Balanced LLC manages and the amount of those sales that are attributable to the Restaurant; Napper's accountant's handling of Fair and Balanced

LLC's profit and loss statements; the number of Everlasting Life employees; Napper's and the Community's relationships to the Restaurant; Napper's use of the Everlasting Life moniker to promote the Restaurant; and Napper's eviction of Yah Kai on November 15, 2011. (*See id.*) Napper was frequently unable to respond to questions regarding the Restaurant's finances from 2011 to 2016 (*see, e.g.*, *id.* at 63:4–7), and his testimony regarding the equipment and assets he converted on November 15, 2011 was imprecise and, at times, evasive (*see, e.g.*, 113:25–114:4 ("Q. And within the next several days you then took that business and everything that was in it and you reopened it in your own name; right? By that I mean you opened it as your restaurant? A. As Everlasting Life.")). Furthermore, throughout his testimony, Napper adamantly—and apparently sincerely—contended that he was the rightful owner of the Everlasting Life business. (*See, e.g.*, *id.* at 99:9–17 ("Your honor, again with all due respect to you and the decision you made . . . Everlasting Life has been my business . . . and your decision didn't change my heart.").)

At the conclusion of Napper's testimony, Plaintiffs called Everlasting Life's perennial accountant, Darryl Edwards. (*See id.* at 132:7–155:22 (Edwards).) Edwards testified about how he had prepared tax returns for Napper and for Fair and Balanced LLC, and also how the profit and loss statements for each of Napper's various restaurants are generated. (*See id.*) Throughout his testimony, Edwards appeared reluctant to answer questions regarding the Restaurant's profits and expenses, and he admitted that he had not yet complied with Plaintiffs' subpoena demanding individualized profit and loss statements for the Restaurant. (*See id.* at 142:5–143:10.) Given Edwards's incomplete testimony, the parties and the Court agreed to leave the

record open so that Edwards could provide these missing documents for the Court's review after trial. (*See id.* at 148:23–149:13; 154:21–23.)

In addition to the live testimony presented during the damages trial, the parties stipulated to the admission of several documents, including: (1) all exhibits admitted at the liability trial; (2) personal tax returns for Napper, from 2012–2015 (*see* Pls.' Damages Trial Ex. 1, ECF No. 114); (3) tax returns for Fair and Balanced LLC, from 2011–15 (*see* Pls.' Damages Trial Ex. 2, ECF No. 114-1); (4) a 2015 notice regarding Prince Immanuel's Trademark Registration for Everlasting Life (*see* Pls.' Damages Trial Ex. 4, ECF No. 114-2); (5) advertisements Napper generated for the Everlasting Life Restaurant and Lounge (*see* Pls.' Damages Trial Ex. 5, ECF No. 114-3); and (6) one of Napper's Facebook posts about the bench trial in this case (*see* Pls.' Damages Trial Ex. 8, ECF No. 114-4).[3] The parties also moved into the record various other summary reports and evaluations pertaining to the financial status of the Restaurant and Napper's other businesses, including: (1) a written report authored by Jerome S. Paige & Associates, LLC that purports to analyze Fair and Balanced LLC's sales and costs (*see* Pls.' Damages Trial Ex. 11, ECF No. 114-5); (2) a spreadsheet titled "Everlasting Life Restaurant & Lounge Expenses by Vendor Detail" that allegedly demonstrates the Restaurant's costs and expenses from 2011–15 (Def.'s Damages Trial Ex. 1, ECF No. 105-1); (3) a summary of the Restaurant's gross sales and claimed profits (Def.'s Damages Trial Ex. 2, ECF No. 105-2); and (4) a list of itemized costs and expenses for the Restaurant in 2014 and 2015 (Def.'s Damages Trial Exs. 3 & 4, ECF Nos. 105-3 &

---

[3] The parties submitted most of these documents to the Court in hard copy only and did not file them on ECF. The Court has posted sealed versions of all the financial records that were provided to it in this case that the parties had not previously posted in ECF. (*See* Pls.' Damages Trial Exs., ECF No. 114.)

105-4). On the whole, these documents seek to generally address and illuminate the financial situations of Napper, Fair and Balanced LLC, and Everlasting Life between the years of 2011 and 2015. They are also relevant to this Court's conclusions regarding the status of the Everlasting Life trademark, Napper's state of mind regarding his use of that trademark, and the value of Yah Kai's equipment and inventory inside the Complex on the night of November 15, 2011.

### B. Noted Record Deficiencies And How This Court Has Addressed Them

This Court's findings of fact, as well as its ultimate determinations regarding the damages owed to Plaintiffs, come with a caveat: the parties in this matter have not presented the kinds of detailed business documentation that one would expect to see in a case such as this one, and this dearth of information has stymied the Court's evaluation of the monetary damages owed to Plaintiffs. For example, due to Napper's bookkeeping and business practices, this Court has had great difficulty determining the costs and expenses that the Restaurant incurred from 2011 to 2015—and, thus, the extent of the Restaurant's profits for that same time period. The difficulty has primarily arisen because, in addition to Everlasting Life, Napper opened two other restaurants (named "Evolve" and "Vegaritos") in this same timeframe (*see* Damages Trial Tr. at 55:19–56:19 (Napper)), and he has managed all three foodservice establishments through a single corporate entity—Fair and Balanced, LLC (*see* 3d Liability FOF Tbl. at 96, 103 (A, B)). And rather than accounting for these businesses separately, Napper and his accountant appear to have commingled the proceeds and expenses from all of these restaurants in Fair and Balanced LLC's records of expenses and tax returns. (*See, e.g.*, Everlasting Life Restaurant & Lounge Expenses by Vendor Detail ("Itemized Expenses") (attached hereto as **Appendix A**), Def.'s Damages Trial

Ex. 1, ECF No. 105-1, at 177, 182 or A8–A9 (showing itemized rental payments for Napper's other restaurants Evolve and Vegaritos); *see also* Fair and Balanced's Tax Returns FY 2011–15; Damages Trial Tr. at 55:5–58:8.)  Thus, despite the fact that the defense has submitted certain financial statements as evidence pertinent to the calculation of damages, there is considerable uncertainty regarding the profits that Napper actually derived from Everlasting Life during the relevant timeframe.[4]

The additional fact that Napper has occasionally compensated himself (and his family members) directly—using business proceeds either to repay "loans" owed to his family or to pay himself and family members directly as "contractors"—further compounds the Court's uncertainty about the trustworthiness of the financial records that have been presented.  (*See, e.g.*, Itemized Expenses at 64–65, 82, 85, 94 or **Appendix A** at A1–A5 (identifying expenses related to Napper or his family members with labels such as "[l]oan," "[r]eimbursement," and "[c]ontractor"); *see also* Damages Trial Tr. at 43:4–44:23.)[5]  Napper also appears at times to have conflated the revenue stream of his businesses with his own personal income; in fact, during the trial, Napper repeatedly maintained that goods or services that he purchased with proceeds earned by the business were *his* in a manner that suggested that he had purchased them personally. (*See, e.g.*, July 14, 2015 Trial Tr. at 80:15–81:20 (Napper); Damages Trial Tr. at 167:3– 18 (Def.'s Counsel).)

---

[4] Notably, during the damages trial, Napper did specifically testify that approximately 90% of the expenses listed in the Itemized Expenses document (ECF No. 105-1) were incurred with respect to the operation of Everlasting Life.  (*See* Damages Trial Tr. at 115:13–116:2.)  But the Court finds this testimony not credible, based on its own review of that document and in light of the bookkeeping practices just described.

[5] The Itemized Expenses document notes payments made to "Dr. Baruch," which is an alias that Napper uses in his dealings with the Community.  (*See, e.g.*, Napper's Facebook Post.)

In short, these unorthodox accounting practices and unexplained discrepancies undermine the accuracy of many of Defendant's financial documents, including such significant records as Fair and Balanced LLC's tax returns for 2011–15 (ECF No. 114-1); Napper's personal tax returns for 2012–15 (ECF No. 114); the list of Itemized Expenses that Edwards submitted to the Court after the damages trial (ECF No. 105-1); and portions of the Supplement Itemized Costs and Expenses for Everlasting Life in 2014 and 2015 (ECF Nos. 105-3 & 105-4). And because Plaintiffs' expert report relies on several of these documents to reach its conclusions (*see* Expert Report, ECF No. 114-5, at 1–2), that report is rendered suspect as well. The Court further notes that in addition to the significant substantive uncertainty regarding the financial information that Napper has provided, various *procedural* deficiencies pertaining to the format in which the information has been presented are also clearly manifest.[6]

For present purposes, it is also important to note that Napper never submitted any documentation whatsoever regarding the Restaurant's sales, profits, or expenses for the 2016 or 2017 calendar years. Plaintiffs served a subpoena seeking the 2016 information prior to the commencement of the damages bench trial, but Napper and his accountant failed to produce this information prior to trial. During the damages trial, the Court directly ordered Napper and his accountant to provide this documentation.

---

[6] The most egregious example is "Defendant's Exhibit 1" (*see* Itemized Expenses, ECF No. 105-1), which is the only document that the defense presented before trial, and which purports to be a comprehensive spreadsheet that lays out the Everlasting Life Restaurant & Lounge's "Expenses By Vendor Detail" from January 2011 through December 2015. Napper has presented the Court with a bound 8 ½ by 11-inch book in portrait orientation—rather than an actual spreadsheet—and thus has rendered virtually incomprehensible data that is ordinarily displayed on the computer across a much wider field and is critical to this case. It appears that defense counsel merely printed off the information sequentially, and made no effort to line up subsequent expense fields with the vendor to whom they relate or otherwise explain how the Court is supposed to access the information, and thus, as the Court explained at trial, this document borders on useless. (*See* Damages Trial Tr. at 169:20–23.) No correction or update has ever been submitted.

(*See* Damages Trial Tr. at 154:21–23 (Edwards).)  And while Napper's accountant acknowledged that a printout of such information would "not [be] a problem" (*id.* at 153:5–15, 154:12–20), Defendant's tardy submission of other documents more than one week later did not contain this information; instead, defense counsel represented that "[t]he accountant has not reconciled the raw data" and thus "this information is not in the Defendant's possession at this time," (Def.'s Doc. Produc. Reqs. at 2).

For its part, Yah Kai has presented no records that represent the actual value of the equipment, goods, and inventory that Napper seized when he evicted Plaintiffs on November 15, 2011.  To be sure, Yah Kai is not entirely at fault for this deficiency, because its business records and any pre-seizure inventory of tangible assets remained within the Complex and within Napper's control following his seizure of the facility in November of 2011.  (*See* Damages Trial Tr. at 32:6–8 (Prince Immanuel).)  However, with a potential legal claim against Napper on the horizon, this Court sees no reason why Yah Kai failed to take steps to generate a roughly contemporaneous accounting of its assets (albeit from memory), which would have been a far superior form of evidence than the testimony that Plaintiffs presented at trial regarding the restaurant equipment and other tangible items that Yah Kai had purchased prior to the seizure.  (*See id.* at 31:15–32:8.)[7]

In fairness, this Court also fully acknowledges that the parties' failure to gather and present the kinds of business records that are ordinarily required to generate a reasonably accurate damages calculation in a trademark infringement case stems in

---

[7] Napper also apparently failed to assess the equipment and other assets of Yah Kai's that he secured upon his seizure of the facility.  Therefore, the record is entirely devoid of specifics regarding the value of most of the tangible goods held within the facility on November 15, 2011.  *See Yah Kai I*, 195 F. Supp. 3d at 321.

13

large part from their nontraditional beliefs regarding property ownership. *See Yah Kai I*, 195 F. Supp. 3d at 298. That is, as this Court explained in *Yah Kai I*, the parties here were once all members of the African Hebrew Israelite Community, which emphasizes communal ownership and does not recognize individual property rights with respect to Community-related endeavors. (*See* 3d FOF Tbl. at 19 (A, B); *see also* July 15, 2015 Trial Tr. at 55:11–15, 106:3–13, 109:23–110:20 (Prince Immanuel).)[8]

But the Community's culture is only a *partial* explanation for the record deficiencies that are apparent in this case; it is also clear that some of the problems are directly attributable to actions of Yah Kai and Napper in the context of the instant dispute. For example, Napper served Yah Kai with a notice to vacate the Complex *twice* before the eviction date—on July 20, 2011, and on October 15, 2011, *see Yah Kai I*, 195 F. Supp. 3d at 304—which means that Yah Kai was fully aware of Napper's claims of ownership and had plenty of time to move, copy, or otherwise secure its business records. It did not do so. Similarly, Napper refused to return Yah Kai's business documents and other assets when he evicted Plaintiffs from the Complex, and has presumably misplaced those records, since neither party has presented them in this case. *See id.* at 323. Furthermore, as noted above, neither party undertook a detailed accounting of the converted items after the eviction, despite being fully aware that they

---

[8] This means that members of the Community regularly "assist[ed] other members of the community" financially (Damages Trial Tr. at 89:13–14 (Napper)), including by pooling their resources and/or offering their time, money, and possessions without expecting compensation. Napper testified that "that was part of our code . . . and when somebody was challenged . . . we came together collectively and addressed it." (*Id.* at 89:15–22.) Community members also apparently believe that everything they built, and all of the resources that were brought to the effort, belonged to the Community; therefore, the Community's members did not always document what items or assets belonged to whom as a matter of law. (*See, e.g., id.* at 88:7–13 (noting that Napper did not document payments the community gave him).)

were engaged in a contentious legal dispute regarding ownership of the business.  And

perhaps most significantly, throughout this litigation, Napper has repeatedly failed to

adhere to his discovery obligations, which has both delayed the proceedings and

hampered Plaintiffs' ability to establish an accurate quantum of damages.[9]

All this means that the instant record provides an exceedingly thin factual

foundation upon which to rest this Court's conclusions regarding the monetary damages

owed to Plaintiffs.  As a general matter, these record deficiencies have broad

implications, because a plaintiff generally bears the initial burden of proof regarding

damages, and that burden includes establishing the amount of damages owed or gross

sales earned by a preponderance of the evidence.  *See Fishman Transducers, Inc. v.*

*Paul*, 684 F.3d 187, 192 (1st Cir. 2012) ("The ordinary rule in civil cases is proof by a

preponderance of the evidence . . ., and the text of section 1117 does not prescribe a

different burden of proof.").  However, it is also well established that, in trademark

infringement and unfair business practice cases, the evidence a plaintiff proffers related

to the sales arising from the infringing use should be construed liberally (i.e., not

---

[9] In one paradigmatic example of the many epic discovery failures that took place in this case, Plaintiffs were forced to call both Napper and another witness back to the stand during the bench trial on liability (after they had previously testified) because Napper had not provided requested documents during the pretrial discovery process.  (*See* Pls.' Mot. to Recall Def. Napper, ECF No. 59, at 1.)  The requested documentation was significant, because it revealed a written settlement agreement between Napper and Plaintiffs' landlord, Kingdom Management, regarding a PEPCO rebate—an intangible right to recover on a debt of which Plaintiffs were previously unaware.  (*See id.*)  Similarly, Napper repeatedly failed to produce requested business and tax records, including data identifying gross sales attributable to the Restaurant that did not surface until after the bench trial on damages had concluded.  These delays occurred despite Plaintiffs' repeated, urgent requests for exactly this information.  (*See* Pls.' Mot. to Enlarge Discovery, ECF No. 83, at 2 (discussing Defendant's obligation to supplement existing document requests); Pls.' Emergency Mot. for an Order to Show Cause Regarding Darrel Edward's Non-Production of Geoffrey Napper's Tax Return ("Pls.' Emergency Mot."), ECF No. 89; Def.'s Doc. Prod. Requests; *see also* Damages Trial Tr. at 140:5–13, 142:11–24, 149:2–11 (Edwards) (acknowledging that Plaintiffs had subpoenaed such information, that Defendant had not provided it, and that it would take "[p]robably . . . a day" to pull it together).)

mechanically) to ensure that the victimized party receives an adequate recovery for the defendant's infringing conduct. *Cf. Hamilton-Brown Shoe Co. v. Wolf Bros. & Co.*, 240 U.S. 251, 262 (1916) ("[I]t is more consonant with reason and justice that the owner of the trademark should have the whole profit than that he should be deprived of any part of it by the fraudulent act of the defendant. It is the same principle which is applicable to a confusion of goods. If one wrongfully mixes his own goods with those of another, so that they cannot be distinguished and separated, he shall lose the whole, for the reason that the fault is his; and it is but just that he should suffer the loss rather than an innocent party, who in no degree contributed to the wrong.").

Moreover, and importantly, the Lanham Act grants the factfinder significant discretion to determine the appropriate remedy, *see Skydive Ariz., Inc. v. Quattrocchi*, 673 F.3d 1105, 1111–12 (9th Cir. 2012), so long as the Court exercises that discretion based on the standards that the D.C. Circuit has laid out for making these kinds of awards, *see Foxtrap, Inc. v. Foxtrap, Inc.*, 671 F.2d 636, 641–42 (D.C. Cir. 1982). Thus, even where the record fails to substantiate fully the parties' specific contentions regarding the extent of the defendant's profits and/or the scope of the infringing sales, the factfinder can undertake to estimate those figures, and to adjust them as needed, in order to arrive at a fair and just damages figure, given the facts presented and the goal of ensuring that justice is served. *See Skydive Ariz.*, 673 F.3d at 1110 (requiring only that "the [factfinder's] award was supported by reasonable inferences and assessments, based on substantial evidence in the record").

### C. The Particular Factual Bases For This Court's Damages Calculation

With that said, this Court will now undertake to set forth its findings of fact pertaining to its calculation of the monetary damages that Napper owes to Prince

Immanuel and Yah Kai as a result of the violations that the Court identified in its liability opinion.  In the main, the Court's findings concern:  (1) the tangible and intangible assets of Yah Kai that were inside the Complex on the date of the eviction and that were converted when Napper took over the business; (2) the estimated profits that the Restaurant has generated during Napper's infringing use of Prince Immanuel's trademark; and (3) the actual damages Plaintiffs suffered due to Napper's infringement and unfair competition.  The Court also addresses certain facts that have *not* been established in the instant record, and that thus cannot be the basis for other requested remedies such as punitive damages or injunctive relief.

    1. <u>Certain Furniture, Equipment, And Other Tangible And Intangible Assets Belonging To Yah Kai Were Present In The Complex When Napper Took Over That Business</u>

When Napper evicted Yah Kai from the Complex on the evening of November 15, 2011, he seized control of all of the furniture, equipment, records, and inventory that was present at the facility on that date, including the food inventory, the food-production equipment, restaurant supplies, administrative supplies and documents, and computers.  (*See* July 15, 2015 Trial Tr. at 102:7–20, 103:4–24 (Prince Immanuel); Damages Trial Tr. at 114:5–11 (Napper).)  Yah Kai and other members of the Community attempted to retrieve these items on the night that Napper evicted them in November of 2011, but Napper requested that the police eject them from the premises before Yah Kai's property could be accessed and removed.  *Yah Kai I*, 195 F. Supp. 3d at 305.  (*See also* Damages Trial Tr. at 113:2–23 (Napper).)  Napper then changed the Complex's locks the next day, preventing Yah Kai from recovering any of the property, equipment, inventory, or records housed within the Complex.  (*See* July 14, 2015 Trial Tr. at 100:21–101:1.)

The record establishes the following regarding the equipment and inventory that was within the Complex when Napper executed his takeover. A few months prior to Napper's takeover of the Complex, its manager (Yah Kai's president, William Young) had provided information to Yah Kai's accountant about the value of the furniture and equipment that Yah Kai had purchased for the Complex. (*See* Dep. of William Young, Damages Trial Ex. 8 ("Young Dep."), ECF No. 43-4, at 95:22–96:13.) As the president of Yah Kai and the one who made purchases on Yah Kai's behalf, Young would have had the personal knowledge necessary to provide a reasonable estimate of the value of such goods. (*See id.* at 10:9–10; 17:16–19; 27:13–19.) In other words, Young was an individual "familiar with the condition" of the Complex's equipment and inventory, and thus was "competent to testify as to its value." *Checkpoint Foreign Car Serv., Inc. v. Sweeney*, 242 A.2d 148, 149 (Md. 1968).

During the deposition testimony that Young provided in 2014, in the context of this litigation, Young was asked to review a document dated June 27, 2011—titled "balance sheet"—that purportedly listed the value of the "furniture and equipment" within the Complex as $17,864, based on the aforementioned figures that Young had provided to his accountant. (Young Dep. at 96:1, 96:4; *see also id.* at 95:22–96:8.)[10] Because Young's deposition testimony is undisputed, and is the only available evidence of the value of *any* of Yah Kai's tangible assets at the time of conversion, this Court considers Young's testimony about a business record that reports the value of

---

[10] The record does not contain the actual balance sheet document, but Young's deposition testimony (which was entered into evidence by consent of the parties because Young is now deceased) specifically identifies and addresses it. (*See* Young Dep. at 95:22–96:20 (summarizing the document's contents in response to questioning).)

equipment and inventory to be reliable evidence regarding the minimum market value of Yah Kai's tangible assets within the facility at that time.

Additionally, because Napper seized certain records that Yah Kai had been storing inside the Complex and used those documents to secure a substantial rebate from the Complex's utility provider (as fully described in the Court's prior memorandum opinion regarding liability, *see Yah Kai I*, 195 F. Supp. 3d at 323–25), the Court finds that the value of the intangible property right that Napper converted when he secured the utility rebate for himself is the negotiated rebate amount—i.e., $125,000. (*See id.* at 325; *see also* July 15, 2015 Trial Tr. at 92:6–16; 93:15–94:6 (Allen).)

2. <u>During Napper's Infringing Use Of The Everlasting Life Trademark, The Restaurant Has Generated Significant Sales And Has Also Incurred Some Costs</u>

Napper reopened the Complex under the name "Everlasting Life Restaurant & Lounge" a few days after Plaintiff's eviction, and he has continued to operate that food-service business ever since. (*See* Damages Trial Tr. 99:4–6; 113:25–114:24 (Napper).) As the owner of the Everlasting Life trademark, Prince Immanuel formally notified Napper of his ownership of the mark two days before the eviction, and thereby specifically alerted Napper to the prospect of the potential infringement that would arise due to his then-threatened takeover of the business. (*See* 3d Liability FOF Tbl. at 132 (A, B); Trademark Infringement Notice from Prince Immanuel, Pls.' Liability Trial Ex. 15, ECF No. 29-1.) Prince Immanuel's letter of November 13, 2011 specifically informed Napper that his use of the "Everlasting Life" trademark was unauthorized, and expressly revoked any license to use that mark that Napper may have believed he possessed. (*See* Trademark Infringement Notice from Prince Immanuel.) Moreover,

Napper received and understood this notice, but ignored it.  (*See* Damages Trial Tr. at 99:21–100:20 (Napper).)

Thus, Napper's infringing use of Price Immanuel's trademark was entirely knowing; indeed, during the trial, Napper admitted that he had continued to operate the Restaurant in violation of the "Everlasting Life" trademark despite the notice, partly because of his antagonistic personal relationship with Prince Immanuel, who Napper believed "didn't look out for [his] best interest[s]."  (*Id.* at 100:18; *see also id.* at 100:13–20.)  And even after this Court issued its memorandum opinion finding Napper liable for infringing upon Prince Immanuel's trademark, Napper has persisted in his willful use of the Everlasting Life trademark in connection with his operation of the Restaurant, because he still maintains that he is the rightful owner of the Complex.  (*See id.* at 99:4–17.)

Since Napper's November 2011 takeover of the business, the Restaurant has generated significant (albeit decreasing) gross sales.  Between November of 2011 and December 2015, the business had a total "ordinary income" of $3,555,428, which is comprised of $136,475 in November and December of 2011; $1,019,788 in 2012; $1,084,287 in 2013; $771,341 in 2014; and $543,537 in 2015.  (*See* Everlasting Life Restaurant & Lounge Gross Profit, January 2011 through December 2015 ("Everlasting Life Gross Sales Summary") (attached hereto as **Appendix B**), ECF No. 105-2, at 1 or B1.)  Meanwhile, the business spent $1,232,518 on the goods needed for sales during this same timeframe—specifically, $51,030 in November and December of 2011; $482,464 in 2012; $449,206 in 2013[11]; $197,617 in 2014; and $52,201 in 2015.  (*See*

---

[11] The Everlasting Life Gross Sales Summary that Defendant provided, attached hereto as **Appendix B**) states that the "Costs of Goods Sold" in 2013 was $449,206.  Given all of the other years have a

*id.*)  It appears that a total of $379,234 was paid for rent (excluding late fees) to Kingdom Management, the Restaurant's landlord, between November 2011 and the end of 2015.  (*See* Itemized Expenses at 95–96, 298–99 or **Appendix A** at A6–A7, A10–A11.)[12]  The Court also finds that Napper has demonstrated $227,210 in operating expenses relating to his infringing use of Prince Immanuel's trademark in 2014 (*see* Supplement Itemized Costs and Expenses for Everlasting Life 2014 (attached hereto in **Appendix C**), ECF No. 105-3, at 1 or C1), and $223,434 in operating expenses relating to his infringing use of the trademark in 2015 (*see* Itemized Costs and Expenses for Everlasting Life 2015 (attached hereto in **Appendix C**), ECF No. 105-4, at 1 or C2).[13]

---

negative value for the "Cost of Goods Sold" column, and the value refers to a "Cost[,]" the Court presumes this to be a clerical error and treats the "Costs of Goods Sold" in 2013 as costs that are to be subtracted from ordinary income.

[12] Determining Napper's rental expenses was a tedious and frustrating affair, largely due to the lack of documentation for rental payments for some months.  For example, the Itemized Expenses document suggests that Napper did not pay rent in August 2012, March 2015, or September 2015, but, in other months such as October 2013, Napper paid significantly more than the amount due for that month—$10,771.48 instead of the $7,645.63 that appears to have been the typical rent during that time period. (*See* Itemized Expenses at 96, 299 or **Appendix A** at A7, A12.)  The Court has thus settled on the following approach to arriving at the total cost of actual payments.  Relying on the Itemized Expenses document, the Court determined what Napper's rental payments were likely to be for each month, based on the assumption that (1) Napper paid rent every month, and (2) the monthly rent stayed constant from month to month unless there was a rent increase borne out by the next few months.  The estimated monthly rent amounts are:  $7,000 (November 2011–December 2011); $7,076.97 (January 2012–October 2012); $7,351.13 (November 2012– June 2013); $7,645.63 (July 2013–April 2014); $7,624.67 (May 2014–December 2014); $7,926.93 (January 2015–April 2015); $8,213.65 (May 2015–October 2015); $8,681.02 (November 2015); and $8,531.02 (December 2015).  (*See* Itemized Expenses 95–96, 298–99 or **Appendix A** at A6–A7, A10–A11.)  Multiplying each of these amounts by the number of months for which that amount was owed and adding up the resulting sums produces the estimated total value of Napper's rental expenses between 2011 and 2015—$379,234.06.

[13] The Court arrived at these operating-expense figures by examining certain documents that Napper provided (*see* Supplement Itemized Costs and Expenses for Everlasting Life 2014; Supplement Itemized Costs and Expenses for Everlasting Life 2015, both attached hereto as **Appendix C**), and excluding certain listed expenses that the Court deemed inaccurate and/or impermissibly included for the purposes of the instant calculation.  For example, for 2014, the Court did not consider:  the listed payments made for rent or the Costs of Goods Sold (since those payments had already been accounted for and should not be deducted twice from the business's revenue); "[c]ontractor" expenses (given Napper's habit of compensating himself or his family through these categories); and expenses for "[t]ravel[,]" "[m]iscellaneous[,]" and "gifts" (because it is unclear how those expenses relate to Napper's infringing use).  The Court also excluded these same categories of expenses for 2015 for the same reasons (to the extent that the same categories appeared in 2015), the "[r]eimbursement" expenses for the same reason that it did not consider the "[c]ontractor" expenses in 2014, and 2015 expenses for "[c]ashier error" or "[g]ift card payment" in the absence of an explanation of how those expenses were necessary for the

3. <u>Napper Genuinely (But Mistakenly) Believes That He Is, And Always Was, The Rightful Owner Of The Business And The Everlasting Life Trademark</u>

Napper's testimony during both the liability and damages trials had one consistent theme:  his belief that the Everlasting Life brand and associated food-service business belongs to him.  (*See, e.g.*, July 14, 2015 Trial Tr. at 142:16–23 ("My testimony is that my business, which is the food business that I established in 1995 . . . The name [of that business] was Everlasting Life."); Damages Trial Tr. at 99:14–17 ("And Everlasting Life had been my business.  I established it, and I established it for the purposes that it serves now, and [the Court's] decision didn't change my heart.").) Make no mistake, in the wake of this Court's decision in *Yah Kai I*, Napper knew that running the Everlasting Life Restaurant & Lounge violated Prince Immanuel's legal rights.  (*See* Damages Trial Tr. at 100:11 ("I realized what was written on the paper[.]").)  But Napper was unwavering in his conviction that his pivotal role in conceiving of and managing the business from its inception conferred upon him the right of ownership, even if the financial equity belonged to someone else and the trademark was registered under someone else's name.  (*See id.* 100:11–13 ("So I realized what was written on the paper, but I knew what was right.  And I knew that I was, I was the person who did all of this.").)  In other words, Napper has consistently expressed certainty that the business formerly known as "Everlasting Life Health Complex" and its accompanying trademark belongs to *him* (without regard to the financial stake of Plaintiffs and other Community members), apparently because of a conception of property ownership that differs sharply from the precepts that are

---

production of the Restaurant's goods and services.  (*See* Part IV.A.2.c, *infra*.)

recognized under federal and Maryland law. *See Yah Kai I*, 195 F. Supp. 3d at 311

(explaining that, as the first user of the trademark, Prince Immanuel owned the

Everlasting Life trademark and the right of businesses to use that trademark).

Thus, Napper is mistaken. But this Court finds that his mistaken ownership

convictions are earnestly and sincerely held, and therefore, Napper's related actions in

recovering what he viewed as his own property are not properly characterized as

malicious. *See Black's Law Dictionary* 1101 (10th ed. 2014) (defining "malicious" as

meaning "[w]ithout just cause or excuse").

### 4. The Registration Status Of The Everlasting Life Trademark Is Presently Uncertain

There is no dispute that Prince Immanuel (and, by license, Yah Kai) was the

rightful holder of the registered "Everlasting Life" trademark at the time that Napper

evicted Plaintiffs and took over the Complex. *See Yah Kai I*, 195 F. Supp. 3d at 319.

However, with the passage of time, the registration status of that trademark has become

uncertain. The testimony at the damages trial indicated that Prince Immanuel may have

allowed the Everlasting Life trademark's registration to lapse when it was up for

renewal in 2016. (*See* Damages Trial Tr. at 29:17–30:15.) And additional evidence

suggested that Napper spied an opportunity, and took steps to register the Everlasting

Life trademark for himself. (*See* 3d Dam. FOF Tbl at 8 (B) (acknowledging that

Napper had attempted to trademark the Everlasting Life mark with the United States

Patent and Trademark Office (USPTO) in June or July 2016); Damages Trial Tr. at

11:20–12:16 (taking judicial notice that this application was still pending as of

November 15, 2016).)

To date, neither of the parties has provided the Court with any notice or other definitive evidence regarding the current status of the registered trademark, and therefore, this Court is not in a position to know whether Prince Immanuel continues to hold the trademark registration, or whether Napper has successfully registered that trademark with the USPTO.  Given Napper's mistaken beliefs about legal ownership, as described above, the Court is not inclined to credit Napper's bald statements of present ownership, and without additional evidence, this Court cannot determine which party the USPTO recognizes as holding the registered trademark—a non-finding that has implications for the Court's conclusions regarding injunctive relief.  (*See* Part IV.C, *infra*.)

## IV.    CONCLUSIONS OF LAW REGARDING MONETARY DAMAGES AND OTHER REQUESTED REMEDIES

As explained fully below, this Court concludes that Plaintiffs have demonstrated that they are entitled to certain monetary damages but not all of the relief that they have requested in this case.  Specifically, the evidence presented establishes that, as a remedy for Napper's willful trademark infringement and unfair competition, Prince Immanuel and Yah Kai are entitled to recover:  (1) the profits that Napper generated (i.e., the Restaurant's gross sales minus its expenses) in connection with his operation of the Restaurant during the period of his infringing use of the "Everlasting Life" trademark—which amounts to $1,856,144—(2) their actual damages for Napper's seizure of their business and operation of that entity under the trademarked name "Everlasting Life," which total $545,407; and (3) the yet-to-be-calculated attorney fees and costs that have arisen from this litigation.  In addition, Yah Kai has also successfully claimed that it is entitled to compensation for Napper's conversion of its

tangible and intangible property interests, in the amount of $142,864, along with $54,434 in prejudgment interest.  However, Plaintiffs have not demonstrated any right to punitive damages or injunctive relief for their claims under the Lanham Act or Maryland common law.

Accordingly, this Court will award Plaintiffs $2,401,551 plus attorney fees and costs with respect to Counts I, II, and III; and with respect to Count VI, Yah Kai is awarded a total of $142,864 in compensatory damages and $54,434 in prejudgment interest.  Plaintiffs will have the opportunity to file a timely motion for attorney fees and costs.  No other damages or injunctive relief will be awarded.

**A. As A Remedy For Napper's Trademark Infringement And Unfair Competition, Plaintiffs Are Entitled To The Restaurant's Profits From November 2011 To The Present, Their Actual Damages, And Also Attorney Fees And Costs**

    1. Overview Of The Statutory And Common Law Remedies For Trademark Infringement And Unfair Competition

The Lanham Act provides a number of remedies that a Court may award plaintiffs in cases of trademark infringement or unfair competition.  These remedies include various types of monetary damages and the issuance of a permanent injunction. *See* 15 U.S.C. §§ 1116–17.  With respect to damages, the Lanham Act provides that

> [w]hen a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, a violation under section 1125(a) or (d) of this title, or a willful violation under section 1125(c) of this title, shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled . . . to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action.

*Id.* § 1117(a).  Thus, Congress has authorized the recovery of three different types of monetary damages for the Lanham Act violations at issue here:  Defendant's profits, Plaintiffs' actual damages, and Plaintiffs' costs of litigating the Lanham Act claim.

A nearly identical set of remedies exists for claims of unfair competition under Maryland common law, *see Md. Metals, Inc. v. Metzner*, 382 A.2d 564, 573 (Md. 1978), with the sole difference being that Maryland's common law also authorizes punitive damages, which are available when a plaintiff acts with actual malice, *see GAI Audio of N.Y., Inc. v. Columbia Broad. Sys., Inc.*, 340 A.2d 736, 750, 754 (Md. Ct. Spec. App. 1975). Because punitive damages can be awarded under common law, it is not uncommon for plaintiffs to claim that the same trademark infringement activity violates both the Lanham Act and state common law prohibitions against unfair competition. *See, e.g.*, *Suntree Techs., Inc. v. Ecosense Int'l, Inc.*, 693 F.3d 1338, 1343 (11th Cir. 2012); *ITC Ltd. v. Punchgini, Inc.*, 373 F. Supp. 2d 275, 278 (S.D.N.Y 2005). But this overlap does not permit a plaintiff to "recover[] twice for the same injury." *Medina v. District of Columbia*, 643 F.3d 323, 328 (D.C. Cir. 2011). Indeed, "if a federal claim and a state claim arise from the same operative facts, and seek identical relief, an award of damages under both theories will constitute double recovery[,]" which is not allowed. *Id.* (quotation omitted).

In addition to the forms of monetary relief mentioned above, the Lanham Act also authorizes district courts to

> grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation under subsection (a), (c), or (d) of section 1125 of this title.

15 U.S.C. § 1116(a). Thus, the statute authorizes a district court to grant a permanent injunction against defendants who engage in trademark infringement or who engage in unfair competition. *See id.* However, the decision to issue such a permanent injunction

rests, as section 1116(a) acknowledges, on the principles of equity that underlie most forms of injunctive relief: "(1) success on the merits, (2) whether the plaintiffs will suffer irreparable injury absent an injunction, (3) whether, balancing the hardships, there is harm to defendants or other interested parties, and (4) whether the public interest favors granting the injunction." *Hanley-Wood LLC v. Hanley Wood LLC*, 783 F. Supp. 2d 147, 151 (D.D.C. 2011) (quoting *Am. Civil Liberties Union v. Mineta*, 319 F. Supp. 2d 69, 87 (D.D.C. 2004)).

2.    Plaintiffs Have Shown That They Are Entitled To Recover The Restaurant's Profits From November 2011 Through The Present

It is well established that, when making an award of monetary damages under the Lanham Act, a trial judge "should state whether the award is based on [the] defendant's profits, plaintiff's actual damages or both, since each measure depends on different factors." *Foxtrap, Inc.*, 671 F.2d at 641. The need for making this distinction arises from the fact that, under the Lanham Act, "courts have generally required proof that certain factors are present before approving a monetary award" and these "factors vary according to the measure of relief used." *Id.*

For example, before a court may award a plaintiff the defendant's profits, the plaintiff must demonstrate that the defendant acted in "bad faith" or with "willful" disregard of the plaintiff's trademark rights. *Id.*; *see also ALPO Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958, 965 (D.C. Cir. 1990) (citing *W.E. Bassett Co. v. Revlon, Inc.*, 435 F.2d 656, 662 (2d Cir. 1970)). This standard is not easy to satisfy, for "courts have insisted on a relatively egregious display of bad faith," *Foxtrap, Inc.*, 671 F.2d at 641, or a showing that the infringement was done knowingly and callously, *see id.* at 641–42 (citing *Stuart v. Collins*, 489 F. Supp. 827, 831 (S.D.N.Y.1980)). Indeed,

"[w]illfulness or bad faith requires some element of targeted wrongdoing and intentionally deceptive conduct before the defendant's profits are recoverable." *Riggs Inv. Mgmt. Corp. v. Columbia Partners, LLC*, 966 F. Supp. 1250, 1270 (D.D.C. 1997) [hereinafter *Riggs I*] (internal quotation marks and citation omitted); *see also ALPO Petfoods, Inc.*, 913 F.2d at 966 ("[I]n the trademark infringement context, 'willfulness' and 'bad faith' require a connection between a defendant's awareness of its competitors and its actions at those competitors' expense.").[14]

If a plaintiff establishes that the defendant acted willfully or in bad faith, the court must assess the profits that the defendant earned through the unlawful use of his mark. *See Riggs Inv. Mgmt. Corp. v. Columbia Inv. Partners, LLC*, 975 F. Supp. 14, 15 (D.D.C. 1997) [hereinafter *Riggs II*] ("[A] plaintiff is not entitled to profits demonstrably not attributable to the unlawful use of his mark."). To do so, the court applies the burden-shifting framework that section 1117(a) establishes, which initially

_____

[14] Congress amended 15 U.S.C. § 1117(a) in 1999. *See* Trademark Amendments Act of 1999, Pub. L. No. 106–43, § 3(b), 113 Stat. 218, 219. Prior to that time, Congress provided no remedy for violations of 15 U.S.C. § 1125(c), and to correct that, Congress's amendment to 15 U.S.C. § 1117(a) allowed for damages in the case of "a *willful* violation under section 1125(c)[.]" 15 U.S.C. § 1117(a) (emphasis added). Notably, however, none of the other Lanham Act violations for which section 1117(a) provides a remedy contains the word "willful." *See id.* Thus, the courts of appeals are currently split regarding whether a showing of willfulness is truly necessary to recover a defendant's profits for all Lanham Act violations. As of last year, the Federal and Ninth Circuits have stood fast by their interpretations mandating willfulness for the recovery of profits. *See Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 441 (9th Cir. 2017), *petition for cert. filed*; *Romag Fasteners, Inc. v. Fossil, Inc.*, 817 F.3d 782, 791 (Fed. Cir. 2016), *cert. granted, judgment vacated*, 137 S. Ct. 1373 (2017), *opinion reinstated in relevant part per curiam*, 668 F. App'x 889 (Fed. Cir. 2017). Meanwhile, the Fourth and Fifth Circuits have continued to insist that willfulness is only a *factor*—as opposed to a requirement—when a court decides whether a defendant must disgorge his profits. *See Synergistic Int'l, LLC v. Korman*, 470 F.3d 162, 175 & n.13 (4th Cir. 2006); *Quick Techs., Inc. v. Sage Grp. PLC*, 313 F.3d 338, 347–49 (5th Cir. 2002). The Third Circuit switched sides in this long-standing debate subsequent to the adoption of the statutory amendment, and it now holds the view that the Fourth and Fifth Circuits espouse. *See Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168, 173–75 (3d Cir. 2005). The D.C. Circuit has not weighed in on the willfulness requirement since its opinion in *ALPO Petfoods, Inc.* in 1990, and thus there is no post-amendment binding law in this Circuit on the subject. Nevertheless, because this Court finds that Napper did willfully infringe upon Prince Immanuel's trademark (*see* Part IV.A.2.a, *infra*), an award of profits is appropriate in this case under either of the approaches taken by the circuit courts.

requires the plaintiff "to prove defendant's sales only[.]"  15 U.S.C. § 1117(a).  The

burden of production then shifts to the defendant, who "must prove all elements of cost

or deduction claimed" from those gross sales, as needed for the court to reach the final

figure representing the defendant's profits.  *Id.*  Should the defendant fail to prove these

costs and deductions, the defendant's gross sales shall serve as the profits for purposes

of section 1117(a).  *See Riggs II*, 975 F. Supp. at 15–16, 17.  The court also retains the

discretion to alter the resulting sum if it concludes that "recovery based on profits is

either inadequate or excessive . . . according to the circumstances of the case."  15

U.S.C. §1117(a).

In the instant case, Plaintiffs focus heavily on the Restaurant's gross sales since

November of 2011, requesting that this Court award Plaintiffs the profits that Napper

secured as a result of his willful conduct in seizing the Restaurant from Plaintiffs and

reopening it under the same trademarked name.  (*See* Pls.' Damages Br. (Pls.' Dam.

Br.), ECF No. 100, at 8–14.)  This focused effort is warranted, because the record

clearly establishes Napper's deliberate disregard for Prince Immanuel's trademark

rights, and thus Plaintiffs are entitled to the Restaurant's profits during the period of

infringement, which, after an equitable increase, amount to $1,856,144, as explained

below.

> a.  *Napper Has Acted With Willful Disregard Of Prince Immanuel's*
> *Rights As A Trademark Holder, And Continues To Do So At*
> *Present*

First of all, as mentioned above, there is no question that Napper's infringement

of the "Everlasting Life" mark was—and still is—*knowing*.  Prince Immanuel notified

Napper in writing that Prince Immanuel held the federally registered "Everlasting Life"

trademark prior to Napper's seizure of the facility and before Napper reopened the

Restaurant. (*See* 3d Liability FOF Tbl. at 132 (A, B); Trademark Infringement Notice at 1.) And Napper has continued to operate the Restaurant under that moniker to date, even after this Court concluded in its liability opinion that his continued use of the mark constitutes trademark infringement. (*See* 3d Liability FOF Tbl. at 114 (A, B).) *Cf. ALPO Petfoods*, 913 F.2d at 966 (explaining that a showing of willfulness usually involves a "deliberate theft of a mark holder's good will").

It is also clear to this Court that Napper has engaged in infringing conduct with a "smug willingness" to violate Prince Immanuel's trademark rights, or at least a "callous disregard" for those rights. *Foxtrap*, 671 F.2d at 641–42. Napper's own testimony at both phases of this trial clearly demonstrates that Napper's actions are not those of an infringer who is proceeding in good faith and with due respect for Plaintiffs' ownership rights, but instead appear to be the deliberate actions of a misguided individual intent upon responding to perceived slights. (*See, e.g.*, Damages Trial Tr. at 100:3–20 (Napper) (acknowledging that Napper considered changing the name of the restaurant, but decided not to do so because "[Prince Immanuel] is an individual who has demonstrated throughout the time that I was in that community that he didn't look out for my best interest").) Indeed, this Court previously noted in its liability opinion that Napper has chosen to exercise his own brand of "vigilante justice" in appropriating Plaintiffs' business and operating it in violation of Prince Immanuel's trademark rights. *Yah Kai I*, 195 F. Supp. 3d at 321–22. Thus, it can be said that Napper has acted in bad faith by deliberately undertaking to seize Plaintiffs' business and operate it as his own, rather than seeking out other dispute-resolution options, *see ALPO Petfoods*, 913 F.2d at 966, and at the very least, Napper has demonstrated a willful and callous disregard

for Prince Immanuel's rights as the undisputed owner of the Everlasting Life trademark, such that an award of the profits from his infringing activities is appropriate, *see, e.g.*, *Greene v. Brown*, 104 F. Supp. 3d 12, 18 (D.D.C. 2015) (awarding plaintiff the defendant's profits given defendant's admission of willfulness); *Riggs I*, 966 F. Supp. at 1270 (holding that defendants acted "willfully and in bad faith" and plaintiffs were thus "entitled to [defendant's] equity profits").

This conclusion leads the Court to an evaluation of the *scope* of Napper's willful infringement. The law provides that Napper is liable to Plaintiffs for the profits that the Restaurant generated for the entire period of his infringement, *see Riggs II*, 975 F. Supp. at 16, and this Court finds that the infringing period in the instant case runs from the time that Napper knowingly undertook to infringe upon Prince Immanuel's trademark through the instant judgment, *see Yah Kai I*, 195 F. Supp. 3d at 307. Prince Immanuel tendered notice of his registration of the "Everlasting Life" mark to Napper in November of 2011, and in that same notice, he clearly revoked any license Napper may have had to use the mark. (*See* Trademark Infringement Notice at 1.) Thus, when Napper began running the Restaurant on November 16, 2011, Napper knowingly, willfully, and immediately infringed upon Prince Immanuel's trademark. Furthermore, because Napper has not ceased using the "Everlasting Life" mark in connection with his operation of the Restaurant to date, Napper's infringing use of Prince Immanuel's trademark has continued to the present day.

Napper argues that his infringing conduct should not be construed to continue through this present judgment, because Prince Immanuel's trademark registration lapsed in 2016 and was not renewed. (*See* Damages Trial Tr. at 153:24–154:5.) But that

argument misunderstands trademark rights, which are protected *both* by statute *and* by common law. It is well established that the termination or cancellation of a federally registered mark does not, in itself, represent the cessation of a priority user's rights in the mark at common law. *See, e.g.*, McCarthy § 20:40 (noting that cancellation of a registration does not "invalidate state or federal rights in the trademark which do not flow from federal registration"); *see also Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992) ("[I]t is common ground that § 43(a) protects qualifying *un*registered trademarks and that the general principles qualifying a mark for registration under § 2 of the Lanham Act are for the most part applicable in determining whether an *un*registered mark is [also] entitled to protection under § 43(a)." (emphasis added)). Thus, even if Prince Immanuel's trademark registration lapsed in 2016, as Napper asserts, Prince Immanuel may nevertheless claim an entitlement to enforcement of his rights at common law, so long as the mark has not been abandoned. *See, e.g.¸ Marcon, Ltd. v. Helena Rubenstein, Inc.*, 694 F.2d 953, 954–55 & n.1 (4th Cir. 1982) (noting that plaintiff had brought state law claims based, in part, on trademarks whose registration had lapsed); *see also Matal v. Tam*, 137 S. Ct. 1744, 1753 (2017) ("[A]n unregistered trademark can be enforced under state common law[.]").

Here, Napper makes no credible contention that Prince Immanuel's trademark rights at common law should not be recognized because of a lapse in the formal federal registration of the "Everlasting Life" trademark. *See Yah Kai I*, 195 F. Supp. 3d at 310–11 (acknowledging that "Plaintiffs hold superior rights at common law that establish their exclusive ownership of the mark and entrust them with the legal power to prevent junior users (such as Napper) from infringing upon said mark"). Nor can it be

said that Prince Immanuel has "abandoned" his trademark interests in any meaningful sense. To be sure, the Community is no longer operating a food-service establishment using that mark, *see Grocery Outlet Inc. v. Albertson's Inc.*, 497 F.3d 949, 951 (9th Cir. 2007) (noting that one may abandon a trademark through nonuse), but that is simply and solely because Napper effectively *stole* the Community's real property and business interests that were associated with that mark, and *not* because Prince Immanuel and Yah Kai willingly relinquished their business, along with any right to use that trademark in the future. In this Court's view, it would pervert the law of trademark infringement and unfair competition to equate Napper's theft of the Complex, and Plaintiffs' reasonable reluctance to initiate a new restaurant business (*see* Damages Trial Tr. at 32:9–21 (Prince Immanuel) (explaining that the Community held off from starting up a new restaurant under the same moniker because it first wanted to resolve this litigation), with legal "abandonment," *see Grocery Outlet*, 497 F.3d at 951 ("To show abandonment by nonuse, the party claiming abandonment must prove both the trademark owner's (1) discontinuance of trademark use and (2) intent not to resume such use." (internal quotation marks omitted)).

In sum, Prince Immanuel not only notified Napper of his priority interest in use of the mark before the November 2011 eviction, but he has also actively litigated the trademark issue before this Court ever since. Thus, Napper can neither (1) reasonably contend that he was unaware of Prince Immanuel's trademark interests such that he should not be liable for the profits generated from the time the infringement began, nor (2) credibly maintain that Prince Immanuel has abandoned his trademark interests

because of his nonuse of the mark.  Consequently, Plaintiffs are entitled to an award of
the Restaurant's profits from November of 2011 through the present date.

> b. *Plaintiffs Have Established Estimated Gross Sales Of Nearly*
> *$3.6 Million Between November Of 2011 And The Present*

This Court concludes that *all* of the profits that Napper has earned from running

the Restaurant are attributable to Napper's infringing use of the Everlasting Life

trademark, because Napper took over Plaintiffs' *entire* business.  As this Court found in

*Yah Kai I*, Napper used a trade name that was "virtually identical to Yah Kai's trade

name"; ran his business "in the same physical space as the former Complex"; and even

retained the Everlasting Life sign that Yah Kai had commissioned and installed outside

of the Capitol Heights building.  195 F. Supp. 3d at 317–18 (emphasis omitted).  Thus,

it is a "near certainty that consumers will (mistakenly) think that Napper's food-service

business is one of the enterprises that is owned and operated by the African Hebrew

Israelites."  *Id.* at 319.  Put another way, Napper's use of the Everlasting Life trademark

enabled him to appropriate all of the Community's customers and its reputation (i.e., its

business good will), and also all of its profits.  *See id.* at 318–19 ("[Napper's] counsel

repeatedly emphasized that, rather than establishing a new, competing enterprise,

Napper is currently operating 'the *same* business . . . [that has] been in the *same* place

using the *same* name that was being used prior to the trademark registration[.]'"

(quoting July 14, 2015 Trial Tr. at 39:17–22 (emphasis added))).  And it is *precisely*

*because* Napper's infringing use was so expansive that the remedy for his Lanham Act

violation and unfair competition should be similarly expansive, such that it

encompasses all of the profits Napper earned from the Restaurant that he unlawfully

commandeered.  *See Riggs II*, 975 F. Supp. at 16 (awarding the plaintiff all of the

defendant's equity profits for "the period of its bad faith conduct" because those profits all resulted from the defendant's infringing conduct).

To satisfy their obligation of demonstrating the Restaurant's gross sales during the relevant period, Prince Immanuel and Yah Kai have struggled to compile various financial records (*see* Pls.' Dam. COL at 13–14), and have proffered the following analysis of how the Court should proceed to account for Napper's infringing profits. Plaintiffs say that, "[r]ather than . . . attempting to parse through an intentionally designed, convoluted, commingled puzzle of Fair and Balanced's financial and tax corporate finances, which funds are substantially derived from Everlasting Life," the Court should, instead, "simplify its task consistent with the letter of the law" by (1) aggregating Fair and Balanced LLC's gross sales from 2011 through 2015, which Plaintiffs say is equal to approximately $4.04 million, and then (2) calculate 25% of this gross sales figure ($1.01 million) as a "starting point" for the determination of Plaintiffs' damages, and then (3) "issue treble damages [by] multiply[ing] this amount three [] times," for a total award of $3.03 million. (*Id.* at 13–14.) This Court agrees that Napper's financial records are "convoluted" and that Plaintiffs' approach is certainly far simpler than undertaking to determine the actual profits that the pertinent business interest generated during the relevant timeframe. (*Id.* at 13.) But, alas, Plaintiffs' requested methodology for determining the profits that resulted from Napper's infringing use of their mark is not at all consistent with the letter—or the spirit—of the law.

To avoid being repetitive, the Court directs Plaintiffs' attention to Part VI.A.1 of this Memorandum Opinion, *supra*, which explains that section 1117 of Title 15 of the

U.S. Code specifies the forms of monetary damages that a court may award for Lanham Act violations, as well as the adjustments that a court may make to those damages amounts. *Ga.-Pac. Consumer Prods. LP v. von Drehle Corp.*, 781 F.3d 710, 717 (4th Cir. 2015) ("Monetary relief for trademark infringement is provided for in 15 U.S.C. § 1117, and each type of monetary award is categorized with particularity and separately addressed."). Arbitrarily awarding a percentage of an umbrella company's aggregated gross revenue is not one of those remedies. *See* 15 U.S.C. § 1117(a). Instead, Congress has directed the Court to evaluate the "profits" that the defendants derived from the infringing use, *id.*, which requires at least *some* effort to determine the actual gross sales pertaining to the infringing activity and to subtract the costs that defendant incurred with respect to those sales.

Luckily, the record here contains a document that purports to evidence the Restaurant's gross sales between November of 2011 and December of 2015. (*See* **Appendix B** at B1.) This document, which Napper's accountant testified that he compiled from his contemporaneous QuickBooks account, shows that the Restaurant generated "[o]rdinary [i]ncome" of $3,555,428 between November 2011 and December 2015—a figure that breaks down to $136,475 for the last two months of 2011 (November and December); $1,019,788 in 2012; $1,084,287 in 2013; $771,341 in 2014; and $543,537 in 2015. In the absence of any other reliable evidence regarding the Restaurant's sales during this period, or any reason to doubt the reliability of these numbers in particular, this Court will rely upon these figures and consider them to represent the Restaurant's gross sales from November of 2011 through December of 2015.

Plaintiffs have also suggested that the applicable gross sales figure for the purpose of determining the Restaurant's profits should include the Restaurant's sales in 2016 (*see* Pls.' Dam. Br. at 14; Pls.' Dam. COL at 13–14)—and presumably their request would now extend to gross sales for the year 2017 and sales-to-date for 2018, because Napper's infringement is still ongoing. But as explained in Part III.B, *supra*, this Court has no evidence regarding the sales figures for those years because Napper has not yet produced those records. And given the apparent and significant downward trajectory in the Restaurant's gross sales in the years since Napper has managed the facility (*see* **Appendix B** at B1), any estimate of the sales for 2016, 2017, or 2018 that is derived from calculating the average of the gross sales from previous years would likely overestimate the Restaurant's recent sales volume. Thus, this Court is reluctant to reach any conclusion about the Restaurant's gross sales in fiscal years 2016, 2017, and early 2018, and will instead account for this time period by adjusting the overall award of profits as the Lanham Act allows. (*See* Part IV.A.2.d, *infra*.)

Consequently, at this point in the analysis, the final gross sales figure encompasses only the documented revenue of the Restaurant between November 2011 and December 2015, and that amount totals $3,555,428.

   c. *Napper's Costs For Operating The Complex Between November 2011 and December 2015 Were Approximately $2 Million*

In order to determine Napper's profits, the expenses that Napper incurred with respect to the Restaurant's operations must be subtracted from the gross sales figure. *See* 15 U.S.C. § 1117(a). Significantly for present purposes, the Lanham Act expressly places the burden of proving the costs attributable to production of the infringing goods *on the defendant*, and it is clear that if such costs are not established, the defendant can

be held liable to the plaintiffs for the full value of the infringing sales. *See id.*; *Riggs I*, 966 F. Supp. at 1271; *see also Hamilton-Brown Shoe Co.*, 240 U.S. at 262 (noting the difficulty in requiring plaintiff to attribute profits specifically to infringing conduct, and accepting that "[i]f one wrongfully mixes his own goods with those of another . . . he shall lose the whole, for the reason that the fault is his" (quoting *Graham v. Plate*, 40 Cal. 593, 598 (1871))). To prove these deductible costs, a defendant must do more than merely maintain that a list of expenses or costs are attributable to the production of infringing goods, especially where, as here, the proffered list include categories of expenses that may well be unrelated to the infringing activity. *See Maltina Corp. v. Cawy Bottling Co., Inc.*, 613 F.2d 582, 586 (5th Cir. 1980); *see also Kamar Int'l, Inc. v. Russ Berrie & Co., Inc.*, 752 F.2d 1326, 1331–33 (9th Cir. 1984) (examining the varying methods courts use to allocate deductions for overhead expenses before concluding that defendant must *prove* that each category of overhead actually contributed to "the production, distribution[,] or sales of the infringing goods").

Unfortunately for Napper, this Court has concluded that some of the records he has provided to demonstrate costs are either unreliable, or contain assertions that the listed expenses are not clearly related to Napper's infringing activities. (*See* Part III.B & n.13, *supra* (explaining why not all of the costs listed in the documents contained within **Appendix A** and **Appendix C** are trustworthy).) With respect to the Itemized Expenses document in particular, the Court expressed its concerns about the commingling of business expenses during the damages trial, and both Napper's accountant and his defense counsel specifically acknowledged those deficiencies, and vowed to address them. (*See, e.g.*, Damages Trial Tr. at 140:14–141:1 (Edwards)

(agreeing it was not possible to identify which expenses were attributable to the Restaurant merely by reviewing the Itemized Expenses document); *see also id.* at 168:9–15 (Def.'s Counsel) (recognizing the need to "ferret[] out [those expenses] that aren't Everlasting Life's expenses" after trial)). But no subsequent effort was ever undertaken to provide the Court with more reliable figures, much less any theory or formula for calculating the costs of Napper's production of the infringing goods and services. (*See e.g.*, Damages Trial Tr. at 157:1–158:8 (Def.'s Counsel) (lacking such a theory); Amended Joint Pretrial Statement, ECF No. 99, at 4 (asserting only that "Defendant's profits were d[e] minimis")). And without any statement regarding *which* of the listed expenses are *actually* attributable to the operation of the former Complex business (as opposed to Napper's other business concerns), this Court cannot conclude as a matter of law that the cost listings that Napper has provided prove all of the operating costs he now claims.

But this is not the end of the matter as far as Napper's costs are concerned. Where a defendant in a trademark infringement case has failed to clearly demonstrate the costs attributable to their production of infringing goods, courts in this Circuit have nevertheless routinely considered other available evidence pertaining to a defendant's readily-attributable expenses. *See, e.g.*, *Breaking the Chain Found., Inc. v. Capitol Educ. Support, Inc.*, 625 F. Supp. 2d 1, 3 (D.D.C. 2013) (using information provided by the plaintiff to help the court determine defendant's costs). Here, an exhibit that has been offered to establish the Restaurant's gross sales also includes evidence of the "[c]osts of [g]oods [s]old" (i.e., the raw materials) between November 2011 and 2015. (*See* **Appendix B** at B1.) According to this document, the Restaurant had a total Cost

of Goods Sold of $1,232,518 in the period from November of 2011 through 2015, which consists of costs of $51,030 in the pertinent part of 2011, $482,464 in 2012, $449,206 in 2013, $197,617 in 2014, and $52,201 in 2015.  (*See id.*)

The accuracy of this document's representation of costs has not been disputed; therefore, this cost figure will be included in the deductions that must be made from the gross sales amounts calculated above in order to determine Napper's profits. Additionally, because the record reflects rent payments that Napper made to Kingdom Management from November 2011 through December 2015 totaling $379,234 (*see* Part III.C.2., *supra*; **Appendix A** at A6–A7, A10–A11), the Court finds that these payments are directly attributable to his infringing use of the mark and should also be subtracted from the Restaurant's gross sales.  Finally, as noted in Part III.C.2, *supra*, the Court has found that two of the documents Defendant submitted provide credible evidence of additional expenses relating to the operation of the Restaurant in the last two years of the infringing period (2014 and 2015)—specifically, $227,210 in 2014, and $223,434 in 2015.  (*See* Part III.C.2. & n.13, *supra*; *see also* **Appendix C** at C1–C3.)  These costs will be deducted as well.  Thus, based on the record evidence, the proven expenses for operation of the Everlasting Life Restaurant between November 2011 and December 2015 total $2,062,396.[15]

The Court will use this cost figure to calculate the profits that the Restaurant

---

[15] The Court acknowledges that this cost figure does not include Napper's expenses for running the Restaurant from 2011 through 2013, other than the rental payments that were made and the costs of the goods sold during those years.  As this Court has previously noted, the defendant has not provided the Court with a trustworthy accounting of all of the Restaurant's expenses during this two-year period. (*See* Part III.B, *supra*.)  Under the Lanham Act's burden-shifting framework, Napper bears the responsibility to prove any costs that he seeks to have deducted from the gross sales figures that Plaintiffs have provided, *see* 15 U.S.C. § 1117(a), and because he has not done so, this Court has no choice but to calculate the damages award without further deductions for unspecified or unproven operating costs.

earned during this timeframe in accordance with the Lanham Act's requirements. *See* 15 U.S.C. § 1117(a). And after subtracting the established expenses attributable to the production of infringing goods from the total gross sales of the Restaurant for 2011 through 2015, the Court holds that Napper's profits from his infringing use of the mark from November 2011 until December 2015 total $1,493,032.

> d.    *In This Court's Discretion, The Award Of Profits Will Be Increased From $1,493,032 To $1,856,144, To Account For Profits Between 2016 and The Present*

The Lanham Act specifically authorizes the modification of an award of profits calculated pursuant to the Act, if the court believes the "amount of the recovery based on profits is inadequate or excessive[,]" 15 U.S.C. § 1117(a), and, here, an award of profits in the amount of $1,493,032 is, in fact, inadequate. As previously mentioned, an award in that amount does not include any of the profits that the Restaurant has earned since January 2016, because the record contains no evidence regarding the Restaurant's gross sales or costs in 2016, 2017, or thus far in 2018. (*See* Part IV.A.2.c, *supra*.) Moreover, the record lacks this evidence because Napper has failed to produce it (and not because the Restaurant ceased to operate and thus stopped infringing upon Prince Immanuel and Yah Kai's trademark rights). Therefore, the "amount of . . . recovery based on profits" that consists only of the Restaurant's profits from November of 2011 until December 2015 is manifestly "inadequate[,]" 15 U.S.C. § 1117(a), and as a result, the Court will adjust its award of profits upward.

The Court is mindful that any such adjustment should be "careful[ly] tailor[ed,]" *Foxtrap*, 671 F.2d at 642, and as a result, the Court will use the following approach. First, the Court will (generously) assume that the Restaurant's gross revenue and expenses in 2016, 2017, and the early part of 2018 (on a pro-rated basis of course) were

the same as those figures were in the year 2015—which is the last year for which this Court has such information. Defendant's gross revenue and proven costs for 2015 were, respectively, $543,537 and $373,837 (consisting of rent payments, the cost of goods sold, and the expenses the Court found were necessarily for the production of the infringing good and services in Part III.C.2, *supra*), and thus Defendant's proven profits for 2015 were $169,700.

Next, the Court will attribute that amount of profits to the years 2016, 2017, and (on a pro-rated basis) 2018, because the Court has no better measure of Defendant's profits for those years, yet the profit generated in those years must be accounted for in the monetary damages award that the Court imposes. When this profit figure, $363,112, is added to the previously calculated profit from 2011 through 2015, the new total award is $1,856,144.

Notably, in making this award of profits for the period from November 2011 to present, this Court rejects Plaintiffs' request for damages in the form of *treble* profits, which the Lanham Act allows in certain circumstances. (*See* Pls.' Dam. COL at 3–4, 9–10, 14.) Under the statute, a plaintiff can claim entitlement to an award of treble profits in cases that involve "use of a counterfeit mark[.]" *See* 15 U.S.C. § 1117(b).[16] But "to

---

[16] Section 1117(b) provides that:

> In assessing damages under subsection [1117(a)] for any violation of section 1114(1)(a) of this title . . . in a case involving use of a counterfeit mark or designation (as defined in section 1116(d) of this title), the court shall, unless the court finds extenuating circumstances, enter judgment for three times such profits or damages, whichever amount is greater, together with a reasonable attorney's fee, if the violation consists of (1) intentionally using a mark or designation, knowing such mark or designation is a counterfeit mark (as defined in section 1116(d) of this title), in connection with the sale, offering for sale, or distribution of goods or services . . . .

15 U.S.C. § 1117(b).

establish trademark counterfeiting, Plaintiff must show that Defendant infringed a

registered trademark in violation of 15 U.S.C. § 1114(1)(a) and that defendant

'intentionally used a mark, knowing such mark is a counterfeit mark.'" *Lifted Research

Grp., Inc. v. Behdad, Inc.*, 591 F. Supp. 2d 3, 7 (D.D.C. 2008) (quoting 15 U.S.C.

§ 1117(b) (emphasis added)); *see also Ga.-Pac. Consumer Prods. LP*, 781 F.3d at 718.

The Lanham Act also makes clear that a "counterfeit" mark is "a spurious mark which

is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C.

§ 1127.

No such allegation or evidence has been presented in the instant case. Indeed,

although the Court previously concluded that Napper's use of the Everlasting Life

moniker was likely to lead confusion on the behalf of the average customer, *see Yah*

*Kai I*, 195 F. Supp. 3d at 319, this Court has never found that Napper's mark is a

counterfeit copy of Prince Immanuel's trademark, or is otherwise indistinguishable

from that mark. And a side-by-side comparison of the two marks—Prince Immanuel's

and Napper's—is sufficient to prove this point:

 

(USPTO Service Mark Registration, Pls.' Liability Trial Ex. 1, ECF No. 29-1, at 2;

Promotional Events by Fair and Balanced for Everlasting Life, Pls.' Liability Trial Ex.

22, ECF No. 29-1, at 87.)

These images do not come close to meeting the "identical" or "substantially indistinguishable" standard that characterizes a counterfeit mark. 15 U.S.C. § 1127; *see Idaho Potato Comm'n v. G & T Terminal Packaging, Inc.*, 425 F.3d 708, 721 (9th Cir. 2005) (explaining that, to engage in trademark counterfeiting, the defendant must use "a non-genuine mark identical to [the registered mark]"). Therefore, this Court does not have the authority to award treble damages for profits under the Lanham Act. *See Ga.-Pac. Consumer Prods. LP*, 781 F.3d at 718.

This Court also rejects Plaintiffs' call for it to exercise its discretion under 15 U.S.C. § 1117(a) to modify the award of profits further, so as to issue an award that effectively trebles the proven profits. (*See* Pls.' Dam. COL at 3–4, 9–10, 14.) Such an award would come perilously close to constituting a punishment for Napper's infringement, which the Lanham Act forbids. *See* 15 U.S.C. § 1117(a) (stating that the awarded sum "shall constitute compensation and not a penalty"); *see also Foxtrap*, 671 F.2d at 642 n.11 ("[T]he [district] court should strive to assure that the award it orders will deter the defendant, yet not be a windfall to plaintiff nor amount to punitive damages.").

### 3. Plaintiffs Are Also Entitled To Attorney Fees And Costs

The Lanham Act authorizes successful plaintiffs to recover their litigation costs in the form of monetary damages, and also, "*in exceptional cases*[,]" plaintiffs can recover "reasonable attorney fees." 15 U.S.C. § 1117(a) (emphasis added). The D.C. Circuit has long interpreted the "exceptional cases" standard to permit a court to award a plaintiff attorney fees under the Lanham Act only if the plaintiff has demonstrated that the defendant engaged in "willful or bad faith infringement." *Reader's Digest Ass'n, Inc. v. Conservative Digest, Inc.*, 821 F.2d 800, 808 (D.C. Cir. 1987), *overruled*

*on other grounds by Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994); *see also ALPO*

*Petfoods*, 913 F.2d at 965–66 (applying the same standard).  However, the Supreme

Court's recent decision in *Octane Fitness, LLC v. ICON Health and Fitness, Inc.*, 134

S.Ct. 1749 (2014), has called this interpretation of the "exceptional cases" standard into

question.

　　In that case, the Supreme Court interpreted the attorney fees provision of the

Patent Act—which has exactly the same language as the attorney fees provision in 15

U.S.C. § 1117(a)[17]—and focusing on the phrase 'exceptional cases,' the Supreme Court

concluded that "an 'exceptional' case . . . is simply one that stands out from others with

respect to the substantive strength of a party's litigating position (considering both the

governing law and the facts of the case) or the unreasonable manner in which the case

was litigated[,]" *Octane Fitness, LLC*, 134 S.Ct. at 1756.  Notably, the Supreme Court

did not insist on any finding of willfulness or bad faith, and ultimately thought it best

that "[d]istrict courts [] determine whether a case is 'exceptional' in the case-by-case

exercise of their discretion, considering the totality of the circumstances."  *Id.*

　　Because the language in section 1117(a) is identical to the language that the

Supreme Court interpreted in *Octane Fitness*, the *Octane Fitness* standard seemingly

also applies to requests for attorney fees under the Lanham Act.  Indeed, every court of

appeals to have considered the relevance of *Octane Fitness* has concluded that its

definition of an "exceptional case" ought to govern the Lanham Act's attorney fees

provision.  *See, e.g.*, *Romag Fasteners, Inc. v. Fossil, Inc.*, 866 F.3d 1330, 1334–35

---

[17] *Compare* 35 U.S.C. § 285 ("The court in exceptional cases may award reasonable attorney fees to the prevailing party.") *with* 15 U.S.C. § 1117(a) ("The court in exceptional cases may award reasonable attorney fees to the prevailing party.").

(Fed. Cir. 2017); *SunEarth, Inc. v. Sun Earth Solar Power Co.*, 839 F.3d 1179, 1180–81 (9th Cir. 2016); *Baker v. DeShong*, 821 F.3d 620, 622–64 (5th Cir. 2016); *Slep-Tone Entm't Corp. v. Karaoke Kandy Store, Inc.*, 782 F.3d 313, 317–18 (6th Cir. 2015); *Ga.-Pac. Consumer Prods. LP*, 781 F.3d at 721; *Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 314–15 (3d Cir. 2014). Further strengthening this conclusion is the fact that the Supreme Court's opinion in *Octane Fitness* specifically approved of the D.C. Circuit's decision in *Noxell Corp. v. Firehouse No. 1 Bar-B-Que Restaurant*, 771 F.2d 521 (D.C. Cir. 1985), wherein the D.C. Circuit concluded that a *defendant* seeking fees under the Lanham Act's 'exceptional case' standard need only show that the case was "uncommon" or "not run-of-the mill." *Id.* at 526. Thus, it appears that the D.C. Circuit's 'willful' or 'bad faith' standard for determining whether a case is 'exceptional' for the purpose of awarding a plaintiff attorney fees under the Lanham Act may not have survived *Octane Fitness*.

Plaintiffs here are entitled to attorney fees in any event, regardless of *Octane Fitness*'s effect on the D.C. Circuit's willfulness standard, because Napper's infringing conduct was willful, as explained above, and this case is also undoubtedly extraordinary. To recap briefly, a finding of 'willfulness' or 'bad faith' in the trademark infringement context "require[s] a connection between a defendant's awareness of its competitors and its actions at those competitors' expense"—*i.e.*, it demands that the defendant engaged in "conduct aimed at a victim targeted by the defendant." *ALPO Petfoods*, 913 F.2d at 966. In this regard, Napper's willfulness in infringing upon Prince Immanuel's trademark is plainly manifest. *See Yah Kai I*, 195 F. Supp. 3d at 316–18; (Part IV.A.2.a, *supra*.) In addition, this Court easily finds that

Napper's deliberate heist—and the accompanying intentional freeriding on the goodwill that Yah Kai had established with customers of the Everlasting Life Complex—is *exceedingly* unusual, and therefore, this case is far from run-of-the-mill. *See Octane Fitness*, 134 S.Ct. at 1756. Consequently, regardless of whether or not *Octane Fitness* now establishes the correct legal standard for an award of attorney fees under the Lanham Act, it is clear that an award of attorney fees is appropriate here.

As is often the case, the final amount of the attorney fees award has not yet been determined, and a motion and further briefing will be necessary to establish the proper scope of the attorney fees award. *See AARP v. Sycle*, 991 F. Supp. 2d 224, 234 (D.D.C. 2013); *see also* Fed. R. Civ. P. 54(d)(2)(B) (laying out the procedures for motions for attorney fees); LCvR 54.2. This Court will also award the Plaintiffs' their costs in litigating this trademark infringement matter, *see* 15 U.S.C. § 1117(a), and this figure, too, will have to await a bill of costs, as initiated by Plaintiffs. *See* Fed. R. Civ. P. 54(d)(1) (laying out the procedures for obtaining costs); LCvR 54.1.

## B. Plaintiffs Have Demonstrated That They Have Actual Damages, And This Court Will Award $545,407 For Such Damages

Congress has authorized a Lanham Act plaintiff to recover any "actual losses," *Foxtrap*, 671 F.2d at 642, that "flow directly from the infringement," Koelemay, *Monetary Relief for Trademark Infringement Under the Lanham Act*, 72 Trademark Rep. 458, 505 (1982). In contrast to the equitable disgorgement of any profits that the infringer earned from his infringing conduct, an award of actual damages accounts for the particular harm that the plaintiff has suffered from not receiving what it otherwise would have earned absent the infringement. Therefore, traditionally, a plaintiff's actual damages include "(1) profits lost on trade diverted to the infringer; (2) profits lost on

sales made at reduced prices in response to competition by the infringer; (3) harm to the plaintiff's reputation and good will; and (4) the cost of advertising needed to prevent or dispel customer confusion." *Id.*; *see also ALPO Petfoods*, 913 F.2d at 969 (approving of Koelemay's treatise and endorsing that document's measure of actual damages under the Lanham Act).

To recover these actual damages, the plaintiff must provide evidence that "adequately supports all items of damages claimed and establishes a causal link between the damages and the defendant's conduct[.]" *ALPO Petfoods*, 913 F.2d at 969. In other words, the plaintiff must prove "both causation and amount" to recover actual damages. J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 30:72 (5th Ed. 2017) (2017 Update) ("McCarthy"). And if the plaintiff successfully proves that it has actual damages, the Lanham Act provides the factfinder with the discretion to award up to three times the amount found if the circumstances of the case so demand. *See* 15 U.S.C. § 1117(a).

In the instant case, Prince Immanuel and Yah Kai have indisputably satisfied the causation aspect of this actual damages analysis. As explained in *Yah Kai I*, Plaintiffs have proven that Napper engaged in activity that infringed their trademark rights, and Napper is thus liable for any losses that the Plaintiffs sustained as a direct result of these actions. *See Yah Kai I*, 195 F. Supp. 3d at 318 (finding that "all but the most discerning consumer would easily mistake Napper's mark and restaurant" for that of Plaintiffs' trademarked establishment). To be specific, it is clear beyond cavil that Napper caused the Community (Yah Kai) to lose profits that were diverted to Napper

when he evicted Prince Immanuel and Yah Kai and stole the Community's food-service establishment business.

The question then becomes whether the instant record establishes the *extent* of the actual harm to Yah Kai and Prince Immanuel. This need not be established to a near certainty, because the D.C. Circuit and other courts have routinely required less rigor when it comes to demonstrating the amount of actual damages the defendant's actions have caused. *See ALPO Petfoods*, 913 F.2d at 969 ("[T]he district court may take into account the difficulty of proving an exact amount of damages."); *Otis Clapp & Son, Inc. v. Filmore Vitamin Co.*, 754 F.2d 738, 745 (7th Cir. 1985) ("The plaintiff is held to a lower burden of proof in ascertaining the exact amount of damages because the most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." (internal quotation marks and citation omitted)). Nevertheless, the plaintiff must still provide "adequate evidentiary support" for the claimed harms that allegedly resulted from the defendant's infringing conduct, *Foxtrap*, 671 F.2d at 642, although the "nature of the proof required to support a [factfinder's] award depends on the circumstances of the case and is subject to the principles of equity," *Skydive Ariz.*, 673 F.3d at 1112 (internal quotation marks and citation omitted). As a general rule, a trademark-infringement plaintiff need only provide "substantial evidence to permit the [factfinder] to draw reasonable inferences and make a fair and reasonable assessment" of the actual damages. *Id.* (emphasis omitted) (citing *La Quinta Corp. v. Heartland Props. LLC*, 603 F.3d 327, 342 (6th Cir. 2010)).

The aforementioned holes in the evidentiary record in this case necessitate a "crude measure[] of [actual] damages." *Id.* There is nothing in the record that establishes what the Complex's profits were in the years immediately preceding the takeover (i.e., when Yah Kai was managing it); therefore, Yai Kai's losses as a result of Napper's infringement are not immediately apparent. Nor can the Court credibly evaluate the loss to Yah Kai of having its business stolen based on the profits that the Restaurant generated when Napper reopened it. (*See* Part IV.C.2 & n.13, *supra* (explaining that the Court has been able to determine Napper's actual profits only for 2014 and 2015).) It is clear from the record in this case that the Restaurant experienced a steady decrease in gross sales under Napper's management—which is entirely consistent with the Community's past experience with Napper's management of the Complex (*see, e.g.*, July 15, 2015 Trial Tr. at 78:5–79:20)—and thus it cannot be said that the profits Napper earned after the takeover are necessarily representative of the full profits that Yah Kai would have generated if it had continued to run the Complex since 2011.

Recognizing that the Court must do its best to evaluate actual damages regardless, this Court has scoured the record for credible evidence pertaining to Yah Kai's actual losses. During the liability trial, the parties stipulated to the admission of Yah Kai's corporate income tax returns for the Complex for 2009 and 2010. (*See* July 14, 2015 Trial Tr. at 9:16–19.) Of the instant trove of financial records, the Complex's tax return for 2010 provides the best indication of the Complex's true profits prior to Napper's takeover, and this document indicates that the Complex had profits totaling $161,602 for the year 2010. (*See* Everlasting Life Health Complex 2010 Tax Return,

Pls.' Liability Trial Ex. 9, ECF 114-6, at 1.)[18]  Given that figure—which represents *12 months* of lost profits—the Court believes that it can confidently award Yah Kai actual damages in the amount of $181,802, as compensation for the 14-month period from November of 2011 through the end of 2012 (the first year of Napper's takeover).  But the Court will stop there, and will not proceed further with the actual damages projections, due to its uncertainty regarding how the Complex actually would have fared under Yah Kai's management many years into the future.

In fact, it is at this point in the actual damages analysis that the Court will pivot away from attempted precision and exercise the discretion that is afforded to the Court under the Lanham Act when the actual harm to a plaintiff is evaluated.  *See* 15 U.S.C. § 1117(a) (authorizing a court to treble the award of actual damages).  The Court finds that an equitable increase in the aforementioned actual damages amount is entirely justified given the facts presented in this case, for as hazy as the actual magnitude of the harm to Yah Kai in the seven years following the takeover might be, one thing is crystal clear:  as a result of Napper's actions in November of 2011, Prince Immanuel, Yah Kai, and the Community went from being profitable Maryland business owners to having no business to speak of—literally overnight.  There is no question that Plaintiffs have suffered a significant harm and that Napper's self-help strategy had long-lasting

---

[18] The Complex's IRS Form 1120 itemizes the total income and various tax-deductible expenses.  The Court's profit figure makes certain adjustments that reasonably account for the Complex's actual profit during the relevant period.  The Court arrives at the profit amount of $161,602 by taking the Complex's gross income and deducting the costs related to salaries and wages, repairs and maintenance, rents, taxes and licenses, depreciation, and advertising.  The Court has also subtracted the value listed for "other deductions," because it is uncertain as to what expenses those deductions actually covered, and they could well have been related to expenses that were necessary to run the business.  However, because the line-item pertaining to "charitable contributions" is not even theoretically related to actual cost of operating the Complex, the $125,836 in charitable contributions that the Complex made in 2012 has not been counted as a cost for the purpose of the Court's projections regarding the profit that Yah Kai would have generated if Napper had not evicted Plaintiffs.

ramifications; therefore, in this Court's view, the actual damages figure *must* extend

beyond the mere ascertainable profits that Plaintiffs were forced to forgo in the one

year following their eviction.  This Court concludes that trebling those damages, as the

Lanham Act permits, is the *least* that can be done to compensate Plaintiffs for their

substantial loss, and as a result, the total award of enhanced actual damages will be

$545,407.  *See* 15 U.S.C. § 1117(a); *Foxtrap*, 671 F.2d at 641.

### C. Plaintiffs Have Failed To Show That Punitive Damages Are Warranted, And The Court Will Not Award Injunctive Relief

Unlike Plaintiffs' call for Napper's profit and their actual damages, Plaintiffs'

request for punitive damages and injunctive relief cannot be sustained.  It is well

established that "[p]unitive damages are reserved typically for punishing the most

heinous of intentional torts and tortfeasors[,]" *see Beall v. Holloway-Johnson*, 130 A.3d

406, 419 (Md. 2016), and that "to recover punitive damages in *any* tort action in the

State of Maryland, facts sufficient to show *actual malice* must be pleaded and proven

by clear and convincing evidence[,]" *Scott v. Jenkins*, 690 A.2d 1000, 1003–04 (Md.

1997) (emphasis original), *superseded by statute on other grounds.*  Actual malice

exists when the defendant's conduct is "characterized by evil motive, intent to injure, ill

will, or fraud."  *Beall*, 130 A.3d at 420; *see also H & R Block, Inc. v. Testerman*, 338

A.2d 46, 52 (Md. 1975) (defining actual malice as "the performance of an act without

legal justification or excuse, but with an evil or rancorous motive influenced by hate,

the purpose being to deliberately and willfully injure plaintiff"), *abrogated on other*

*grounds by Owens-Illinois, Inc. v. Zenobia*, 601 A.2d 633 (Md. 1992).  And in this

Court's view, no such intent is evident on the facts presented here.

Far from displaying malice or evil intent, Napper is, was, and has always been motivated by a sincere—albeit woefully mistaken—belief that he owns Everlasting Life, and that he could therefore rightfully seize the business from Plaintiffs (who he believes wrongfully ousted him) and manage it as his own. As previously stated, this Court has no doubt that Napper's conviction that he is the rightful owner of the business due to his substantial in-kind contributions to the creation and management of the Complex is earnest. *See Yah Kai I*, 195 F. Supp. 3d at 321–22. Napper reasserted this belief fervently during both of the trials that this Court held in this matter. (*See* Damages Trial Tr. at 87:1–7 (Napper); July 14, 2015 Trial Tr. at 140:17–148:22.) And even though Napper is entirely and utterly wrong about his ability to claim legal ownership of the business, *see Yah Kai I*, 195 F. Supp. 3d at 321 (making clear that "Napper's vision of his rights and entitlements is inconsistent with the law and is not supported by the facts that were established during the trial"), the Court concludes that Napper's actions were motivated by this mistaken belief—not by a malicious intent. (*See, e.g.*, Damages Trial Tr. at 99:14–17 ("Everlasting Life had been my business. I established it, and I established it for the purposes that it serves now, and your decision didn't change my heart."); 100:11–13 ("So I realized what was written on the paper, but I knew what was right. And I knew that I was, I was the person who did all of this."); 107:16–18 ("I said, Why would they do this to me? Why would you take this from me? This is all I had, Your Honor.").)

This means that even though Napper wrongfully and willfully infringed upon the trademark and engaged in unfair business practices with respect to Prince Immanuel and Yah Kai, punitive damages are not appropriate, because the evidence does not support a

finding of actual malice under Maryland law. *See Food Fair Stores, Inc. v. Hevey*, 338 A.2d 43, 47 (Md. 1975) ("It has long been recognized in Maryland that where an act, though wrongful in itself, is committed in the honest assertion of a supposed right or in the discharge of duty, . . . there is no ground on which punitive damages can be awarded."); *see also Darcars Motors of Silver Spring, Inc. v. Borzym*, 818 A.2d 1159, 1176 (Md. Ct. Spec. App. 2003) (same) (citation omitted). Therefore, Plaintiffs' request for punitive damages must be denied.

Plaintiffs have also failed to establish that they are entitled to an award of injunctive relief. Although the record does make clear that Napper has willfully continued to use the Everlasting Life trademark, Plaintiffs' request for injunctive relief is too vague to be enforced. (*See* Pls.' Dam. Br. at 6 (asking for "injunctive relief including, but not limited to a ruling that invalidates Napper's continued use of Plaintiffs' trade name"); Pls.' Dam. COL at 3 (same).) One wonders whether, by requesting "invalidation" of Napper's use of the trade name, Plaintiffs are seeking an injunction that requires Napper merely to change the name of his Restaurant, or are they asking this Court to enjoin Napper's continued operation of the business that is and has always operated under that trade name? Plaintiffs have not provided clarification, such as any proposed language for their requested injunction, and their lack of specificity makes it difficult for the Court to *evaluate* the scope of the requested injunction, much less order it.

Even more significant is the fact that Plaintiffs have not demonstrated the current status of Prince Immanuel's trademark registration or analyzed its impact on the requested injunctive relief, if any. The record indicates that Prince Immanuel's

trademark registration lapsed in 2016, and not only have Plaintiffs ceased to manage any food-service establishment since the 2011 eviction, but Napper is also apparently in the process of applying for registration of substantially the same mark before the USPTO. (*See* Part III.C.4, *supra*.) Thus, the threat of future harm to Prince Immanuel as the trademark owner—which is a requirement for injunctive relief under the Lanham Act (*see* Part IV.A.1, *supra*)—is unclear at this time. *See ALPO Petfoods*, 913 F.2d at 966 (pointing out that the "propriety of a permanent injunction" depends in part on "whether a defendant is likely to cause future harm"); *Greene*, 104 F. Supp. 3d at 21 ("Without a demonstration of a threat of ongoing harm, the Court cannot conclude that Plaintiff will suffer any irreparable injury."). Consequently, this Court cannot conclude that injunctive relief is either appropriate or warranted.

### D. Yah Kai Is Entitled To Compensatory Damages Plus Prejudgment Interest For Napper's Conversion Of Yah Kai's Tangible Assets And Intangible Rights

Yah Kai not only seeks the aforementioned damages and injunctive relief with respect to Napper's trademark violation and unfair competition, for it has also requested "economic damages, compensatory and punitive damages" as compensation for Napper's conversion of Yah Kai's tangible and intangible property interests when he evicted Plaintiffs from the Complex. (Pls.' Dam. Br. at 1.)[19] Specifically, Yah Kai requests (1) "economic damages for tangible items" left behind in the Complex, (2) the value of its intangible interest in the PEPCO utility rebate, and (3) unspecified additional compensatory and punitive damages. (*Id*. at 16.) For the reasons explained

---

[19] As the Court noted in its Findings of Fact and Conclusions of Law at the liability phase of this trial, only Yah Kai has sustained its burden of demonstrating ownership of the converted tangible and intangible assets, as is necessary for entitlement to damages for conversion. *See Yah Kai I*, 195 F. Supp. 3d at 322 n.16.

below, this Court concludes that Yah Kai has demonstrated its entitlement to $17,864 in damages for its tangible equipment and goods, and that it is also entitled to recover $125,000 for Napper's conversion of its intangible interests, which represents the established value of Yah Kai's intangible interest in the PEPCO rebate. The Court will also award Yah Kai prejudgment interest with respect to these amounts, as Maryland law requires, but it will not award punitive damages for the reasons previously explained.

4. <u>Yah Kai Will Be Awarded A Total Of $142,864 As Compensatory Damages For Its Conversion Claim</u>

"In [an] action for conversion, title to the chattel passes to [the defendant], so that he is in effect required to buy it at a forced judicial sale." *Staub v. Staub*, 376 A.2d 1129, 1132 (Md. 1977). Thus, the measure of damages owed to a plaintiff in an action for conversion typically includes the fair market value of the property at the time of conversion and any interest from the time of conversion through the date of judgment. *See Keys v. Chrysler Credit Corp.*, 494 A.2d 200, 209 (Md. 1985); *Checkpoint Foreign Car Serv.*, 242 A.2d at 149. Punitive damages are also technically available. *See Henderson v. Md. Nat'l Bank*, 366 A.2d 1, 4 (Md. 1976). But just as with common law claims of unfair competition, such damages are only available if the plaintiff demonstrates that the defendant converted the plaintiff's property with actual malice. (*See* Part IV.A.1, *supra*.) *See also Scott*, 690 A.2d at 1003–04.

It is the plaintiff's burden to provide the factfinder with a sufficient basis for evaluating the amount of damages for common law conversion. *See Owens-Corning v. Walatka*, 725 A.2d 579, 585 (Md. Ct. Spec. App. 1999). To recover damages for the tangible items that Napper converted, Yah Kai must provide evidence of the market

value of its equipment, inventory, and other chattels within the Capitol Heights Everlasting Life facility, and although the existing record is sparse in this regard (*see* Part III.B, *supra*), as explained above, this Court finds that Yah Kai has provided evidence—in the form of William Young's deposition testimony—to support the conclusion that the tangible items converted included assets with a market value at the time of at least $17,864 (*see* Part III.C.1, *supra*). Therefore, the Court will award Yah Kai $17,864 to compensate it for Yah Kai's converted tangible property. *See Checkpoint Foreign Car Serv.*, 242 A.2d at 149 (explaining that testimony by one who is in a position to know the value of converted tangible objects may suffice to establish the damages for that conversion).

Yah Kai also seeks recompense for Napper's conversion of the utility invoices that evidenced Yah Kai's intangible right to a rebate for years of overpayments to PEPCO. (*See* Pls.' Dam. Br. at 16.) This Court will award that measure of damages as well, because Maryland common law provides that conversion of a physical document evidencing an intangible property right permits recovery of "the value of the right evidenced or represented by the document." *Lawson v. Commonwealth Land Title Ins. Co.*, 518 A.2d 174, 176 (Md. Ct. Spec. App. 1986); *see also Allied Inv. Corp. v. Jasen*, 731 A.2d 957, 965 (Md. 1999) (requiring a complaint for conversion of an intangible interest to allege that "tangible documents evidenced [the rights,] and that the documents were transferred improperly to respondent"); *Medi-Cen Corp. of Md. v. Birschbach*, 720 A.2d 966, 972 (Md. 1988) (noting that accounts receivable records "represented by hard copies or electronic data" likely sufficed to fulfill the tangible documents requirement).

This Court has already found that Napper's conversion of Yah Kai's business records and utility payment invoices made him liable for "the value of the right evidenced" by those documents, *Yah Kai I*, 195 F. Supp. 3d at 323 (citing *Lawson*, 518 A.2d at 176), and that value is unquestionably $125,000 under the circumstances presented in this case. (*See* Part III.C.1, *supra* (finding that the evidence presented regarding Napper's negotiations with the management company establishes that the value of the rebate right was $125,000).) Moreover, there is no uncertainty regarding the *collectability* of this debt—a factor that might otherwise bear on the valuation of this intangible right, *see Birschbach*, 720 A.2d at 976—because Napper took it upon himself to negotiate and actually collect upon this debt in the process of converting Plaintiffs' property. *See Yah Kai I*, 195 F. Supp. 3d at 304 n.11. Therefore, this Court easily concludes that the value of the intangible right associated with Yah Kai's invoices is $125,000, as (ironically) determined by the defendant himself.[20]

5.    Napper Is Liable To Yah Kai For Prejudgment Interest

Given the conclusions above, the total known value of the tangible and intangible goods that Napper converted was $142,864. However, notably, the value of the converted goods themselves is not the entire amount that is available for recovery under Maryland common law. Maryland law also authorizes plaintiffs to recover

---

[20] Napper does not, and cannot, contest that he had access to the business records left in the Capitol Heights facility when Yah Kai was evicted from the premises, nor does he contest that had access to the facility prior to the eviction. Thus, Napper had possession of Yah Kai's tax records, inventories, and the equipment itself, and therefore had the capacity to make a reasonable estimation of the value of the rebate at the time he converted those documents. Indeed, at the time of the lease and rebate negotiations, Napper himself was in a far better position than Yah Kai (and this Court) is now to estimate the value of the intangible rights that he converted. That is, as discussed previously, whatever the actual amount of the overpayment that was being reimbursed, Napper used the invoices for Yah Kai's utilities payments as the basis of the settlement price he negotiated, so this Court's conclusion that Yah Kai's intangible right to recover for this debt had a value of $125,000 was, in fact, estimated by Napper at the time of the conversion.

*interest* on the conversion damages, from the time of conversion through the date of judgment. *See Keys*, 494 A.2d at 209; *see also Staub*, 376 A.2d at 1131 (establishing that the time of conversion occurs at the time the claimant is deprived of "ownership or dominion" over his property). Indeed, in cases where the value of the converted chattel can reasonably be estimated at the time of conversion, prejudgment interest is "a matter of right" to the plaintiff. *Buxton v. Buxton*, 770 A.2d 152, 165 (Md. 2001).

The fact that prejudgment interest is calculated from the date of conversion under Maryland law means that this Court must determine the date that Napper converted Yah Kai's tangible and intangible property. This is easily done in regard to Yah Kai's *tangible* property interests, because Napper unquestionably took dominion and control over all of the furniture and equipment that was inside the Complex on November 15, 2011, when he evicted Plaintiffs from the premises. *See Yah Kai I*, 195 F. Supp. 3d at 323. The analysis pertaining to the timing of Napper's conversion of Yah Kai's *intangible* interests in the PEPCO rebate is more complicated, and is as follows.

The trial record suggests that Napper utilized the invoices that reflected Yah Kai's utility payments to PEPCO between 2009 and 2011 to negotiate a settlement with Kingdom Management at some point between when he extended the existing lease with Kingdom Management (in July of 2011) and when he finalized the settlement with PEPCO (on October 7, 2011). *See id.* at 304 n.11. Thus, Napper was interfering with Yah Kai's control over its debt even prior to his execution of the physical seizure of the Complex in November 2011.[21] This situation is analogous to the one that Maryland's

---

[21] To the extent that Napper maintains that the underlying overpayments that were the impetus for the rebate were made *by him* between 2004 through 2008—in his prior capacity as the Complex's manager

Court of Special Appeals confronted in *Staub*, where that court had to determine the point in time at which an ongoing interference with plaintiff's property rights became so substantial that it constituted conversion. *See Staub*, 376 A.2d at 1132–33. In *Staub*, the Court of Special Appeals identified factors that differentiated "mere interference" with plaintiff's property, on the one hand, from the level of dominion properly held to constitute conversion, on the other, and the court specifically noted that "a conversion occurs at such time as a person is deprived of property to the possession of which he is entitled." *Id*. at 1131. The various factors that can be considered when determining the point at which such a deprivation has occurred included, *inter alia*, "the actor's intent to assert a right in fact inconsistent with the other's right of control," "the actor's good faith," and "the extent and duration of the resulting interference with the other's right of control." *Id*. at 1132.

In *Staub*, the Court of Special Appeals upheld a trial court's finding that a defendant father had not converted bonds when he wrongfully added his name to them, nor had he done so when he had the bonds reissued under both his son's and his name. Instead, the Court concluded that the conversion took place only once the father had cashed the bonds *and thus deprived his son of the opportunity to do so*. *See id*. With respect to the facts presented here, this Court similarly concludes that Napper's interference with Yah Kai's use of its utility invoices reached the level of interference necessary to constitute conversion when Napper utilized the invoices to finalize the

---

before Yah Kai was formed (*see, e.g.*, Damages Trial Tr. at 167:3–7 (Def.'s Counsel))—this representation not only reflects Napper's misunderstanding of legal ownership, it is also directly contrary to the testimony that the Kingdom Management representative provided at the liability trial. The witness specifically stated that the overpayment settlement amount was calculated using invoices for approximately "a three-year period . . . going into 2011 until we actually separated the meter" (July 15, 2015 Trial Tr. at 88:4–20 (Allen)). This means that Yah Kai was actually paying the utility bills during the relevant timeframe.

settlement agreement, and thereby exercised total dominion over Yah Kai's right to the PEPCO rebate by depriving Yah Kai of the property interest to which it was entitled. Accordingly, this Court finds that Napper converted the utility invoices, and the associated PEPCO rebate, on October 7, 2011, when he executed the settlement agreement with Kingdom Management.

Prejudgment interest in Maryland is provided for in the Constitution of Maryland, and is calculated at the legal rate of six percent per annum in simple interest. Md. Const. Art. III, § 57; *see also* Sally J.T. Necheles, 13 *Maryland Law Encyclopedia* Interest and Usury § 14 (Dec. 2017 Update) (noting that the charging of interest under the Maryland Constitution is limited to simple interest). Because Maryland's General Assembly has not enacted an alternative rate, this rate controls. *See Great Am. Ins. Co. v. Nextday Network Hardware Corp.*, No. 14-1451, 2016 WL 828094, at *10 (D. Md. Feb. 29, 2016); *Hartford Cty. v. Saks Fifth Ave Distrib. Co.*, 923 A.2d 1, 15 (Md. 2007) (noting there is no Maryland statute covering prejudgment interest rates).

Accordingly, this Court will award Yah Kai prejudgment interest on $125,000 of its conversion damages at the rate of six percent per annum, beginning on October 7, 2011, and continuing through the date of this judgment. That prejudgment interest amount is $47,815. Yah Kai is further awarded prejudgment interest related to Napper's conversion of Yah Kai's tangible equipment and inventory at a rate of six percent per annum from the November 15, 2011 conversion date. The prejudgment interest on the tangible equipment damages amount of $17,864 is $6,619.

6. This Court Will Not Grant Yah Kai Punitive Damages Because Yah Kai Has Not Demonstrated That Napper Acted With Actual Malice

Finally, as has been noted repeatedly above, Plaintiffs cannot obtain punitive damages under Maryland's common law unless they demonstrate that Napper acted with actual malice. (*See* Part IV.A.1, *supra*) *See also Scott*, 690 A.2d at 1003–04. Although this Court has found that Napper acted willfully in converting Yah Kai's property, it does not believe that he did so with an "evil motive, intent to injure, ill will, or fraud." *Beall*, 130 A.3d at 420 (citation omitted). Instead, Napper acted on a genuine and good faith belief that he owned the Everlasting Life business and brand. *See Yah Kai I*, 195 F. Supp. 3d at 321–22.

To be sure, this Court's conclusion that "Napper's vision of his rights and entitlements is inconsistent with the law and is not supported by the facts that were established during the trial," *id.* at 321, has never waned. But it is equally clear that acting wrongfully based upon a mistaken belief is qualitatively different than acting wrongfully based upon "an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff." *Testerman*, 338 A.2d at 52. And this Court concludes that Napper had no such motive. (*See* Part IV.A.2.a, *supra*.) In other words, Napper's earnest belief in the righteousness of his wrongful conduct renders punitive damages unwarranted. *See Food Fair Stores*, 338 A.2d at 46.

## V. CONCLUSION

For the reasons explained above and in this Court's July 2016 Findings of Fact and Conclusions of Law, and based on evidence presented at both stages of the bifurcated bench trial that has taken place in regard to the instant dispute, this Court concludes that Plaintiffs Prince Immanuel and Yah Kai World Wide Enterprises, Inc.

have adequately established their right to certain monetary damages for Defendant

Napper's trademark infringement, unfair competition, and common law conversion.

Thus, as set forth in the accompanying order, **JUDGMENT WILL BE ENTERED IN**

**PLAINTIFFS' FAVOR** as follows.  With regard to the trademark infringement and

unfair competition claims, this Court finds Defendant liable to Plaintiffs in the amount

of $2,401,551 based on an accounting of Defendant's profits from infringing goods and

Plaintiffs' actual damages, and Plaintiffs are also entitled to attorney fees and

litigations costs.  Defendant is also liable to Plaintiff Yah Kai for common law

conversion in the amount of $142,864, and for prejudgment interest totaling $54,434.

DATE:  February 21, 2018

*Ketanji Brown Jackson*
KETANJI BROWN JACKSON
United States District Judge

# APPENDICES[*]

[*] The following appendices contain relevant excerpts of documents discussed in the memorandum opinion and are included to provide the reader with a sense of the financial information the Court had access to in making its determinations.

# EVERLASTING LIFE RESTAURANT & LOUNGE
## Expenses by Vendor Detail
### January 2011 through December 2015

| Type | Date | Num | Memo | Account | Clr | Split |
|------|------|-----|------|---------|-----|-------|
| Bill | 01/06/2014 | 12/15-... | 12/15-12/28/1... | Contractor | | Accounts Paya... |
| Bill | 01/20/2014 | 12/29/... | 12/29/13-01/1... | Contractor | | Accounts Paya... |
| Check | 01/22/2014 | | missed pay 2... | Contractor | | Cash in Drawer |
| Bill | 02/03/2014 | 01/12-... | 01/12-01/25/1... | Contractor | | Accounts Paya... |
| Bill | 02/17/2014 | 01/26-... | 01/26-02/08/1... | Contractor | | Accounts Paya... |
| Bill | 03/03/2014 | 02/09-... | 02/09-02/22/1... | Contractor | | Accounts Paya... |
| Bill | 03/18/2014 | 02/23-... | 02/23-03/08/1... | Contractor | | Accounts Paya... |
| Bill | 03/31/2014 | 03/09-... | 03/09-03/22/1... | Contractor | | Accounts Paya... |
| Bill | 04/14/2014 | 03/23-... | 03/23-04/05/1... | Contractor | | Accounts Paya... |
| Bill | 04/28/2014 | 04/06-... | 04/06-04/19/1... | Contractor | | Accounts Paya... |
| Bill | 07/21/2014 | 06/29-... | 06/29-07/12/1... | Contractor | | Accounts Paya... |
| Bill | 10/27/2014 | 10/05-... | 10/05-10/18/1... | Contractor | | Accounts Paya... |
| Bill | 11/10/2014 | 10/19-... | 10/19-11/01/1... | Contractor | | Accounts Paya... |
| Bill | 11/28/2014 | 11/02-... | 11/02-11/15/1... | Contractor | | Accounts Paya... |
| Bill | 12/08/2014 | 11/16-... | 11/16-11/29/1... | Contractor | | Accounts Paya... |

Total Donald Hendrix

**Douglas Whitaker**

| | | | | | | |
|------|------|-----|------|---------|-----|-------|
| Bill | 03/18/2014 | 02/23-... | 02/23-03/08/1... | Contractor | | Accounts Paya... |

Total Douglas Whitaker

**Dr.Baruch**

| | | | | | | |
|------|------|-----|------|---------|-----|-------|
| Deposit | 11/14/2011 | | loan | Loan | | Cash in Drawer |
| Deposit | 11/15/2011 | | loan | Loan | | Cash in Drawer |
| Deposit | 11/15/2011 | | loan | Loan | | Cash in Drawer |
| Deposit | 11/16/2011 | | loan | Loan | | Cash in Drawer |
| Deposit | 11/16/2011 | | loan | Loan | | Cash in Drawer |
| Deposit | 11/17/2011 | | loan | Loan | | Cash in Drawer |
| Deposit | 11/19/2011 | | loan | Loan | | Cash in Drawer |
| Deposit | 11/20/2011 | | loan | Loan | | Cash in Drawer |
| Deposit | 11/20/2011 | | loan | Loan | | Cash in Drawer |
| Check | 11/21/2011 | | credit card rei... | Reimbursement | | Cash in Drawer |
| Check | 11/21/2011 | | reimburseme... | Reimbursement | | Cash in Drawer |
| Deposit | 11/21/2011 | | loan | Loan | | Cash in Drawer |
| Deposit | 11/21/2011 | | loan | Loan | | Cash in Drawer |
| Deposit | 11/21/2011 | | loan for payroll | Loan | | Cash in Drawer |
| Deposit | 11/22/2011 | | Deposit | Loan | | Cash in Drawer |
| Deposit | 11/22/2011 | | loan | Loan | | Cash in Drawer |
| Deposit | 11/23/2011 | | loan | Loan | | Cash in Drawer |
| Deposit | 11/28/2011 | | loan for washi... | Loan | | Cash in Drawer |
| Deposit | 11/28/2011 | | loan for verizon | Loan | | Cash in Drawer |
| Deposit | 11/28/2011 | | loan for waste... | Loan | | Cash in Drawer |
| Deposit | 11/29/2011 | | loan for busin... | Loan | | Cash in Drawer |
| Deposit | 11/29/2011 | | loan for conve... | Loan | | Cash in Drawer |
| Deposit | 11/30/2011 | | loan for poto... | Loan | | Cash in Drawer |
| Check | 12/01/2011 | | loan for bever... | Loan | | Cash in Drawer |
| Deposit | 12/01/2011 | | loan for U-Haul | Loan | | Cash in Drawer |
| Deposit | 12/01/2011 | | loan for rest. ... | Loan | | Cash in Drawer |
| Deposit | 12/01/2011 | | loan for checks | Loan | | Cash in Drawer |
| Deposit | 12/02/2011 | | loan for Resta... | Loan | | Cash in Drawer |
| Deposit | 12/02/2011 | | loan for rest. ... | Loan | | Cash in Drawer |
| Deposit | 12/02/2011 | | loan for home... | Loan | | Cash in Drawer |
| Deposit | 12/03/2011 | | loan for Home... | Loan | | Cash in Drawer |
| Deposit | 12/03/2011 | | loan for Brunc... | Loan | | Cash in Drawer |
| Deposit | 12/03/2011 | | loan for flyer | Loan | | Cash in Drawer |
| Deposit | 12/05/2011 | | loan for judah | Loan | | Cash in Drawer |
| Deposit | 12/05/2011 | | for index cards | Loan | | Cash in Drawer |
| Deposit | 12/06/2011 | | loan for rest. ... | Loan | | Cash in Drawer |
| Deposit | 12/06/2011 | | loan for Conv... | Loan | | Cash in Drawer |
| Deposit | 12/06/2011 | | loan for Freezer | Loan | | Cash in Drawer |
| Deposit | 12/08/2011 | | loan for poto... | Loan | | Cash in Drawer |
| Deposit | 12/09/2011 | | loan for payroll | Loan | | Cash in Drawer |
| Check | 12/12/2011 | | investment plan | Consulting Services | | Cash in Drawer |

# EVERLASTING LIFE RESTAURANT & LOUNGE
## Expenses by Vendor Detail
### January 2011 through December 2015

| Type | Date | Num | Memo | Account | Clr | Split |
|------|------|-----|------|---------|-----|-------|
| Check | 03/29/2012 | | supplies | Reimbursement | | Cash in Drawer |
| Check | 05/31/2014 | | Dr. Baruch Ca... | Miscellaneous Expe... | | Cash in Drawer |
| **Total Dr.Baruch** | | | | | | |
| **DRH Mechanical** | | | | | | |
| Check | 08/09/2011 | | Cookie Oven ... | Repairs and Mainten... | | Cash in Drawer |
| Check | 09/28/2011 | | looked at Con... | Repairs and Mainten... | | Cash in Drawer |
| Bill | 12/06/2011 | | Service On C... | Repairs and Mainten... | | Accounts Paya... |
| **Total DRH Mechanical** | | | | | | |
| **Duane Jackson** | | | | | | |
| Bill | 02/03/2012 | | Electrician for ... | Repairs and Mainten... | | Accounts Paya... |
| **Total Duane Jackson** | | | | | | |
| **Duncan Ford** | | | | | | |
| Bill | 06/24/2014 | | Graphic Desig... | Advertising and Pro... | | Accounts Paya... |
| **Total Duncan Ford** | | | | | | |
| **Duston Burton** | | | | | | |
| Bill | 04/27/2012 | | Food Processor | Equipment | | Accounts Paya... |
| **Total Duston Burton** | | | | | | |
| **Earl Montgomery** | | | | | | |
| Bill | 03/15/2011 | 2/27-3... | 2/27-3/12/11 ... | Contractor | | Accounts Paya... |
| **Total Earl Montgomery** | | | | | | |
| **Eat Healthy** | | | | | | |
| Check | 04/22/2011 | | transfer to Eat... | Ask My Accountant | | YAH KAI 4926 |
| Deposit | 05/02/2011 | | Deposit | Food Sales | | YAH KAI 4926 |
| Check | 05/02/2011 | | transfered to ... | Food Sales | | YAH KAI 4926 |
| Deposit | 05/13/2011 | | Deposit | Health Spa Services | | YAH KAI 4926 |
| Check | 05/13/2011 | | transfer to Eat... | Reimbursement | | YAH KAI 4926 |
| **Total Eat Healthy** | | | | | | |
| **ebay** | | | | | | |
| Check | 01/05/2012 | | vitamix | Equipment | | Cash in Drawer |
| Bill | 04/28/2012 | | Cut Poison B... | Equipment | | Accounts Paya... |
| **Total ebay** | | | | | | |
| **ebottles** | | | | | | |
| Bill | 09/28/2012 | 165497 | 165497 | Restaurant Supplies | | Accounts Paya... |
| Bill | 11/23/2012 | 167870 | 167870 | Restaurant Supplies | | Accounts Paya... |
| Bill | 07/17/2013 | | bottles | Restaurant Supplies | | Accounts Paya... |
| **Total ebottles** | | | | | | |
| **Eddie Davis** | | | | | | |
| Bill | 09/13/2013 | 001 | | Contractor | | Accounts Paya... |
| Bill | 09/13/2013 | 002 | | Contractor | | Accounts Paya... |
| Bill | 09/13/2013 | 003 | | Contractor | | Accounts Paya... |
| Bill | 09/18/2013 | | Final payment... | Contractor | | Accounts Paya... |
| **Total Eddie Davis** | | | | | | |

# EVERLASTING LIFE RESTAURANT & LOUNGE
## Expenses by Vendor Detail
### January 2011 through December 2015

| Type | Date | Num | Memo | Account | Clr | Split |
|------|------|-----|------|---------|-----|-------|
| Bill | 12/07/2015 | 11/15-... | 11/15-11/28/1... | Contractor | | Accounts Paya... |
| Bill | 12/14/2015 | | Payroll Recon... | Reimbursement | | Accounts Paya... |
| Bill | 12/21/2015 | 11/29-... | 11/29-12/12/1... | Contractor | | Accounts Paya... |
| **Total Francisca Hernandez** | | | | | | |
| | | | | | | |
| **Frank Banks** | | | | | | |
| Bill | 10/21/2015 | | HVAC Parts | HVAC Services | | Accounts Paya... |
| Bill | 10/21/2015 | 15-0257 | 15-0257 | HVAC Services | | Accounts Paya... |
| **Total Frank Banks** | | | | | | |
| | | | | | | |
| **Franklin Foodservice Equipment & Supply** | | | | | | |
| Bill | 03/06/2012 | | $ Aluminum S... | Restaurant Supplies | | Accounts Paya... |
| **Total Franklin Foodservice Equipment & Supply** | | | | | | |
| | | | | | | |
| **Freddie** | | | | | | |
| Check | 10/21/2012 | | dishwasher | Contractor | | Cash in Drawer |
| **Total Freddie** | | | | | | |
| | | | | | | |
| **Freestate Auto and Truck Service** | | | | | | |
| Bill | 07/10/2014 | 0082326 | 0082326 | Repairs and Mainten... | | Accounts Paya... |
| Bill | 04/21/2015 | Food ... | Food Truck R... | Repairs and Mainten... | | Accounts Paya... |
| Bill | 09/25/2015 | | Food Truck R... | Repairs and Mainten... | | Accounts Paya... |
| **Total Freestate Auto and Truck Service** | | | | | | |
| | | | | | | |
| **Futuristic Studio LLC** | | | | | | |
| Bill | 11/07/2011 | | website design | Website Maintenance | | Accounts Paya... |
| **Total Futuristic Studio LLC** | | | | | | |
| | | | | | | |
| **Gary Faunteroy** | | | | | | |
| Bill | 05/26/2011 | | Plumbing Rep... | Repairs and Mainten... | | Accounts Paya... |
| **Total Gary Faunteroy** | | | | | | |
| | | | | | | |
| **Geoffrey Napper** | | | | | | |
| Bill | 05/13/2013 | 04/21-... | 04/21-05/04/1... | Contractor | | Accounts Paya... |
| Check | 05/21/2013 | | gas | Travel Expense | | Cash in Drawer |
| Check | 05/23/2013 | | gas expense | Travel Expense | | Cash in Drawer |
| Bill | 05/27/2013 | 05/05-... | 05/05-05/18/1... | Contractor | | Accounts Paya... |
| Bill | 06/10/2013 | 05/19-... | 05/19-06/01/1... | Contractor | | Accounts Paya... |
| Bill | 07/08/2013 | 06/16-... | 06/16-06/29/1... | Contractor | | Accounts Paya... |
| Bill | 07/22/2013 | 06/30-... | 06/30-07/13/1... | Contractor | | Accounts Paya... |
| Bill | 08/05/2013 | 07/14 ... | Payroll 07/14 ... | Contractor | | Accounts Paya... |
| Bill | 08/12/2013 | 2013-... | PAYROLL 20... | Contractor | | Accounts Paya... |
| Check | 09/01/2013 | | | Contractor | | Cash in Drawer |
| Bill | 09/02/2013 | 2013-... | PAYROLL 20... | Contractor | | Accounts Paya... |
| Bill | 09/16/2013 | 2013-... | PAYROLL 20... | Contractor | | Accounts Paya... |
| Bill | 09/30/2013 | 2013-... | Payroll 2013-... | Contractor | | Accounts Paya... |
| **Total Geoffrey Napper** | | | | | | |
| | | | | | | |
| **Gerson Health Media** | | | | | | |
| Bill | 06/15/2015 | 16921 | 16921 | Food Purchases | | Accounts Paya... |
| **Total Gerson Health Media** | | | | | | |

# EVERLASTING LIFE RESTAURANT & LOUNGE
## Expenses by Vendor Detail
### January 2011 through December 2015

| Type | Date | Num | Memo | Account | Clr | Split |
|------|------|-----|------|---------|-----|-------|
| **Green Shoots Distribution** | | | | | | |
| Bill | 02/25/2012 | 50102... | 50102482 | Food Purchases | | Accounts Paya... |
| Bill | 03/21/2012 | 50102... | 50102548, 50... | Food Purchases | | Accounts Paya... |
| Bill | 04/09/2012 | 50102... | 50102699 | Food Purchases | | Accounts Paya... |
| Bill | 04/12/2012 | 50102... | 50102812 | Food Purchases | | Accounts Paya... |
| Bill | 05/31/2012 | 50102... | 50102816,501... | Food Purchases | | Accounts Paya... |
| Bill | 05/31/2012 | 50103... | 50103126 | Food Purchases | | Accounts Paya... |
| Bill | 08/30/2012 | 50103... | 50103771 | Food Purchases | | Accounts Paya... |
| Total Green Shoots Distribution | | | | | | |
| **Greenbelt Labor Day Festival** | | | | | | |
| Bill | 10/26/2013 | | Permit | Business Licenses a... | | Accounts Paya... |
| Total Greenbelt Labor Day Festival | | | | | | |
| **Greg Godwin** | | | | | | |
| Bill | 01/03/2011 | 12/26/... | 12/26/10-01/0... | Contractor | | Accounts Paya... |
| Bill | 01/10/2011 | 01/02-... | 01/02-01/08/1... | Contractor | | Accounts Paya... |
| Bill | 01/17/2011 | 01/09-... | 01/09-01/15/1... | Contractor | | Accounts Paya... |
| Bill | 01/31/2011 | 1/16-1... | 1/16-1/29/11 ... | Contractor | | Accounts Paya... |
| Bill | 02/14/2011 | 01/30-... | 01/30-02/12/1... | Contractor | | Accounts Paya... |
| Bill | 02/28/2011 | 2/13-2... | 2/13-2/26/11 ... | Contractor | | Accounts Paya... |
| Bill | 03/14/2011 | 2/24-3... | 2/24-3/12/11 ... | Contractor | | Accounts Paya... |
| Bill | 03/28/2011 | 3/13-3... | 3/13-3/26/11 ... | Contractor | | Accounts Paya... |
| Bill | 04/11/2011 | 3/27-4... | 3/27-4/9/2011 ... | Contractor | | Accounts Paya... |
| Bill | 04/25/2011 | 4/10-4... | 4/10-4/23/201... | Contractor | | Accounts Paya... |
| Bill | 05/09/2011 | 4/24-5... | 4/24-5/7/11 1... | Contractor | | Accounts Paya... |
| Total Greg Godwin | | | | | | |
| **Guardian Fire Protection** | | | | | | |
| Bill | 04/15/2011 | 01323... | 0132334-IN | Fire Protection Servi... | | Accounts Paya... |
| Bill | 10/24/2011 | 0146521 | 0146521 | Fire Protection Servi... | | Accounts Paya... |
| Bill | 08/29/2012 | 0161804 | 0161804 | Fire Protection Servi... | | Accounts Paya... |
| Bill | 07/26/2013 | 01779... | Past due bill fr... | Fire Protection Servi... | | Accounts Paya... |
| Total Guardian Fire Protection | | | | | | |
| **Guy Napper** | | | | | | |
| Bill | 01/03/2011 | 12/26/... | 12/26/10-01/0... | Contractor | | Accounts Paya... |
| Bill | 01/10/2011 | 01/02-... | 01/02-01/08/1... | Contractor | | Accounts Paya... |
| Bill | 01/17/2011 | 01/09-... | 01/09-01/15/1... | Contractor | | Accounts Paya... |
| Bill | 01/31/2011 | 1/16-1... | 1/16-1/29/11 ... | Contractor | | Accounts Paya... |
| Bill | 02/14/2011 | 01/30-... | 01/30-02/12/1... | Contractor | | Accounts Paya... |
| Bill | 02/28/2011 | 2/13-2... | 2/13-2/26/11 ... | Contractor | | Accounts Paya... |
| Bill | 03/14/2011 | 2/24-3... | 2/24-3/12/11 ... | Contractor | | Accounts Paya... |
| Bill | 03/28/2011 | 3/13-3... | 3/13-3/26/11 ... | Contractor | | Accounts Paya... |
| Bill | 04/11/2011 | 3/27-4... | 3/27-4/9/2011... | Contractor | | Accounts Paya... |
| Bill | 04/25/2011 | 4/10-4... | 4/10-4/23/201... | Contractor | | Accounts Paya... |
| Bill | 05/09/2011 | 4/24-5... | 4/24-5/7/11 7... | Contractor | | Accounts Paya... |
| Bill | 05/23/2011 | 5/08-5... | 5/08-5/21/11 ... | Contractor | | Accounts Paya... |
| Bill | 07/04/2011 | 06/19-... | 06/19-07/02/1... | Contractor | | Accounts Paya... |
| Bill | 07/11/2011 | 07/03-... | 07/03-07/09/1... | Contractor | | Accounts Paya... |
| Bill | 07/18/2011 | 07/03-... | 07/03-07/16/1... | Contractor | | Accounts Paya... |
| Bill | 08/01/2011 | 07/17-... | 07/17-07/30/1... | Contractor | | Accounts Paya... |
| Bill | 08/15/2011 | 07/31-... | 07/31-08/13/1... | Contractor | | Accounts Paya... |
| Bill | 08/29/2011 | 08/14-... | 08/14-08/27/1... | Contractor | | Accounts Paya... |
| Bill | 09/12/2011 | 08/28-... | 08/28-09/10/1... | Contractor | | Accounts Paya... |
| Bill | 09/16/2011 | | For Customer... | Advertising and Pro... | | Accounts Paya... |
| Bill | 09/26/2011 | 09/11-... | 09/11-09/24/11 | Contractor | | Accounts Paya... |
| Bill | 09/27/2011 | | Customer Loy... | Advertising and Pro... | | Accounts Paya... |
| Check | 09/30/2011 | | event flyer | Printing and Reprod... | | Cash in Drawer |
| Bill | 10/03/2011 | | Ad Cards | Advertising and Pro... | | Accounts Paya... |
| Bill | 10/10/2011 | 09/25-... | 09/25-10/08/1... | Contractor | | Accounts Paya... |
| Check | 10/18/2011 | | loyalty cards | Printing and Reprod... | | Cash in Drawer |
| Bill | 10/24/2011 | 10/09-... | 10/09-10/22/1... | Contractor | | Accounts Paya... |
| Bill | 10/24/2011 | | Loyalty Cards... | Advertising and Pro... | | Accounts Paya... |
| Check | 10/28/2011 | | customer loya... | Advertising and Pro... | | Cash in Drawer |

10:54 PM

# EVERLASTING LIFE RESTAURANT & LOUNGE

02/08/17

## Expenses by Vendor Detail

Accrual Basis

### January 2011 through December 2015

| Type | Date | Num | Memo | Account | Clr | Split |
|------|------|-----|------|---------|-----|-------|
| Bill | 12/05/2011 | 11/20-... | 11/20-12/03/1... | Contractor | | Accounts Paya... |
| Check | 12/05/2011 | | 1HRS | Contractor | | Cash in Drawer |
| Check | 02/11/2012 | | Running Wires | Contractor | | Cash in Drawer |
| Check | 02/16/2012 | | electrical 2 HRS | Repairs and Mainten... | | Cash in Drawer |
| Check | 02/16/2012 | 3504 | Drywall | Repairs and Mainten... | | Cash in Drawer |
| Bill | 03/06/2012 | | repairs | Repairs and Mainten... | | Accounts Paya... |

Total Judah Ben Israel

**Julia Nohemi Franco Romero**
| | | | | | | |
|------|------|-----|------|---------|-----|-------|
| Bill | 06/11/2012 | 05/20-... | 05/20-06/02/1... | Contractor | | Accounts Paya... |
| Bill | 06/25/2012 | 06/03-... | 06/03-06/16/1... | Contractor | | Accounts Paya... |

Total Julia Nohemi Franco Romero

**Jumanne Clay**
| | | | | | | |
|------|------|-----|------|---------|-----|-------|
| Check | 01/02/2011 | | 1/2/11-1/8/11 | Contractor | | Cash in Drawer |
| Bill | 01/09/2011 | 01/02-... | 01/02-01/08/1... | Contractor | | Accounts Paya... |
| Check | 01/16/2011 | | | Contractor | | Cash in Drawer |
| Check | 01/30/2011 | | | Contractor | | Cash in Drawer |
| Check | 02/28/2011 | | DISHWASHER | Contractor | | Cash in Drawer |
| Check | 03/14/2011 | | | Contractor | | Cash in Drawer |

Total Jumanne Clay

**Juvelina Ceron Carias**
| | | | | | | |
|------|------|-----|------|---------|-----|-------|
| Bill | 04/15/2013 | 03/24-... | 03/24-04/06/1... | Contractor | | Accounts Paya... |
| Bill | 04/29/2013 | 04/07-... | 04/07-04/20/1... | Contractor | | Accounts Paya... |
| Bill | 05/13/2013 | 04/21-... | 04/21-05/04/1... | Contractor | | Accounts Paya... |
| Bill | 05/27/2013 | 05/05-... | 05/05-05/18/1... | Contractor | | Accounts Paya... |
| Bill | 06/10/2013 | 05/19-... | 05/19-06/01/1... | Contractor | | Accounts Paya... |
| Bill | 06/24/2013 | 06/02-... | 06/02-06/15/1... | Contractor | | Accounts Paya... |
| Bill | 07/08/2013 | 06/16-... | 06/16-06/29/1... | Contractor | | Accounts Paya... |
| Bill | 07/22/2013 | 06/30-... | 06/30-07/13/1... | Contractor | | Accounts Paya... |
| Bill | 08/05/2013 | 07/14 ... | Payroll 07/14 ... | Contractor | | Accounts Paya... |
| Bill | 08/12/2013 | 2013-... | PAYROLL 20... | Contractor | | Accounts Paya... |
| Bill | 09/02/2013 | 2013-... | PAYROLL 20... | Contractor | | Accounts Paya... |
| Bill | 09/16/2013 | 2013-... | PAYROLL 20... | Contractor | | Accounts Paya... |
| Bill | 09/30/2013 | 2013-... | Payroll 2013-... | Contractor | | Accounts Paya... |
| Bill | 10/14/2013 | 09/22-... | 09/22-10/05/1... | Contractor | | Accounts Paya... |
| Bill | 10/28/2013 | 10/06-... | 10/06-10/19/1... | Contractor | | Accounts Paya... |
| Bill | 11/11/2013 | 10/20-... | 10/20-11/02/1... | Contractor | | Accounts Paya... |

Total Juvelina Ceron Carias

**K-Mart**
| | | | | | | |
|------|------|-----|------|---------|-----|-------|
| Check | 11/19/2012 | | | Restaurant Supplies | | Cash in Drawer |

Total K-Mart

**Kahlilah Napper**
| | | | | | | |
|------|------|-----|------|---------|-----|-------|
| Bill | 09/14/2015 | 08/23-... | 08/23-09/05/1... | Contractor | | Accounts Paya... |
| Bill | 09/28/2015 | 09/06-... | 09/06-09/19/1... | Contractor | | Accounts Paya... |
| Bill | 10/12/2015 | 09/20-... | 09/20-10/03/1... | Contractor | | Accounts Paya... |
| Bill | 10/26/2015 | 10/04-... | 10/04-10/17/1... | Contractor | | Accounts Paya... |
| Bill | 11/09/2015 | 10/18-... | 10/18-10/31/1... | Contractor | | Accounts Paya... |
| Bill | 11/23/2015 | 11/01-... | 11/01-11/14/1... | Contractor | | Accounts Paya... |
| Bill | 12/07/2015 | 11/15-... | 11/15-11/28/1... | Contractor | | Accounts Paya... |
| Bill | 12/21/2015 | 11/29-... | 11/29-12/12/1... | Contractor | | Accounts Paya... |

Total Kahlilah Napper

**Katom**
| | | | | | | |
|------|------|-----|------|---------|-----|-------|
| Bill | 06/29/2012 | | Popcorn Bags | Restaurant Supplies | | Accounts Paya... |
| Bill | 11/23/2012 | KT102... | KT1023667 | Restaurant Supplies | | Accounts Paya... |
| Bill | 02/20/2013 | KT104... | KT1042895 | Restaurant Supplies | | Accounts Paya... |
| Bill | 12/02/2013 | KT111... | KT1110357 | Restaurant Supplies | | Accounts Paya... |
| Bill | 05/01/2014 | KT115... | KT1150399 | Restaurant Supplies | | Accounts Paya... |

Total Katom

# EVERLASTING LIFE RESTAURANT & LOUNGE
## Expenses by Vendor Detail
### January 2011 through December 2015

| Type | Date | Num | Memo | Account | Clr | Split |
|------|------|-----|------|---------|-----|-------|
| **Keith Holmes** | | | | | | |
| Bill | 06/14/2012 | 478903 | 478903 | Food Purchases | | Accounts Paya… |
| Bill | 06/28/2012 | 478908 | 478908 | Food Purchases | | Accounts Paya… |
| Bill | 07/10/2012 | 478909 | 478909 | Food Purchases | | Accounts Paya… |
| Check | 07/12/2012 | | drinks | Food Purchases | | Cash in Drawer |
| Bill | 07/13/2012 | 478910 | 478910 | Food Purchases | | Accounts Paya… |
| Bill | 07/17/2012 | 478911 | 478911 | Food Purchases | | Accounts Paya… |
| Bill | 07/27/2012 | 478914 | 478914 | Food Purchases | | Accounts Paya… |
| Bill | 08/02/2012 | 478915 | 478915 | Food Purchases | | Accounts Paya… |
| Bill | 08/09/2012 | 478917 | 478917 | Food Purchases | | Accounts Paya… |
| Bill | 08/16/2012 | 478920 | 478920 | Food Purchases | | Accounts Paya… |
| Bill | 09/17/2012 | 478927 | 478927 | Food Purchases | | Accounts Paya… |
| Check | 09/17/2012 | | | Food Purchases | | Cash in Drawer |
| Bill | 10/02/2012 | 478929 | 478929 | Food Purchases | | Accounts Paya… |
| Bill | 10/17/2012 | 478930 | 478930 | Food Purchases | | Accounts Paya… |
| | | | | | | |
| Total Keith Holmes | | | | | | |
| | | | | | | |
| **Kimberly Armstrong** | | | | | | |
| Bill | 03/28/2012 | | Bartender Ser… | Entertainment Servi… | | Accounts Paya… |
| Bill | 04/03/2012 | | Beverage Pur… | Food Purchases | | Accounts Paya… |
| Bill | 04/10/2012 | 412 | Reminaing Ba… | Entertainment Servi… | | Accounts Paya… |
| Bill | 11/01/2012 | | | Outside Services | | Accounts Paya… |
| Bill | 08/24/2013 | 082413 | | Contractor | | Accounts Paya… |
| | | | | | | |
| Total Kimberly Armstrong | | | | | | |
| | | | | | | |
| **Kingdom Management** | | | | | | |
| Bill | 01/04/2011 | 3796 | 3796 JANUA… | Rent Expense | | Accounts Paya… |
| Bill | 02/04/2011 | 3834 | FEBRUARY … | Rent Expense | | Accounts Paya… |
| Bill | 02/09/2011 | 03 | Inv.# 03 Wate… | Utilities Water | | Accounts Paya… |
| Bill | 03/01/2011 | | March 2011 R… | Rent Expense | | Accounts Paya… |
| Bill | 04/06/2011 | #3946 | Invoice 3946 … | Rent Expense | | Accounts Paya… |
| Bill | 04/21/2011 | 3980 | 3980 | Rent Expense | | Accounts Paya… |
| Bill | 05/03/2011 | 411 | Water Usage … | Utilities Water | | Accounts Paya… |
| Bill | 05/26/2011 | 4048 | June 2011 Rent | Rent Expense | | Accounts Paya… |
| Bill | 05/26/2011 | 511 | Water Usage… | Utilities Water | | Accounts Paya… |
| Bill | 06/20/2011 | | 2009 CAM adj… | Rent Expense | | Accounts Paya… |
| Bill | 06/24/2011 | 4098 | 4098 July Rent | Rent Expense | | Accounts Paya… |
| Bill | 07/06/2011 | 611 | Water Usage … | Utilities Water | | Accounts Paya… |
| Bill | 08/01/2011 | | Rent for August | Rent Expense | | Accounts Paya… |
| Bill | 08/25/2011 | 4201 | 4201 | Rent Expense | | Accounts Paya… |
| Bill | 09/26/2011 | 4235 …. | 4235 October | Rent Expense | | Accounts Paya… |
| Bill | 11/15/2011 | | November Rent | Rent Expense | | Accounts Paya… |
| Bill | 12/01/2011 | | December | Rent Expense | | Accounts Paya… |
| Bill | 12/29/2011 | 4349 | 4349 | Rent Expense | | Accounts Paya… |
| Bill | 01/05/2012 | 112 | 112 Water Us… | Rent Expense | | Accounts Paya… |
| Bill | 02/01/2012 | 4412 | February Rent… | Rent Expense | | Accounts Paya… |
| Bill | 03/01/2012 | 4449 | 4449 | Rent Expense | | Accounts Paya… |
| Bill | 04/01/2012 | | april rent | Rent Expense | | Accounts Paya… |
| Bill | 04/02/2012 | 412 | water usage j… | Rent Expense | | Accounts Paya… |
| Bill | 05/01/2012 | 4527 | 4527 | Rent Expense | | Accounts Paya… |
| Bill | 05/22/2012 | 512 | 512 Water Us… | Water Usage | | Accounts Paya… |
| Bill | 06/01/2012 | 4566 | 4566 June Rent | Rent Expense | | Accounts Paya… |
| Bill | 07/01/2012 | 4611 J… | 4611 July Rent | Rent Expense | | Accounts Paya… |
| Bill | 07/12/2012 | 512,712 | 512,712 Wate… | Water Usage | | Accounts Paya… |
| Bill | 08/06/2012 | 712 | Water Usage … | Water Usage | | Accounts Paya… |
| Bill | 08/29/2012 | 812 | 812 | Water Usage | | Accounts Paya… |
| Bill | 09/01/2012 | 4822 | 4822 | Rent Expense | | Accounts Paya… |
| Bill | 09/26/2012 | 912 | #912 Water U… | Water Usage | | Accounts Paya… |
| Bill | 10/01/2012 | | October Rent | Rent Expense | | Accounts Paya… |
| Bill | 10/23/2012 | | November Rent | Rent Expense | | Accounts Paya… |
| Bill | 10/23/2012 | 1012 | Water Usage … | Water Usage | | Accounts Paya… |
| Bill | 12/01/2012 | 4959 | 4959 | Rent Expense | | Accounts Paya… |
| Bill | 12/18/2012 | 1112 | Water Usage … | Water Usage | | Accounts Paya… |
| Bill | 01/01/2013 | | 5027 Jan Rent | Rent Expense | | Accounts Paya… |
| Bill | 01/08/2013 | 04 | #04 WSSC W… | Waste Services | | Accounts Paya… |
| Bill | 02/01/2013 | 5078 | 5078 Rent Fe… | Rent Expense | | Accounts Paya… |
| Bill | 02/04/2013 | 113 | 113 Water Us… | Water Usage | | Accounts Paya… |

# EVERLASTING LIFE RESTAURANT & LOUNGE
## Expenses by Vendor Detail
### January 2011 through December 2015

| Type | Date | Num | Memo | Account | Clr | Split |
|------|------|-----|------|---------|-----|-------|
| Bill | 02/25/2013 | 213 | 213 water usa... | Water Usage | | Accounts Paya... |
| Bill | 03/04/2013 | 5186 | 5186 March R... | Rent Expense | | Accounts Paya... |
| Bill | 03/22/2013 | 5220 | 5220 April Rent | Rent Expense | | Accounts Paya... |
| Bill | 04/02/2013 | 313 | 313 | Water Usage | | Accounts Paya... |
| Bill | 05/01/2013 | 5329 | 5329 May Rent | Rent Expense | | Accounts Paya... |
| Bill | 05/22/2013 | 5302, ... | 5302, 5376 W... | Water Usage | | Accounts Paya... |
| Bill | 06/06/2013 | June ... | June Rent | Rent Expense | | Accounts Paya... |
| Bill | 07/03/2013 | 5526 | 5526 | Rent Expense | | Accounts Paya... |
| Bill | 07/15/2013 | | Cam&Tax Inc... | Rent Expense | | Accounts Paya... |
| Bill | 08/07/2013 | Augus... | Rent for Everl... | Rent Expense | | Accounts Paya... |
| Bill | 09/06/2013 | 613 & ... | | Rent Expense | | Accounts Paya... |
| Bill | 10/01/2013 | 5758 | 5758 | Rent Expense | | Accounts Paya... |
| Bill | 10/08/2013 | October | October Rent ... | Rent Expense | | Accounts Paya... |
| Bill | 10/25/2013 | 1013 | 1013 | Rent Expense | | Accounts Paya... |
| Bill | 11/01/2013 | 5796 | 5796 | Rent Expense | | Accounts Paya... |
| Bill | 11/20/2013 | CAM | CAM | Reimbursement | | Accounts Paya... |
| Bill | 12/05/2013 | 5872 | 5872 Dec Rent | Rent Expense | | Accounts Paya... |
| Bill | 01/06/2014 | 5917 | 5917 | Rent Expense | | Accounts Paya... |
| Bill | 01/06/2014 | 1213 | 1213 | Rent Expense | | Accounts Paya... |
| Bill | 02/06/2014 | 5983 | 5983 | Rent Expense | | Accounts Paya... |
| Bill | 03/01/2014 | 6015 | 6015 | Rent Expense | | Accounts Paya... |
| Bill | 04/03/2014 | 6085 | April Rent + 1... | Rent Expense | | Accounts Paya... |
| Bill | 05/06/2014 | 4998-88 | 4998-88 | Rent Expense | | Accounts Paya... |
| Bill | 06/04/2014 | 4998-... | 4998-140 | Rent Expense | | Accounts Paya... |
| Bill | 07/07/2014 | 4998-... | 4998-174 | Rent Expense | | Accounts Paya... |
| Bill | 08/05/2014 | AUG ... | AUG RENT | Rent Expense | | Accounts Paya... |
| Bill | 09/05/2014 | 5740 | 5740 | Rent Expense | | Accounts Paya... |
| Bill | 10/03/2014 | 5769 | 5769 | Rent Expense | | Accounts Paya... |
| Bill | 10/15/2014 | 814 | 814 | Rent Expense | | Accounts Paya... |
| Bill | 11/04/2014 | 5869 | 5869 | Rent Expense | | Accounts Paya... |
| Bill | 12/05/2014 | Dec. ... | Dec. Rent | Rent Expense | | Accounts Paya... |
| Bill | 01/05/2015 | 5928 | 5928 | Rent Expense | | Accounts Paya... |
| Bill | 02/05/2015 | | FEb Rent | Rent Expense | | Accounts Paya... |
| Bill | 04/03/2015 | | April Rent | Rent Expense | | Accounts Paya... |
| Bill | 04/03/2015 | 315 | 315 water bill | Rent Expense | | Accounts Paya... |
| Bill | 05/04/2015 | May R... | May Rent | Rent Expense | | Accounts Paya... |
| Bill | 06/01/2015 | 6287 | 6287 | Rent Expense | | Accounts Paya... |
| Bill | 06/05/2015 | 515 | 515 Water us... | Water Usage | | Accounts Paya... |
| Bill | 07/03/2015 | 6337 | July Rent, Lat... | Rent Expense | | Accounts Paya... |
| Bill | 08/05/2015 | 6363 | August 6363 | Rent Expense | | Accounts Paya... |
| Bill | 10/05/2015 | 10063 | 10063 | Rent Expense | | Accounts Paya... |
| Bill | 11/11/2015 | | November Re... | Rent Expense | | Accounts Paya... |
| Bill | 12/04/2015 | 10154 | 10154 | Rent Expense | | Accounts Paya... |

Total Kingdom Management

**kitchenall**

| | | | | | | |
|------|------|-----|------|---------|-----|-------|
| Bill | 11/14/2012 | 51288 | 51288 Hot/Co... | Equipment | | Accounts Paya... |

Total kitchenall

**Lamont**

| | | | | | | |
|-------|------|-----|------|---------|-----|-------|
| Check | 04/09/2012 | | dishwashing | Contractor | | Cash in Drawer |
| Check | 06/21/2013 | | travel | Travel Expense | | Cash in Drawer |
| Check | 06/25/2013 | | travel | Travel Expense | | Cash in Drawer |
| Check | 07/12/2013 | | | Travel Expense | | Cash in Drawer |
| Check | 07/17/2013 | | | Travel Expense | | Cash in Drawer |
| Check | 08/09/2013 | | | Travel Expense | | Cash in Drawer |
| Check | 06/11/2015 | | gas | Travel Expense | | Cash in Drawer |
| Check | 06/11/2015 | | 4th street run | Travel Expense | | Cash in Drawer |

Total Lamont

10:54 PM

# EVERLASTING LIFE RESTAURANT & LOUNGE
## Expenses by Vendor Detail
### January 2011 through December 2015

02/08/17

**Accrual Basis**

| Type | Date | Num | Memo | Account | Clr | Split |
|------|------|-----|------|---------|-----|-------|
| **Thornton Properties** | | | | | | |
| Bill | 08/22/2013 | Security | Security | Rent Expense | | Accounts Paya... |
| Bill | 01/02/2014 | | 6904 4th St. | Rent Expense | | Accounts Paya... |
| Bill | 01/02/2014 | | 6904 4th St. | Rent Expense | | Accounts Paya... |
| Bill | 02/06/2014 | Rent | February Rent | Rent Expense | | Accounts Paya... |
| Bill | 04/03/2014 | | April Rent 4th ... | Rent Expense | | Accounts Paya... |
| Bill | 05/06/2014 | May R... | May Rent | Rent Expense | | Accounts Paya... |
| Bill | 06/04/2014 | | June Rent | Rent Expense | | Accounts Paya... |
| Bill | 08/04/2014 | | August Rent | Rent Expense | | Accounts Paya... |
| Bill | 09/04/2014 | | September R... | Rent Expense | | Accounts Paya... |
| Bill | 10/03/2014 | Octob... | October | Rent Expense | | Accounts Paya... |
| Bill | 12/05/2014 | Dec. ... | Dec. Rent | Rent Expense | | Accounts Paya... |
| Bill | 01/05/2015 | Janua... | January Rent | Rent Expense | | Accounts Paya... |
| Bill | 04/03/2015 | Vegari... | April Rent | Rent Expense | | Accounts Paya... |
| Bill | 05/01/2015 | May R... | May Rent | Rent Expense | | Accounts Paya... |
| Bill | 08/05/2015 | | Ausugt Rent | Rent Expense | | Accounts Paya... |
| Bill | 10/02/2015 | | Oct. Rent | Rent Expense | | Accounts Paya... |
| Bill | 11/02/2015 | Nove... | November Rent | Rent Expense | | Accounts Paya... |
| Bill | 12/04/2015 | | December Rent | Rent Expense | | Accounts Paya... |
| Total Thornton Properties | | | | | | |
| **Tijuana Best** | | | | | | |
| Bill | 10/08/2013 | | muscadine gr... | Food Purchases | | Accounts Paya... |
| Total Tijuana Best | | | | | | |
| **Tina Pervine** | | | | | | |
| Bill | 12/22/2014 | 11/30-... | 11/30-12/13/1... | Contractor | | Accounts Paya... |
| Total Tina Pervine | | | | | | |
| **Tiondra Stevens** | | | | | | |
| Bill | 01/10/2011 | 01/02-... | 01/02-01/08/1... | Contractor | | Accounts Paya... |
| Bill | 03/28/2011 | 3/13-3... | 3/13-3/26/11 ... | Contractor | | Accounts Paya... |
| Bill | 04/11/2011 | 3/27-4... | 3/27-4/9/2011... | Contractor | | Accounts Paya... |
| Bill | 04/25/2011 | 4/10-4... | 4/10-4/23/201... | Contractor | | Accounts Paya... |
| Bill | 05/09/2011 | 4/24-5... | 4/24-5/7/11 8... | Contractor | | Accounts Paya... |
| Bill | 06/06/2011 | 5/22-6... | 5/22-6/04/11 ... | Contractor | | Accounts Paya... |
| Total Tiondra Stevens | | | | | | |
| **TPSS FOOD CO-OP** | | | | | | |
| Bill | 01/03/2011 | | GROCERY 0... | Food Purchases | | Accounts Paya... |
| Bill | 01/10/2011 | | GROCERY 1/... | Food Purchases | | Accounts Paya... |
| Bill | 01/17/2011 | | GROCERY 1/... | Food Purchases | | Accounts Paya... |
| Bill | 01/21/2011 | | GROCERY 1/... | Food Purchases | | Accounts Paya... |
| Bill | 01/24/2011 | | GROCERY 1/... | Food Purchases | | Accounts Paya... |
| Bill | 01/31/2011 | | GROCERY 1/... | Food Purchases | | Accounts Paya... |
| Bill | 02/07/2011 | | GROCERY 2/... | Food Purchases | | Accounts Paya... |
| Bill | 02/09/2011 | | GROCERY 2/... | Food Purchases | | Accounts Paya... |
| Bill | 02/14/2011 | 392040 | 392040 | Food Purchases | | Accounts Paya... |
| Bill | 02/19/2011 | | Shopping | Food Purchases | | Accounts Paya... |
| Bill | 02/21/2011 | | Shopping | Food Purchases | | Accounts Paya... |
| Bill | 02/23/2011 | | shopping | Food Purchases | | Accounts Paya... |
| Bill | 02/26/2011 | | shopping | Food Purchases | | Accounts Paya... |
| Bill | 03/05/2011 | | shopping | Food Purchases | | Accounts Paya... |
| Bill | 03/10/2011 | | vegenaise | Food Purchases | | Accounts Paya... |
| Bill | 03/11/2011 | | shopping | Food Purchases | | Accounts Paya... |
| Bill | 03/12/2011 | | spike and sea... | Food Purchases | | Accounts Paya... |
| Bill | 03/18/2011 | | EL and CSC s... | Food Purchases | | Accounts Paya... |
| Bill | 03/25/2011 | | shopping | Food Purchases | | Accounts Paya... |
| Bill | 04/01/2011 | | shopping | Food Purchases | | Accounts Paya... |
| Bill | 04/08/2011 | | shopping | Food Purchases | | Accounts Paya... |
| Bill | 04/15/2011 | | El and Eat He... | Food Purchases | | Accounts Paya... |
| Bill | 04/22/2011 | | EL and Eat H... | Food Purchases | | Accounts Paya... |
| Bill | 04/29/2011 | | shopping | Food Purchases | | Accounts Paya... |
| Bill | 05/06/2011 | | shopping | Food Purchases | | Accounts Paya... |
| Bill | 05/13/2011 | | shopping EL ... | Food Purchases | | Accounts Paya... |
| Bill | 05/20/2011 | | shopping | Food Purchases | | Accounts Paya... |

# EVERLASTING LIFE RESTAURANT & LOUNGE
## Expenses by Vendor Detail
### January 2011 through December 2015

| Type | Date | Num | Memo | Account | Clr | Split |
|------|------|-----|------|---------|-----|-------|
| **USPS** | | | | | | |
| Check | 01/10/2012 | | | Postal Services | | Cash in Drawer |
| Check | 02/17/2012 | | | Postal Services | | Cash in Drawer |
| Bill | 10/31/2012 | | postal service | Postal Services | | Accounts Paya... |
| Check | 05/07/2013 | | | Postal Services | | Cash in Drawer |
| Total USPS | | | | | | |
| | | | | | | |
| **V-Nine Seafood** | | | | | | |
| Bill | 02/15/2011 | 0011 | 0011 | Food Purchases | | Accounts Paya... |
| Bill | 03/12/2011 | 24988 | PER CASE | Food Purchases | | Accounts Paya... |
| Check | 03/30/2011 | | | Food Sales | | YAH KAI 4926 |
| Bill | 06/01/2011 | 28084 | bean curd | Food Sales | | Accounts Paya... |
| Bill | 08/03/2011 | 30139 | bean curd | Food Sales | | Accounts Paya... |
| Bill | 09/26/2011 | | 32223 | Food Sales | | Accounts Paya... |
| Check | 10/25/2011 | | bean curd | Food Sales | | Cash in Drawer |
| Check | 11/28/2011 | | | Food Sales | | Cash in Drawer |
| Bill | 12/20/2011 | 35118 | 35118 Dried ... | Food Sales | | Accounts Paya... |
| Bill | 01/19/2012 | 36053 | Driend Bean ... | Food Sales | | Accounts Paya... |
| Bill | 02/14/2012 | 36867 | 36867 | Food Sales | | Accounts Paya... |
| Check | 03/08/2012 | | | Food Purchases | | Cash in Drawer |
| Check | 03/27/2012 | | | Food Purchases | | Cash in Drawer |
| Check | 04/10/2012 | | | Food Purchases | | Cash in Drawer |
| Check | 04/17/2012 | | | Food Purchases | | Cash in Drawer |
| Check | 05/06/2012 | | | Food Purchases | | Cash in Drawer |
| Check | 05/24/2012 | | | Food Purchases | | Cash in Drawer |
| Check | 06/14/2012 | | | Food Purchases | | Cash in Drawer |
| Check | 07/03/2012 | | | Food Purchases | | Cash in Drawer |
| Bill | 08/21/2012 | 43676 | 43676 | Food Purchases | | Accounts Paya... |
| Bill | 09/12/2012 | 45360 | 45360 | Food Purchases | | Accounts Paya... |
| Bill | 11/23/2012 | 47747 | 47747 | Food Purchases | | Accounts Paya... |
| Bill | 01/14/2013 | | | Food Purchases | | Accounts Paya... |
| Check | 03/05/2013 | | | Food Purchases | | Cash in Drawer |
| Check | 04/23/2013 | | | Food Purchases | | Cash in Drawer |
| Check | 05/20/2013 | | | Food Purchases | | Cash in Drawer |
| Bill | 06/11/2013 | 53516 | 53516 | Food Purchases | | Accounts Paya... |
| Bill | 09/27/2013 | | 7522 | Food Purchases | | Accounts Paya... |
| Bill | 01/16/2014 | 61154 | 61154 | Food Purchases | | Accounts Paya... |
| Check | 04/20/2015 | | | Food Purchases | | Cash in Drawer |
| Total V-Nine Seafood | | | | | | |
| | | | | | | |
| **Valentine Davies** | | | | | | |
| Bill | 04/03/2014 | | April Rent | Rent Expense | | Accounts Paya... |
| Bill | 05/06/2014 | May R... | May Rent | Rent Expense | | Accounts Paya... |
| Bill | 06/04/2014 | | June Rent | Rent Expense | | Accounts Paya... |
| Bill | 07/07/2014 | | July Rent | Rent Expense | | Accounts Paya... |
| Bill | 08/04/2014 | | August Rent | Rent Expense | | Accounts Paya... |
| Bill | 09/04/2014 | | September | Rent Expense | | Accounts Paya... |
| Bill | 10/03/2014 | Octob... | October Rent | Rent Expense | | Accounts Paya... |
| Bill | 01/05/2015 | Janua... | Rent | Rent Expense | | Accounts Paya... |
| Bill | 04/03/2015 | | | Rent Expense | | Accounts Paya... |
| Bill | 04/03/2015 | Evolve... | April Rent | Rent Expense | | Accounts Paya... |
| Bill | 05/01/2015 | May R... | May Rent | Rent Expense | | Accounts Paya... |
| Bill | 08/05/2015 | | August Rent+... | Rent Expense | | Accounts Paya... |
| Bill | 10/02/2015 | | October Rent | Rent Expense | | Accounts Paya... |
| Bill | 11/02/2015 | | November Rent | Rent Expense | | Accounts Paya... |
| Bill | 12/04/2015 | | December Rent | Rent Expense | | Accounts Paya... |
| Total Valentine Davies | | | | | | |

# EVERLASTING LIFE RESTAURANT & LOUNGE
## Expenses by Vendor Detail
### January 2011 through December 2015

| Amount | Balance |
|---|---|
| 160.00 | 160.00 |
| 105.00 | 265.00 |
| 105.00 | 370.00 |
| 105.00 | 475.00 |
| 60.00 | 535.00 |
| 60.00 | 595.00 |
| 60.00 | 655.00 |
| 60.00 | 715.00 |
| 90.00 | 805.00 |
| 90.00 | 895.00 |
| 30.00 | 925.00 |
| 21.00 | 946.00 |
| 30.00 | 976.00 |
| 30.00 | 1,006.00 |
| | |
| 1,006.00 | 1,006.00 |
| | |
| 200.00 | 200.00 |
| 156.65 | 356.65 |
| 200.00 | 556.65 |
| 208.79 | 765.44 |
| 247.04 | 1,012.48 |
| | |
| 1,012.48 | 1,012.48 |
| | |
| 6,866.08 | 6,866.08 |
| 6,866.08 | 13,732.16 |
| 475.00 | 14,207.16 |
| 6,866.08 | 21,073.24 |
| 6,866.08 | 27,939.32 |
| 6,866.08 | 34,805.40 |
| 643.55 | 35,448.95 |
| 6,866.08 | 42,315.03 |
| 272.13 | 42,587.16 |
| 6,594.00 | 49,181.16 |
| 6,866.08 | 56,047.24 |
| 411.87 | 56,459.11 |
| 6,866.08 | 63,325.19 |
| 6,866.08 | 70,191.27 |
| 6,866.88 | 77,058.15 |
| 7,000.00 | 84,058.15 |
| 7,000.00 | 91,058.15 |
| 7,076.97 | 98,135.12 |
| 2,107.70 | 100,242.82 |
| 7,076.97 | 107,319.79 |
| 7,076.97 | 114,396.76 |
| 7,076.97 | 121,473.73 |
| 834.04 | 122,307.77 |
| 7,076.97 | 129,384.74 |
| 773.51 | 130,158.25 |
| 7,076.97 | 137,235.22 |
| 7,076.97 | 144,312.19 |
| 1,334.85 | 145,647.04 |
| 561.34 | 146,208.38 |
| 436.46 | 146,644.84 |
| 7,076.97 | 153,721.81 |
| 503.00 | 154,224.81 |
| 7,076.97 | 161,301.78 |
| 7,351.13 | 168,652.91 |
| 409.98 | 169,062.89 |
| 7,351.13 | 176,414.02 |
| 1,291.48 | 177,705.50 |
| 7,351.13 | 185,056.63 |
| 350.00 | 185,406.63 |
| 7,351.13 | 192,757.76 |
| 758.43 | 193,516.19 |

# EVERLASTING LIFE RESTAURANT & LOUNGE
## Expenses by Vendor Detail
### January 2011 through December 2015

| Amount | Balance |
|--------:|-----------:|
| 552.37 | 194,068.56 |
| 7,351.13 | 201,419.69 |
| 7,351.13 | 208,770.82 |
| 314.82 | 209,085.64 |
| 7,351.13 | 216,436.77 |
| 799.12 | 217,235.89 |
| 7,351.13 | 224,587.02 |
| 7,645.63 | 232,232.65 |
| 1,767.00 | 233,999.65 |
| 7,645.63 | 241,645.28 |
| 8,040.76 | 249,686.04 |
| 7,645.63 | 257,331.67 |
| 10,771.48 | 268,103.15 |
| 381.32 | 268,484.47 |
| 7,645.63 | 276,130.10 |
| 2,000.00 | 278,130.10 |
| 7,645.63 | 285,775.73 |
| 7,645.63 | 293,421.36 |
| 617.64 | 294,039.00 |
| 7,645.63 | 301,684.63 |
| 7,645.63 | 309,330.26 |
| 8,653.18 | 317,983.44 |
| 7,624.67 | 325,608.11 |
| 7,624.67 | 333,232.78 |
| 7,624.67 | 340,857.45 |
| 7,624.67 | 348,482.12 |
| 7,624.67 | 356,106.79 |
| 7,624.67 | 363,731.46 |
| 726.59 | 364,458.05 |
| 7,624.67 | 372,082.72 |
| 7,624.67 | 379,707.39 |
| 7,926.93 | 387,634.32 |
| 7,926.93 | 395,561.25 |
| 7,926.93 | 403,488.18 |
| 548.87 | 404,037.05 |
| 8,213.65 | 412,250.70 |
| 8,213.65 | 420,464.35 |
| 725.36 | 421,189.71 |
| 9,380.19 | 430,569.90 |
| 8,213.65 | 438,783.55 |
| 8,213.65 | 446,997.20 |
| 8,681.02 | 455,678.22 |
| 8,531.02 | 464,209.24 |
| 464,209.24 | 464,209.24 |
| 2,179.00 | 2,179.00 |
| 2,179.00 | 2,179.00 |
| 45.00 | 45.00 |
| 40.00 | 85.00 |
| 40.00 | 125.00 |
| 40.00 | 165.00 |
| 40.00 | 205.00 |
| 40.00 | 245.00 |
| 10.00 | 255.00 |
| 25.00 | 280.00 |
| 280.00 | 280.00 |

# EVERLASTING LIFE RESTAURANT & LOUNGE
## Gross Profit
### January 2011 through December 2015

APPENDIX B

| | Jan '11 - Dec 11 | Jan '12 - Dec 12 | Jan '13 - Dec 13 | Jan '14 - Dec 14 | Jan '15 - Dec 15 |
|---|---|---|---|---|---|
| Ordinary Income | $136,475 | $1,019,788 | $1,084,287 | $771,341 | $543,537 |
| Income | $1,672 | | | | |
| Cost of Goods Sold | -$51,030 | -$482,464 | $449,206 | -$197,617 | -$52,201 |
| Gross Profit | $87,117 | $537,324 | $1,533,493 | $573,724 | $491,336 |

# EVERLASTING LIFE RESTAURANT & LOUNGE
## Gross Profit
### January 2011 through December 2015

| | Jan '11 - Dec 11 | Jan '12 - Dec 12 | Jan '13 - Dec 13 | Jan '14 - Dec 14 | Jan '15 - Dec 15 |
|---|---|---|---|---|---|

# EVERLASTING LIFE RESTAURANT & LOUNGE
## Gross Profit
### January 2011 through December 2015

| | Jan '11 - Dec 11 | Jan '12 - Dec 12 | Jan '13 - Dec 13 | Jan '14 - Dec 14 | Jan '15 - Dec 15 |
|---|---|---|---|---|---|

**Everlasting Life Restaurant Lounge**
**Profit  Loss**
**Jan.through Dec. 2014**

APPENDIX C

| | Jan - Dec 14 |
|---|---|
| **Ordinary Income/Expense** | |
| **Income** | |
| **Food Sales** | 771,341 |
| **Total Income** | 771,341 |
| **Food Purchases** | |
| **Cost of Goods Sold** | 197,617 |
| **Total COGS** | 197,617 |
| **Gross Profit** | 573,724 |
| **Expense** | |
| **Accounting** | 3,300 |
| **Advertisement** | - |
| **Business Licenses / Permits** | 1,478 |
| **Computer Expenses** | - |
| **Entertainment and Promotion** | 1,440 |
| **Gifts** | 88 |
| **Insurance** | 3,015 |
| **Laundry and Cleaning** | 1,771 |
| **License and Permits** | 521 |
| **Parking fees** | - |
| **Sales Expense** | 3,581 |
| **Supplies Expense** | 14,425 |
| **Telephone** | 1,960 |
| **Repairs and Maintenance** | 6,941 |
| **Taxes** | 24,498 |
| **Travel Expenses** | 1,811 |
| Contractor | 196,387 |
| **Utilities Expenses** | 10,076 |
| **HVAC services** | 4,417 |
| **Miscellaneous** | 3,371 |
| **Payroll Expenses** | 141,357 |
| **Rent Expense** | 137,077 |
| **Hygiene Services** | 6,506 |
| **Waste Services** | 1,924 |
| **Total Expense** | 565,944 |
| **Net Ordinary Income** | 7,780 |
| **Net Income** | **7,780** |

**CONFIDENTAL**

| | Jan - Dec 15 |
|---|---|
| **Ordinary Income/Expense** | |
| **Income** | |
| **Food Sales** | 543766 |
| **Discrepancies** | |
| **Shortages** | -360 |
| **Overage** | 131 |
| **Total Discrepancies** | |
| **Total Income** | 543537 |
| **Cost of Goods Sold** | |
| **Food Purchases** | 52201 |
| **Total COGS** | 52201 |
| **Gross Profit** | 491336 |
| **Expense** | |
| **Gift Card Payment** | 10 |
| **Hygiene Services** | 309 |
| **Water Usage** | 725 |
| **Electrical Services** | 170 |
| **Alarm Services** | 160 |
| **Cashier Error** | 54 |
| **Entertainment Services** | 542 |
| **Restaurant Supplies** | 7059 |
| **Waste Services** | 5204 |
| **Cable** | 0 |
| **Accountant Services** | 1500 |
| **Advertising and Promotion** | 5034 |
| **Business Licenses and Permits** | 1344 |
| **Contractor** | 153108 |
| **HVAC Services** | 2483 |
| **Linen Expense** | 922 |
| **Miscellaneous Expense** | |
| **Tips** | 3206 |
| **Miscellaneous Expense - Other** | 26 |
| **Total Miscellaneous Expense** | 3232 |
| **Office Supplies** | 444 |
| **Payroll Expenses** | 143402 |
| **Pest Control** | 25 |
| **Reimbursement** | 2552 |
| **Rent Expense** | 91611 |
| **Repairs and Maintenance** | 5593 |
| **Taxes - Property** | 38254 |
| **Telephone and Internet Expense** | 2196 |
| **Travel Expense** | 1874 |
| **Utilities** | |
| **ELECTRIC** | 5186 |
| **GAS** | 2882 |
| **Total Utilities** | 8068 |

| | |
|---|---|
| **Total Expense** | 475873 |
| **Net Ordinary Income** | 15462 |
| **Net Income** | **15462** |